UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>STEVEN WAYNE TOMPKINS,<br><br>Defendant | Criminal No. 25cr10334<br><br>Violations:<br><br>Counts One-Two: Extortion Under Color of Official Right<br>(18 U.S.C. § 1951)<br><br>Forfeiture Allegation:<br>(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)) |

INDICTMENT

At all times relevant to this Indictment:

General Allegations

1. The defendant, STEVEN WAYNE TOMPKINS ("TOMPKINS") was a resident of Boston, Massachusetts.

2. Defendant TOMPKINS is currently the Sheriff for the Suffolk County Sheriff's Department (the "SCSD"). TOMPKINS was first appointed Sheriff in 2013, elected as Sheriff in a special election in or about 2014, and thereafter gained election to successive six-year terms beginning in or about 2016. As SCSD Sheriff, TOMPKINS oversaw approximately 1000 SCSD correctional officers and other employees responsible for operating and maintaining correctional facilities in Boston at the House of Correction and Nashua Street Jail. From 2020 to 2022, TOMPKINS collected total yearly compensation of approximately $152,437, $161,911, and $172,783, respectively.

3. As SCSD Sheriff, TOMPKINS was a Massachusetts state employee. As a

1

Massachusetts state employee, TOMPKINS was subject to Massachusetts state ethics laws, including Massachusetts General Laws, Chapter 268A, which prohibited TOMPKINS from (i) soliciting or receiving anything of substantial value, for or because of his official position, or (ii) using his official position to obtain any unwarranted privilege of substantial value for himself, and that which was not properly available to other similarly situated individuals, M.G.L., c. 268A § 23(b)(2).

4. Sheriff TOMPKINS was aware of the above prohibitions because:

   a. In August 2015, TOMPKINS entered into a disposition agreement with the Massachusetts State Ethics Commission ("SEC") in which TOMPKINS acknowledged that he had read the prohibition of M.G.L., c. 268A § 23(b)(2) and admitted that he had violated such prohibition when, during his 2013 election campaign, TOMPKINS used his position as Sheriff to cause retail shop proprietors to take down his political opponent's campaign signs; and

   b. In November 2020, the SEC served TOMPKINS with a preliminary inquiry notice, informing TOMPKINS that he was being investigated for violations of M.G.L., c. 268A § 23(b)(2) stemming from TOMPKINS creating a paid position at the SCSD for his niece in or about 2017, which facilitated her to assist with TOMPKINS's childcare, and TOMPKINS using other SCSD staff to perform childcare for TOMPKINS from 2014 to at least 2020.[1]

5. "Company A" was a national cannabis cultivation and retail company that operated

---

[1] In March 2023, TOMPKINS entered into a disposition agreement with the SEC in which TOMPKINS acknowledged that he had read the prohibition of M.G.L., c 268A § 23(b)(2) and admitted that he had violated such prohibition when he hired his niece and used other SCSD staff to provide childcare for TOMPKINS.

2

cannabis dispensaries in Massachusetts and several other states. Company A, which conducted business in and affecting interstate commerce, was founded in approximately 2018 and became a publicly listed and traded company at the time of its initial public offering ("IPO") in or about 2021.

6. Prior to becoming a publicly listed company, sales of Company A stock[2] were restricted by various Company A agreements that generally prohibited transfers of shares, and by securities laws that prohibited the sale of non-public stock to the general public unless certain conditions were met.

7. "Individual A" was a Company executive and the owner of "Holding Company A." Individual A owned shares of non-public Company A stock through Holding Company A.

8. The Massachusetts Cannabis Control Commission (the "CCC") was charged with overseeing the regulation, approval, and licensure process for cannabis companies seeking to conduct business in Massachusetts. Cannabis companies operating in Massachusetts were required to renew their license on an annual basis with the CCC.

9. Cannabis companies that sought to operate in communities that had been disproportionately impacted by cannabis prohibition and enforcement were also required to implement a positive impact plan intended to benefit areas of disproportionate impact, as defined by the CCC (the "PIP Requirement"), as part of the licensure and annual licensure renewal process.

10. Company A[3] sought to open a retail cannabis dispensary in Boston, Massachusetts and applied to the CCC for a dispensary license beginning in or about 2019. To satisfy the PIP

---

[2] Equity interests in Company A had different names and took various forms over time, but for simplification will be referred to herein as "Company A stock."
[3] For purposes herein, references to Company A shall also include its Massachusetts subsidiary that applied for its Boston licensure with the CCC.

Requirement, Company A entered into a partnership with the SCSD whereby the SCSD would help screen and refer graduates of its re-entry program to apply for work at Company A's retail store. Company A's partnership with the SCSD was memorialized in a September 2019 letter signed by TOMPKINS on SCSD letterhead and submitted to the CCC in its completed dispensary license application in or about March 2020.[4]

11. In or about March 2021, the CCC approved a license for Company A to operate a cannabis dispensary in Boston. Thereafter, Company A submitted license renewal applications to the CCC in 2021, 2022, and 2023, which were each ultimately approved. In each of the renewal applications, Company A included its ongoing partnership with the SCSD as part of its fulfillment of the PIP Requirement.

### TOMPKINS's Extortion of Individual A

12. From in or about 2020 to July 2023, defendant TOMPKINS engaged in schemes to extort Individual A (i) into selling TOMPKINS a pre-IPO equity interest in Company A for $50,000 in exchange for TOMPKINS's favorable action or inaction as the SCSD Sheriff with respect to the SCSD's partnership with Company A, and (ii) thereafter refunding the entire $50,000 equity interest in Company A to defendant TOMPKINS at later dates in exchange for the same.

*Company A Looks Toward Initial Public Offering*

13. Since its inception in 2018, one of Company A's goals was to grow its cannabis business nationwide by raising sufficient capital to launch an IPO, and then continue its growth as a publicly traded company.

---

[4] On or about October 13, 2020, Company A, as part of its ongoing license application to the CCC, obtained an October 13, 2020 letter signed by TOMPKINS on SCSD letterhead and addressed to the CCC, which reaffirmed SCSD's partnership with Company A.

14. Because Company A was then a non-public, privately-owned company, Company A officials, including Individual A, sought large-scale, multimillion-dollar investments from institutions or other high net-worth, sophisticated investors in order to raise capital efficiently and in accordance with general restrictions applicable to the sale of privately-held securities. Company A officials, including Individual A, were not looking to raise capital from the general public or small, individual investors.

15. Beginning in or about mid-2020, Company A began the process of preparing for an IPO of Company A stock, which included producing audited financial statements, hiring attorneys for compliance with securities laws, and obtaining additional financing from large scale and high net-worth investors, among other things.

16. During this same approximate period in 2020, Company A was actively seeking to obtain its license from the CCC to operate a retail cannabis dispensary in downtown Boston. Being one of the first recreational marijuana dispensaries to open in downtown Boston was an important strategic goal for Company A's successful IPO launch.

*TOMPKINS Pressures Individual A to Sell TOMPKINS Pre-IPO Company A Stock*

17. Beginning in or about mid-2020 and continuing in the following months, TOMPKINS told Individual A on several occasions, in sum and substance, that TOMPKINS wanted to "take part in the IPO" and "wanted to get in on the stock so [he] could make some cannabis money." Individual A did not want to sell any pre-IPO Company A stock to TOMPKINS.

18. After being initially rebuffed in his requests to buy Company A stock before the IPO, TOMPKINS increased his pressure on Individual A to sell him Company A stock by reminding Individual A that TOMPKINS should get Company A stock because TOMPKINS had

helped Company A in its Boston licensing efforts and that Company A would continue to need TOMPKINS's help for license renewals.

19.  Finally, after increased pressure from TOMPKINS on Individual A, which caused Individual A to believe and fear that TOMPKINS would use his official position as Sheriff to jeopardize Company A's partnership with the SCSD, and thus imperil both (i) the dispensary license for Company A's cannabis store in Boston, and (ii) the timing of Company A's IPO, Individual A relented and agreed to TOMPKINS's demands for a pre-IPO interest in Company A stock.

*TOMPKINS Obtains a $50,000 Pre-IPO, Equity Interest in Company A Stock*

20.  As noted above, Individual A owned shares of pre-IPO Company A stock through Holding Company A. These shares, however, were subject to various Company A agreements that prohibited the general transfer of shares of pre-IPO Company A stock unless certain conditions were met, including compliance with securities laws, notice to other Company A stockholders, and even approval from the Company A board under certain circumstances.

21.  To circumvent these restrictions, but still allow TOMPKINS to acquire a pre-IPO equity interest in Company A, TOMPKINS and Individual A agreed that Individual A would sell TOMPKINS an ownership interest in Holding Company A. Holding Company A's sole asset was its ownership interest in Company A stock.

22.  To complete the transaction, TOMPKINS and Individual A did the following:

   a. On or about November 10, 2020, TOMPKINS wired a $50,000 payment from TOMPKINS's retirement account to an account controlled by Individual A.

6

b. On or about November 13, 2020, TOMPKINS entered into a side agreement ("Side Agreement") with Individual A whereby, in exchange for TOMPKINS's $50,000 payment, TOMPKINS received a percentage ownership interest in Holding Company A, "which was equal to 28,833 shares of [Company A stock]."

23. Based on TOMPKINS's $50,000 payment and receipt of equity equivalent to 28,833 shares of Company A stock, TOMPKINS paid a pre-IPO price of approximately $1.73 per share of Company A stock. After a reverse-split of Company A stock, which occurred just prior to the IPO, TOMPKINS held approximately 14,417 shares of Company A stock (at a per share price of approximately $3.46).

24. In or about mid-2021, Company A launched its IPO. At or around the time of the IPO, Company A stock had a value of approximately $9.60 per share. Thus, TOMPKINS's $50,000 purchase of 14,417 shares of Company A stock had appreciated to an approximate value of $138,403.

*TOMPKINS Demands His $50,000 Investment Back to Help Pay for Campaign and Personal Expenses*

25. In or about late 2021 to 2022, TOMPKINS was in the midst of a re-election campaign for Sheriff. To help pay for his campaign and other personal expenses, TOMPKINS demanded that Individual A refund TOMPKINS's $50,000 investment in Company A stock.

26. Although the Side Agreement did not grant TOMPKINS a guaranteed risk-free investment in Company A stock,[5] nor any unilateral authority to demand and receive his investment back, much less the full $50,000 payment, Individual A feared that if Individual A did

---

[5] The Side Agreement provided, in part, that: "The Buyer [TOMPKINS] is able to bear the economic risk of an investment ..., including the risk of a complete loss of his or her investment."

not agree to TOMPKINS's demands, TOMPKINS could use his official authority as Sheriff to terminate the SCSD's ongoing partnership with Company A and, thus, jeopardize Company A's Boston and other Massachusetts dispensary license renewals with the CCC.

27.  Therefore, even though Company A stock had decreased in price such that TOMPKINS's equity interest in Company A stock was worth several thousand dollars less than $50,000, Individual A agreed to TOMPKINS's demands for full repayment.

28.  From approximately May 2022 to July 2023, Individual A refunded TOMPKINS's $50,000 investment by issuing TOMPKINS five (5) checks. Moreover, in accordance with TOMPKINS's wishes, Individual A wrote memos "loan repayment" and "[company] expense" to disguise the nature of some of the payments:



8

## COUNTS ONE AND TWO
### Extortion
### (18 U.S.C. § 1951)

The Grand Jury charges:

29.  The Grand Jury re-alleges and incorporates by reference paragraphs 1 - 28 of this Indictment.

30.  From in or about mid-2020 to in or about July 2023, in the District of Massachusetts, and elsewhere, the defendant,

**STEVEN WAYNE TOMPKINS,**

did obstruct, delay, and affect, and attempt to obstruct, delay and affect, in any way and degree, commerce and the movement of any article and commodity in commerce, by extortion, as that term is defined in Title 18, United States Code, section 1951; that is, by obtaining property not due to the defendant, from Individual A with the consent of Individual A, under color of official right and by the wrongful use of fear, including fear of economic loss:

| Count | Transaction |
| --- | --- |
| 1 | Defendant TOMPKINS's acquisition of a pre-IPO $50,000 equity interest in Company A stock in November 2020 |
| 2 | Defendant TOMPKINS's obtaining the refund of his entire initial $50,000 equity investment in Company A stock from May 2022 to July 2023 |

All in violation of Title 18, United States Code, Section 1951(a).

## FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

1.  Upon conviction of one or more of the offenses in violation Title 18, United States Code, Section 1951, set forth in Counts One and Two, the defendant,

STEVEN WAYNE TOMPKINS,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses.

2.  If any of the property described in Paragraph 1, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendant --

   a. cannot be located upon the exercise of due diligence;
   b. has been transferred or sold to, or deposited with, a third party;
   c. has been placed beyond the jurisdiction of the Court;
   d. has been substantially diminished in value; or
   e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 1 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

A TRUE BILL

_Penny J. Sander_
FOREPERSON


_John T. Mulcahy_
JOHN T. MULCAHY
DUSTIN CHAO
ASSISTANT UNITED STATES ATTORNEYS
DISTRICT OF MASSACHUSETTS

District of Massachusetts: August 7, 2025
Returned into the District Court by the Grand Jurors and filed.

/s/Thomas F. Quinn @ 1:15pm.
DEPUTY CLERK

11