UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| _____ | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 25-CR-10334-MJJ |
| | ) | Leave to file granted on |
| STEVEN WAYNE TOMPKINS, | ) | October 10, 2025 |
| Defendant | ) | |
| | ) | |
| _____ | ) | |

## MOTION TO DISMISS

Now comes the defendant Steven Tompkins, by and through undersigned counsel, and, pursuant to Fed. R. Crim. P. 12, hereby respectfully moves this Honorable Court to dismiss Counts 1 and 2 of the Indictment in the above-captioned matter.

The Indictment is predicated upon a number of factual infirmities, which Mr. Tompkins categorically denies.  For example:

- Mr. Tompkins did not "engage[] in schemes to extort" the cannabis executive referred to as "Individual A." Dkt. 1 ¶ 12.

- Mr. Tompkins did not agree to an "exchange" of any equity interest in the cannabis company, referred to as "Company A," for any "favorable action or inaction as the [Suffolk County Sheriff's Department ('SCSD')] Sheriff." *Id.*

- Mr. Tompkins did not "cause[] Individual A to believe and fear that [Mr. Tompkins] would use his official position as Sheriff to jeopardize Company A's partnership with the SCSD." *Id.* ¶ 19.

But, even accepting, only for the purposes of this Motion to Dismiss, the facts set forth in the Indictment, they are legally insufficient to support a *quid pro quo* agreement to exchange Mr. Tompkins's official acts for payment, as required to obtain a conviction under 18 U.S.C. § 1951

1

for extortion under color of official right, in order to prevent federal overreach into issues more properly policed by state or local officials.  Instead, Mr. Tompkins made an investment as did many others, paid full value for it, and received no financial benefit not conferred on other buyers.

The Indictment alleges that Mr. Tompkins authored a letter on behalf of the SCSD acknowledging that Company A could hire graduates of the SCSD's "Common Ground Institute" ("CGI") to work in Company A's retail stores.  *See* Dkt. 1 ¶ 10; Exhibit A, September 5, 2019 Letter.  This letter was authored on September 5, 2019, many months before the Indictment alleges that any benefit to the defendant was requested or even contemplated, and more than a full year before the Indictment alleges that Mr. Tompkins received any equity interest in Company A.  There is no allegation that the letter was part of an agreement in which Mr. Tompkins would receive subsequent benefits a year-plus later, an essential element of any *quid pro quo* bribery scheme.  Any alleged benefit to the defendant thereafter was, at the very most, a mere gratuity insufficient as a matter of law to support conviction under the Supreme Court's recent opinion in *Snyder v. United States*, 603 U.S. 1 (2024) or under clear First Circuit precedents defining the essential elements of extortion.  Mere allegations of "fear," "pressure," and "demands" are not sufficient to establish extortion under color of official right.  Rather, there must be a *quid pro quo* agreement to exchange an official act for payment, which is lacking here.

The Indictment similarly fails to adequately allege that Mr. Tompkins received the equity interest in Company A, or the subsequent refund of his investment, through extortion.  To the contrary, the Indictment alleges that Mr. Tompkins paid $50,000 in exchange for an interest in a holding company that owned Company A's stock.  At the time that he requested repayment of

2

his investment, to help fund his re-election campaign, the value of the shares was higher than the $50,000 he requested.  Mr. Tompkins was entitled to receive the value of his equity interest, and his request to do so was not "wrongful" and therefore cannot support conviction.  *See United States v. Brissette*, 919 F.3d 670, 685 (1st Cir. 2019).

The Indictment neither alleges nor does the context show that signing a letter agreeing to employment opportunities for re-entering prisoners constitutes an official act within *McDonnell v. United States*, 579 U.S. 550 (2016).  The letter simply acknowledged that Company A would be permitted to hire graduates of the SCSD's CGI program, just as any reputable employer would be permitted to do.  Such a ministerial action cannot support a federal extortion prosecution of an elected state official.

The government's alternative theory of extortion by fear of economic loss similarly fails. Mr. Tompkins's letter confirming Company A's participation in the CGI program was not a material benefit, and there is no basis for inferring that the withdrawal of the ability to participate in the program would have doomed Company A's application or otherwise resulted in wrongful economic loss.  Company A, like all other Boston companies that obtained cannabis licensure, had dozens if not hundreds of options to satisfy the PIP requirement, including at least one such option that Company A listed in its original application and many others it listed in follow-up renewal filings.  *See* Exhibit B, Plan for Positive Impact on Areas of Disproportionate Impact (2020) (citing program to "contribute 0.5% of . . . net revenue to the WeGrow Foundation," which would "support eligible organizations and programs that provide service to," *inter alia*, "[p]ast or present residents of the geographic 'areas of disproportionate impact,' which have been defined by the Commission," and "Massachusetts residents who have past drug

convictions"); Exhibit C, Plan for Positive Impact on Areas of Disproportionate Impact (2021) (adding partnership with "The Last Prisoner Project . . . , a non-profit, cannabis criminal justice reform organization" and holding of "CORI expungement and record sealing clinics"); Exhibit D, Plan for Positive Impact on Areas of Disproportionate Impact (2022) (adding partnership "with MasscultivatED to hire formerly incarcerated individuals who have convictions for non-violent drug offenses"); Exhibit E, Plan for Positive Impact on Areas of Disproportionate Impact (2023-2024) (adding "[p]artnerships with social equity licensees to provide technical assistance").[1]  Consequently the allegation that Individual A was pressured to return the defendant's investment, dollar for dollar, for fear of the consequences of losing the support of the defendant is, to the extent the allegation is made that the Company would risk its CCC licensure upon the withdrawal of support by the defendant, a transparent fiction that does not support the alleged crime.

Finally, the Court should decline to construe the Hobbs Act in a manner that "expands federal criminal liability in a way that conflicts with principles of federalism."  *Ocasio v. United*

---

[1] In ruling on a motion to dismiss under Fed. R. Crim. P. 12, this Court may consider facts subject to judicial notice.  *See United States v. Gordon*, 634 F.2d 639, 642 (1st Cir. 1980).  Here, the Court may take judicial notice of the contents of the CCC applications, which are public records and are expressly relied upon by the Indictment.  *See, e.g.*, *Wiggins v. Ocwen Loan Servicing, LLC*, 722 F. App'x 415, 417 n.1 (6th Cir. 2018) (holding in civil case that "plaintiff's loan modification application and public records regarding her foreclosure" were "ripe for consideration at the motion-to-dismiss stage because they were either (a) public records subject to judicial notice, or (b) referred to in the complaint and central to plaintiff's claims"); *United States v. Bryant*, 556 F. Supp. 2d 378, 439 n.31 (D.N.J. 2008) (considering bylaws "central to the allegations in the Indictment" on motion to dismiss); *United States v. Gen. Dynamics Corp.*, 644 F. Supp. 1497, 1500 (C.D. Cal. 1986) ("If th[e] terms [of the relevant contract] make it clear that the indictment should not proceed, it would be a travesty if the Defendants were forced to engage in a lengthy trial with the inevitable result that the Court would then dismiss the indictment once the Contract came into evidence."), *rev'd on other grounds*.

*States*, 578 U.S. 282, 304 (2016) (Thomas, J., dissenting).  That statute in particular has "already served as the engine for a stunning expansion of federal criminal jurisdiction into a field traditionally policed by state and local laws—acts of public corruption by state and local officials." *Id.* (citation omitted).  Where, as here, there is substantial doubt regarding the scope of a federal criminal prohibition, the Court can and should limit the statute's application to its "solid core." *United States v. Skilling*, 561 U.S. 358, 407 (2010); *see also United States v. Brissette*, No. 16-CR-10137, 2020 WL 718294, at *12 (D. Mass. Feb. 12, 2020) (citing the need to "'define[] the forbidden zone of conduct' for public officials exercising their government authority 'with sufficient clarity,' thereby avoiding serious constitutional, federalism, and other policy concerns." (quoting *McCormick v. United States*, 500 U.S. 257, 273 (1991)); *id.* (also noting importance of "preserv[ing] states' 'prerogative to regulate the permissible scope of interactions between state officials and their constituents' by preventing federal prosecutors and courts from setting and policing 'standards of good government for local and state officials.'" (quoting *McDonnell*, 579 U.S. at 576-77)).  The instant prosecution, for reasons set forth *infra*, falls outside the "core" conduct that Congress sought to proscribe in enacting the Hobbs Act.

As further grounds and reasons for his Motion, Mr. Tompkins incorporates the below Memorandum of Law.

## REQUEST FOR ORAL ARGUMENT

Mr. Tompkins respectfully requests that oral argument be held on this Motion.

## MEMORANDUM OF LAW

### A.    Background[2]

Mr. Tompkins stands charged with two counts of Hobbs Act extortion.  These charges

stem from Mr. Tompkins's position as Sheriff for the SCSD and, specifically, the SCSD's

relationship with Company A, which operated cannabis dispensaries in Massachusetts and other

states.  *See* Dkt. 1 at ¶¶ 1, 5.

In 2019, Company A "sought to open a retail cannabis dispensary in Boston,

Massachusetts and applied to the [Cannabis Control Commission ('CCC')] for a dispensary

license . . . ."  *Id.* ¶ 10.  The CCC required "companies that sought to operate in communities that

had been disproportionately impacted by cannabis prohibition and enforcement . . . to implement

a positive impact plan intended to benefit areas of disproportionate impact [referred to as the

'PIP requirement'], as defined by the CCC . . . , as part of the licensure and annual licensure

renewal process."  *Id.* ¶ 9.  "To satisfy the PIP Requirement," amongst other initiatives designed

to satisfy this condition, "Company A entered into a partnership with the SCSD whereby the

SCSD would help screen and refer graduates of its re-entry program to apply for work at

Company A's retail store."  *Id.* ¶ 10.  This "partnership . . . was memorialized in a September

2019 letter signed by [Mr. Tompkins] on SCSD letterhead and submitted to the CCC in its

completed dispensary license application in or about March 2020."  *Id.*

It was not until months after Mr. Tompkins signed the letter, and Company A submitted

its application (including the letter) to the CCC, that, according to the Indictment, "[b]eginning

---

[2] Except where otherwise noted, the below facts are taken from the Indictment and accepted as
true only for purposes of this Motion to Dismiss.  Mr. Tompkins reserves the right to contest any
and all of these facts at an eventual trial in this matter.

in or about mid-2020," Mr. Tompkins told an executive of Company A ("Individual A") that Mr.

Tompkins "wanted to 'take part in [an] IPO'" that Company A planned to undertake and

"wanted to get in on the stock so [he] could make some cannabis money." *Id.* ¶ 17.  Mr.

Tompkins allegedly "remind[ed] Individual A that [Mr. Tompkins] should get Company A stock

because [Mr. Tompkins] had helped Company A in its Boston licensing efforts and that

Company A would continue to need [Mr. Tompkins's] help for license renewals," which if

credible would at most constitute a gratuity which is outside the parameters of § 1951.  *Id.* ¶ 18.

Ultimately, "after increased pressure from [Mr. Tompkins] on Individual A, . . . Individual A

relented and agreed to [Mr. Tompkins's] demands for a pre-IPO interest in Company A stock."

*Id.* ¶ 19.  Mr. Tompkins paid $50,000 to Individual A and "received a percentage ownership

interest" in a holding company, which purported to have a value of $50,000 of Company A's

stock (equivalent to 14,417 shares priced at $3.46 per share) but lacked the liquidity that direct

ownership of shares of Company A stock would provide.  *Id.* ¶¶ 22, 23.  Company A launched

its IPO in "mid-2021."  *Id.* ¶ 24.

     While, after Mr. Tompkins's purchase, the value of Company A's stock initially

increased in value, *see id.* ¶ 24, the stock subsequently "decreased in price such that [Mr.

Tompkins's] equity interest . . . was worth several thousand dollars less than $50,000 . . . ."  *Id.*

¶ 27.  In "late 2021 to 2022," Mr. Tompkins is alleged to have "demanded that Individual A

refund [his] $50,000 investment in Company A stock."  *Id.* ¶ 25.  Publicly available data

demonstrates that throughout 2021, and until April 2022, Company A's stock price remained

above the $3.46 price upon which Individual A allegedly based his sale of a percentage interest

in the holding company. *See* Exhibit F at 21-25.[3]  Individual A subsequently issued Mr.

Tompkins a series of five checks from May 2022 to July 2023, for a total amount of $50,000.

*See* Dkt. 1 at ¶ 28.  Had Individual A repaid Mr. Tompkins for his investment when asked, Mr.

Tompkins would have received less money than if Individual A had simply given him shares of

Company A's stock rather than an interest in a holding company because, at all times in "late

2021" and until April 2022, the price of the stock was higher than the ostensible purchase price

that Mr. Tompkins asked to be refunded.

For the Court's convenience, the defense provides the below timeline of relevant events

alleged in the Indictment and/or subject to judicial notice:

| **Date** | **Event** |
|---|---|
| 2013 | Mr. Tompkins appointed Sheriff. *Id.* ¶ 2. |
| 2016 | Mr. Tompkins re-elected. *Id.* |
| 2018 | Company A founded. *Id.* ¶ 5. |
| 2019 | Company A applied to the CCC for a dispensary license. *Id.* ¶ 10. |
| September 2019 | Mr. Tompkins signed a letter confirming Company A's participation in the CGI program. *Id.* |
| March 2020 | Company A submitted the September 2019 letter to the CCC in its completed dispensary license application. *Id.* |
| Mid-2020 | Company A began the process of preparing for an IPO. *Id.* ¶ 15. |
| Mid-2020 | Mr. Tompkins allegedly asked to take part in Company A's IPO. *Id.* ¶ 17. |

---

[3] The Court may take judicial notice of Company A's publicly available historical stock price. *See, e.g.*, *Warren v. Zapata Computing, Inc.*, No. 23-CV-13197, 2025 WL 1556040, at *7 & n.12 (D. Mass. June 2, 2025) (citing cases).

| | |
|---|---|
| October 13, 2020 | Mr. Tompkins signed a letter reaffirming the SCSD's relationship with Company A. *Id.* at page 4 n.4. |
| November 9, 2020 | Company A submitted its first renewal application to the CCC, including WeGrow Foundation partnership as alternative means of satisfying the PIP requirement. |
| November 10, 2020 | Mr. Tompkins wired $50,000 to Individual A. Dkt. 1 at ¶ 22a. |
| November 13, 2020 | Mr. Tompkins and Individual A entered an agreement for Mr. Tompkins to receive an ownership interest in a company holding Company A's stock in exchange for the $50,000 payment. *Id.* ¶ 22b. |
| March 2021 | CCC approved the license for Company A to operate a cannabis dispensary in Boston. *Id.* ¶ 11. |
| Mid-2021 | Company A launched its IPO. *Id.* ¶ 24. |
| November 15, 2021 | Company A submitted its second renewal application to the CCC, including "WeGrow Foundation" partnership, "Last Prisoner Project" partnership, and "CORI expungement" clinics as alternative means of satisfying the PIP requirement. Exhibit C. |
| Late 2021 to 2022 | Mr. Tompkins asked for a refund of his $50,000 investment. Dkt. 1 at ¶ 25. |
| Late 2021 to April 2022 | Company A's stock price remained above the $3.46 ostensible purchase price. |
| May 27, 2022 | Individual A issued Mr. Tompkins a check for $12,500. *Id.* ¶ 28. |
| September 9, 2022 | Individual A issued Mr. Tompkins a check for $12,500. *Id.* |
| October 2, 2022 | Individual A issued Mr. Tompkins a check for $12,000. *Id.* |
| December 27, 2022 | Individual A issued Mr. Tompkins a check for $12,000. *Id.* |
| January 6, 2023 | Company A submitted its third renewal application to the CCC, including "MasscultivatED" partnership, "Last Prisoner Project" partnership, and "CORI expungement" clinics as alternative means of satisfying the PIP requirement. Exhibit D. |
| July 9, 2023 | Individual A issued Mr. Tompkins a check for $1,000. Dkt. 1 at ¶ 28. |

The government alleges that Mr. Tompkins received the equity interest and the subsequent refund after Company A's IPO "in exchange for [Mr. Tompkins's] favorable action or inaction as the SCSD Sheriff with respect to the SCSD's partnership with Company A." *Id.* ¶ 12. The government additionally asserts that Individual A gave Mr. Tompkins the equity interest because he feared Mr. Tompkins "would use his official position as Sheriff to jeopardize Company A's partnership with the SCSD, and thus imperil both (i) the dispensary license for Company A's cannabis store in Boston, and (ii) the timing of Company A's IPO . . . ." *Id.* ¶ 19; *see also id.* ¶ 26 (alleging that "Individual A feared that if Individual A did not agree to [Mr. Tompkins's] demands" for a refund, Mr. Tompkins "could use his official authority as Sheriff to terminate the SCSD's ongoing partnership with Company A and, thus, jeopardize Company A's Boston and other Massachusetts dispensary license renewals with the CCC"). Nowhere does the Indictment allege an agreement linking the earlier supportive letters to Mr. Tompkins's subsequent opportunity to invest in Company A or the later refund of that investment, *i.e.*, there was no *quid pro quo* agreement as required to support conviction.

## B.    Legal Standards

The Fifth Amendment to the United States Constitution guarantees, "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . ." The Sixth Amendment independently requires that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation . . . ." In addition to protecting these fundamental rights of defendants, criminal indictments also serve "to inform the court of the facts alleged, so that it may decide whether

they are sufficient in law to support a conviction, if one should be had." *Russell v. United States*,

369 U.S. 749, 768 (1962) (citation omitted).

"[I]t is **not** sufficient" for an indictment "to set forth the offence in the words of the

statute, unless those words of themselves fully, directly, and expressly, without any uncertainty

or ambiguity, set forth **all** the elements necessary to constitute the offence intended to be

punished." *United States v. Carll*, 105 U.S. 611, 612 (1881) (emphasis added); *see also Russell*,

369 U.S. at 765 ("It is an elementary principle of criminal pleading, that where the definition of

an offence . . . includes generic terms, it is not sufficient that the indictment shall charge the

offence in the same generic terms . . . but it must state the species,—it must descend to

particulars." (citation omitted)); *Hughes v. United States*, 340 F.2d 609, 610 (1st Cir. 1965) ("[I]t

is insufficient to charge simply in the language of the statute if the statute itself failed to set forth

expressly, fully, and clearly all elements necessary to constitute the offense." (citation omitted)).

The *Carll* Court, for example, held an indictment for uttering a forged obligation of the United

States insufficient for its omission of the requirement, imposed by judicial precedent, "that the

defendant knew the instrument which he uttered to be false, forged, and counterfeit." 105 U.S. at

613.

"An indictment is [also] ripe for dismissal if the facts" alleged by the government

"demonstrate that, as a matter of law, the prosecution will not be able to prove each of the

elements of the charged offense." *United States v. Sidoo*, 468 F. Supp. 3d 428, 436 (D. Mass.

2020). Accordingly, a defendant may move to dismiss on the grounds that "the specific facts

alleged . . . fall beyond the scope of the relevant criminal statute, as a matter of statutory

interpretation." *United States v. Willis*, 844 F.3d 155, 162 (3d Cir. 2016) (citation omitted); *see*

*also United States v. Enmons*, 410 U.S. 396, 401 (1973) (affirming dismissal of Hobbs Act indictment because statute "does not apply to the use of force to achieve legitimate labor ends"); *United States v. Panarella*, 277 F.3d 678, 685 (3d Cir. 2002) (rejecting government argument "that an indictment . . . charges an offense . . . as long as it recites in general terms the essential elements of the offense, even if the specific facts alleged in the charging instrument fail to satisfy those elements"), *abrogated on other grounds by Skilling*, 561 U.S. at 410; *United States v. Nosal*, No. 08-CR-0237, 2010 WL 934257, at *2 (N.D. Cal. Jan. 6, 2010) ("General conclusory allegations need not be credited . . . when they are belied by more specific allegations in the [indictment]." (citation omitted) (alteration in original)), *aff'd*, 676 F.3d 854 (9th Cir. 2012). This analysis is part of the Court's "duty to review the Government's Indictment and confirm that a legally deficient charge does not go to the jury."  *United States v. Pimenta*, No. 14-CR-649, 2015 WL 6502098, at *5 (D.N.J. Oct. 27, 2015) (dismissing charge because factual allegations failed to satisfy element of offense).

## C.    Argument

### i.    *Dismissal is required for failure to allege quid pro quo bribery*

As the Supreme Court has recently explained in the context of the federal programs bribery statute, 18 U.S.C. § 666, federal law:

> distinguish[es] between two kinds of payments to public officials—bribes and gratuities.  As a general matter, bribes are payments made or agreed to *before* an official act in order to influence the official with respect to that future official act. American law generally treats bribes as inherently corrupt and unlawful.  But the law's treatment of gratuities is more nuanced. Gratuities are typically payments made to an official *after* an official act as a token of appreciation. . . .  *[G]ratuities after the official act are not the same as bribes before the official act*. After all, unlike gratuities, bribes can corrupt the official act—

meaning that the official takes the act for private gain, not for the
public good.

*Snyder*, 603 U.S. at 5-6 (emphasis added).

The First Circuit, before *Snyder*, had held that extortion under color of official right
requires "a quid pro quo," meaning "the giving of something of value -- the quid -- in exchange
for influence over some official conduct of the recipient -- the quo." *United States v. DeQuattro*,
118 F.4th 424, 444 (1st Cir. 2024) (citation omitted); *see also United States v. Correia*, 55 F.4th
12, 29 (1st Cir. 2022) ("[T]he offense is completed at the time when the public official receives a
payment in return for his agreement to perform specific official acts . . . ." (quoting *United States
v. Turner*, 684 F.3d 244, 253 (1st Cir. 2012)).  This is a hallmark of bribery.  *See United States
v. Fernandez*, 722 F.3d 1, 19 (1st Cir. 2013) ("[F]or bribery there must be a *quid pro quo*—a
specific intent to give or receive something of value in exchange for an official act.  An illegal
gratuity, on the other hand, may constitute merely a reward for some future act that the public
official will take (and may already have determined to take), *or for a past act that he has already
taken*." (quoting *United States v. Sun-Diamond Growers of Calif.*, 526 U.S. 398, 404-05 (1999)).
The Supreme Court has also described this prong of Hobbs Act extortion as "the rough
equivalent of what we would . . . describe as 'taking a bribe.'"  *Evans v. United States*, 504 U.S.
255, 260 (1992).  As the Supreme Court noted in *Snyder*, "[t]he Government identifie[d] no . . .
provision in the U. S. Code that prohibits bribes and gratuities in the same provision."  603 U.S.
at 13.

*Snyder* was decided in a manner consistent with First Circuit § 1951 color of right law,
holding that the federal programs bribery statute applies only to bribes, not gratuities.  *See id.* at
10.  The defense respectfully contends that the same is true of the Hobbs Act's prohibition on

extortion under color of official right.  Several of the considerations that led the *Snyder* Court to hold that the federal programs bribery statute does not include gratuities are equally applicable to the analysis under the Hobbs Act.  First, the "statutory punishments" suggest that § 1951 does not extend to gratuities.  603 U.S. at 13.  "[A]ccepting an illegal gratuity as a federal official is punishable by only up to 2 years."  *Id.*  Accordingly, the Hobbs Act, which carries a 20-year maximum sentence, should not be construed to apply to that same conduct.  Second, this result is supported by federalism concerns.  "The carefully calibrated policy decisions that the States and local governments have made about gratuities would be gutted" if the Hobbs Act were read to encompass all such conduct.  *Snyder*, 603 U.S. at 14.  The Indictment's allegation that Mr. Tompkins violated state ethics statutes, *see* Dkt. 1 at ¶¶ 3-4, underscores the risk that the government's theory of prosecution is outside the heartland and even the precedential ambit of § 1951.  *See Brissette*, 2020 WL 718294, at *1 ("The Hobbs Act does not empower federal prosecutors to use the criminal law to enforce . . . a state code of conduct that itself has no criminal or even civil penalties, or a local government policy.").  Third, a broad reading of § 1951 would violate principles of fair notice, "creat[ing] traps for unwary state and local officials."  *Snyder*, 603 U.S. at 15.  "It is unfathomable that Congress would authorize a [20]- year criminal sentence for gifts to 19 million state and local officials without any coherent federal guidance (or any federal guidance at all) about how an official can distinguish the innocuous from the criminal."  *Id.* at 17.  The Sixth Circuit recently cited *Snyder*'s analysis of the difference between bribes and gratuities in the context of upholding a Hobbs Act prosecution. *See United States v. Sittenfeld*, 128 F.4th 752, 761 n.1 (6th Cir. 2025).

Here, the Indictment on its face refutes any conceivable inference that Mr. Tompkins and Individual A agreed to exchange an ownership interest in a company holding the stock in Company A for Mr. Tompkins's September 2019 letter.  The letter consisted of only three substantive sentences, "confirm[ing] that the [SCSD] has agreed to partner with [Company A] to refer and help screen appropriate candidates for employment in their retail stores.  The candidates will be graduates of our Common Ground Institute (CGI) re-entry program.  As part of the CGI program, the Sheriff's Department trains and prepares candidates for employment and regularly works with employers who are willing to hire them."  Exhibit A.  The letter was authored and submitted months before the Indictment alleges that Mr. Tompkins even raised the issue of Company A's stock for the first time, and more than a full year before he obtained any equity interest in the company.  *See* Dkt. 1 ¶¶ 10, 17, 22.  While "the timing of the <u>payment</u> may not provide a conclusive answer as to whether [a] payment is a bribe or a gratuity, . . . the timing of the <u>agreement to make or receive a payment</u> may."  *Correia*, 55 F.4th at 31 (quoting *Fernandez*, 722 F.3d at 19).  "[T]he agreement to exchange a thing of value for an official act" must be "made before the act is performed."  *Id.*  Taking the Indictment's allegations at face value, there could not possibly have been any agreement to exchange Mr. Tompkins's September 2019 letter for a payment that was not discussed until approximately nine months later.  The Indictment does allege that Mr. Tompkins authored a second letter in October 2020, but that letter still preceded the transfer of any equity interest to Mr. Tompkins, and there is no allegation that Mr. Tompkins's opportunity to invest in Company A was part of a *quid pro quo* exchange for the earlier letters.  Dkt. 1 at page 4 n.4.  There is further, more generally, no allegation that Mr. Tompkins and Individual A agreed to exchange stock in Company A for Mr.

15

Tompkins's support of renewal applications.  Even if Individual A may have hoped that Mr. Tompkins would support the renewal applications, that would be at most a mere gratuity insufficient to support conviction.  *See Fernandez*, 722 F.3d at 19 ("An illegal gratuity . . . may constitute merely a reward for some future act that the public official will take . . . .").

      **ii.**      ***Dismissal is required for failure to allege extortionate demand where Mr. Tompkins paid full value for his investment and had a right to sell it***

The facts alleged in the Indictment refute any claim that Mr. Tompkins "obtained" the equity interest in Company A or later refund "by . . . extortion," as required for conviction under § 1951.  With respect to Count 1, Mr. Tompkins paid $50,000 for his equity interest in Company A.  The Indictment contains no allegation that this price was discounted.  The mere allegation that Mr. Tompkins asked to "take part in the IPO" and "remind[ed] Individual A that" Mr. Tompkins "should get Company A stock because" Mr. Tompkins "had helped Company A . . . and that Company A would continue to need" his "help for license renewals" cannot convert an everyday business transaction into a federal crime punishable by 20 years imprisonment.   Dkt. 1 ¶¶ 17-18.  The law is clear that, even assuming *arguendo* Individual A feared the SCSD would withdraw its permission for Company A to participate in the CGI program, such fear is, without more, insufficient as a matter of law.  *See United States v. Brissette*, 919 F.3d 670, 685 (1st Cir. 2019) (noting that fear of economic harm "is not necessarily wrongful for Hobbs Act purposes" because "fear of economic harm is part of many legitimate business transactions" and "may also be a necessary consequence of many legitimate exercises of official authority." (citations omitted)).

The argument for dismissal on this basis is even stronger with respect to Count 2.  Had Individual A simply provided Mr. Tompkins with Company A stock, Mr. Tompkins would have

been free to sell it at any time. Instead, Individual A gave Mr. Tompkins an illiquid investment in a holding company that owned the stock. Additionally, had Individual A liquidated Mr. Tompkins's investment when Mr. Tompkins asked for the return of the investment in "late 2021 to 2022," the proceeds of selling the Company A stock would have exceeded the $50,000 repayment that Mr. Tompkins had requested to help fund his re-election campaign. Dkt. 1 ¶ 25. In short, after making the investment, Mr. Tompkins had a right to sell it. His request to do so was not "wrongful" and not criminal. The suggestion of any extortionate demand by Mr. Tompkins is further undermined by the fact that it took Individual A 14 months to fully refund his investment. *Id.* ¶ 28.

### iii.    *Dismissal is required for failure to allege official act exchanged for payment*

The Indictment also fails to sufficiently allege the existence of any requisite official act taken by Mr. Tompkins in exchange for the benefits he received. The Supreme Court has held that the federal bribery statute's reference to an "official act," *see* 18 U.S.C. § 201, requires that the public official in question "make a decision or take an action on [a] 'question, matter, cause, suit, proceeding or controversy,' or agree to do so." *McDonnell*, 579 U.S. at 574. The matter at issue "must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee," which must also "be something specific and focused that is 'pending' or 'may by law be brought' before a public official." *Id.* "'Pending' and 'may by law be brought' suggest something that is relatively circumscribed—the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete. In particular, 'may *by law* be brought' conveys something within the

17

specific duties of an official's position—the function conferred by the authority of his office." *Id.* at 570.

Not every "favorable action or inaction" by a public official will suffice. *See* Dkt. 1 at ¶ 12; *Woodward v. United States*, 905 F.3d 40, 45 (1st Cir. 2018) (discussing Second Circuit opinion holding that definition of official act to include "any action taken or to be taken under color of official authority" did not comport with *McDonnell* (citing *United States v. Silver*, 864 F.3d 102 (2d Cir. 2017)). "[A] typical meeting, telephone call, or event arranged by a public official," for example, is not an official act. *McDonnell*, 579 U.S. at 568.

While § 1951 does not expressly include the term "official act," the Supreme Court in *McDonnell* assumed based on the parties' agreement that the Hobbs Act includes that element. *See id*. at 580. Additionally, both the Supreme Court and the First Circuit have used the term "official act" to describe the requirements for conviction under the Hobbs Act. *See Correia*, 55 F.4th at 29 ("To prove this type of extortion, the government must 'show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for ***official acts***.'" (quoting *Ocasio*, 578 U.S. at 285) (emphasis added)). Other courts of appeals have applied *McDonnell* in this context. *See United States v. Hills*, 27 F.4th 1155, 1175 (6th Cir. 2022) (applying *McDonnell*'s official act requirement to Hobbs Act); *United States v. Mayweather*, 991 F.3d 1163, 1185 (11th Cir. 2021) ("All of the Supreme Court's concerns about the government's expansive definition of 'official act'—lawful interactions between state officials and constituents, vagueness, and federalism—are equally applicable to this case and establish the importance of giving guidance to the jury by defining the alleged 'official act' at issue in each Hobbs Act extortion case."); *United States v. Skelos*, 988 F.3d 645, 656 (2d Cir.

18

2021) (finding Hobbs Act instructions erroneous because they "failed to require that the 'specific and focused question or matter' on which [the defendant] was expected to take official action be identified at the time of the payment").

The concerns motivating the Supreme Court's restrictive reading of "official act" in § 201 are equally applicable to the Hobbs Act. Absent this requirement, the offense lacks "sufficient definiteness that ordinary people can understand what conduct is prohibited" and opens the door to "arbitrary and discriminatory enforcement." *McDonnell*, 579 U.S. at 576 (quoting *Skilling*, 561 U.S. at 402-03). Under an uncabined reading of the statute, "public officials could be subject to prosecution, without fair notice, for the most prosaic interactions," raising "serious" Due Process concerns. *Id.* There are also federalism interests served by a narrow interpretation. "[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance." *United States v. Bass*, 404 U.S. 336, 349 (1971). "This principle applies when Congress intends to pre-empt the historic powers of the States or when it legislates in traditionally sensitive areas that affec[t] the federal balance." *Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533, 543 (2002) (citation omitted) (alteration in original). "A State defines itself as a sovereign through the structure of its government, and the character of those who exercise government authority. That includes the prerogative to regulate the permissible scope of interactions between state officials and their constituents." *McDonnell*, 579 U.S. at 576 (citation omitted). Federal bribery statutes should not be construed "in a manner that leaves [their] outer boundaries ambiguous and involves the Federal Government in setting standards of good government for local and state officials." *Id.* at 577 (citation omitted). These

19

considerations apply with equal force to prosecutions under the Hobbs Act for extortion under color of official right.

The Indictment at issue here, on its face, fails to charge that Mr. Tompkins engaged in any "official act," or that Individual A intended for him to engage in any such act, in exchange for any payment or benefit. This fact alone warrants dismissal. "Indictments must 'contain[] the elements of the offense charged and fairly inform[] a defendant of the charge against which he must defend . . . .'" *United States v. Johnson*, 981 F.3d 1171, 1179 (11th Cir. 2020) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974) (alterations in original)). Under *McDonnell* and the other precedents cited *supra*, in order to sustain a conviction under § 1951, the government is required to prove an "official act" by the public official in exchange for the alleged bribe. That term appears nowhere in the Indictment in this case. The mere fact that the Indictment "track[s] statutory language" does not insulate it from challenge where the charging document fails to include an element held by judicial precedent to be required for conviction. *See id.* at 1179-80; *Carll*, 105 U.S. at 612 ("[I]t is not sufficient to set forth the offence in the words of the statute, unless those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished . . . ."); *Hughes*, 340 F.2d at 610 (similar).

The Indictment does not even expressly identify a single act that Mr. Tompkins allegedly took in exchange for payment. Instead, it vaguely asserts that Mr. Tompkins promised "favorable action or inaction as the SCSD Sheriff with respect to SCSD's partnership with Company A." Dkt. 1 at ¶ 12. This provides insufficient notice of the charges. The lack of notice is especially problematic given that (a) binding First Circuit precedent makes clear that

not any "favorable action or inaction" by a public official is an official act, *Woodward*, 905 F.3d at 45; and (b) one of the few specific acts by Mr. Tompkins alleged in the Indictment, his September 2019 letter, could not possibly have been part of any *quid pro quo* exchange for reasons set forth *supra*.

Moreover, the signing of a letter to the CCC merely "confirm[ing]" Company A's participation in the SCSD's pre-existing re-entry program does not constitute an official act. *See Silver*, 864 F.3d at 120 ("[U]sing government letterhead is not, by itself, a formal exercise of government power on a matter similar to a hearing or lawsuit."). CGI is "a vocational training and re-entry program that teaches marketable vocation skills in a classroom setting and allows inmates to hone those skills by renovating public lands and facilities throughout Suffolk County. One of CGI's most unique features is its job placement component for graduates with employers who hire with full knowledge of the offender's criminal history." Massachusetts Sheriffs' Association, Suffolk County Sheriff's Office (last visited Oct. 8, 2025).[4] Given the purpose of the program, Mr. Tompkins would allow any reputable employer to hire graduating inmates, just as he did for Company A. And Company A did not prove to be a significant employer of program graduates, hiring, at most, two applicants through the program. *See* Exhibit C, Plan for Positive Impact on Areas of Disproportionate Impact at 2 (2021). To hold that the mere signing of a letter confirming an employer's ability to participate in such a widely available program constitutes an "official act" under *McDonnell* would be to trivialize that requirement, one of the very purposes of which was to avoid a construction of the Hobbs Act "that leaves its outer

---

[4] *Available at* https://www.masssheriffs.org/suffolk-county-sheriffs-office.

boundaries ambiguous and involves the Federal Government in setting standards of good government for local and state officials." 579 U.S. at 577 (citation omitted). Certainly, the alleged conduct at issue here is far afield from paradigmatic examples of official acts, such as legislative votes and procurement decisions. *See, e.g.*, *United States v. Woodward*, No. 17-CV-12036, 2017 WL 4684000, at *6 (D. Mass. Oct. 18, 2017) (Woodlock, J.) ("Leading the opposition to a major piece of legislation plainly qualifies as an 'official act' under *McDonnell*. So too would the many instances where [the defendant] 'carried' pro-insurance bills through the legislative process after they left the committee." (citation omitted)); *cf. United States v. Tavares*, 844 F.3d 46, 57 (1st Cir. 2016) (finding official act requirement under state gratuity statute not satisfied where the evidence failed to show that a state representative "subsequently introduced a bill based on either of [the defendant's] proposals or took some official act with respect to such a bill proposed by another legislator").

### iv.    *Dismissal is required for failure to allege reasonable fear of wrongful economic loss*

In addition to extortion under color of official right, the Indictment alternatively alleges that Mr. Tompkins violated the Hobbs Act "by the wrongful use of fear, including fear of economic loss." Dkt. 1 ¶ 30. While fear of economic loss may support conviction, "[t]he loss feared must be a particular economic loss, not merely the loss of a potential benefit." *United States v. Falcon-Nieves*, 79 F.4th 116, 140 (1st Cir. 2023) (citation omitted). And the victim's fear of such economic loss must be reasonable. *See, e.g.*, *United States v. Cruz-Arroyo*, 461 F.3d 69, 74 (1st Cir. 2006). The only allegation in the Indictment on this point is that Individual A feared Mr. Tompkins "would use his official position as Sheriff to jeopardize Company A's partnership with the SCSD . . . ." Dkt. 1 ¶ 19. More specifically, the Indictment alleges that

Company A used its participation in the SCSD's CGI program "as part of its fulfillment of the PIP Requirement" in its renewal applications to the CCC. *Id.* ¶ 11. This allegation is insufficient for multiple reasons.

First, the Honorable Judge Sorokin has held that, where a prosecution "hinge[s] solely on the defendant['s] status as [a] public official[] and ar[i]se[s] exclusively from actions [he] undertook in that capacity, the decisions of the Supreme Court require[] the government to allege and prove the existence of a quid pro quo" in order to sustain a Hobbs Act conviction under any theory. *Brissette*, 2020 WL 718294, at *1. Where, as here, "the government's theory supporting the threats and wrongfulness elements of extortion . . . rests solely on actions undertaken by the defendant[] using [his] authority as [a] public official[], . . . all of the same considerations that caused the Supreme Court to reject 'expansive interpretation[s]' of federal criminal law proposed by the government in the 'color of official right' context apply with equal force . . . ." *Id.* at *12 (quoting *McDonnell*, 579 U.S. at 573). For all of the reasons set forth *supra*, the Indictment fails to adequately allege *quid pro quo* bribery.

Second and independently, loss of the SCSD's partnership, in itself, does not constitute economic loss as a matter of law. And the facts alleged in the Indictment do not support a plausible inference that such loss would have jeopardized Company A's license in any respect. To the contrary, the SCSD program was only "***part***" of what Company A used to satisfy the PIP requirement. The applicable CCC standards, moreover, do not impose any particular demands that would invariably require the SCSD's support. To the contrary, the CCC asked applicants to "establish" their own "specific goals that will make a positive impact on one or more of . . . five groups" of disadvantaged persons. CCC, Guidance on Plans to Positively Impact

Disproportionately Harmed People at page 3 (Jan. 16, 2020).[5]  Applicants were expressly

"encourage[d] . . . to develop [their] own goals, especially by taking and considering input from

the disproportionately harmed people and/or communities . . . ."  *Id.*  Similarly, applicants

"should develop and individualize [their] own programs to reach [their] goals."  *Id.*  And the

renewal applications irrefutably indicate that Company A utilized many alternative options of

satisfying the PIP requirement, omitting any reference to the SCSD altogether in its fourth

renewal application.  *See supra* at pages 3-4.  In these circumstances, the Indictment fails to

adequately allege that a reasonable person in Individual A's circumstances would have feared

any economic loss resulting from the potential withdrawal of the SCSD's support.

        Third, the Indictment fails to adequately allege that Mr. Tompkins used "wrongful

means" to achieve a "wrongful purpose."  *Brissette*, 2020 WL 718294, at *13; *see also, e.g.*,

*United States v. Burhoe*, 871 F.3d 1, 9 (1st Cir. 2017) ("Setting aside the issue of wrongful ends

. . . , there is also another principle in play—namely, that the means used to obtain the end must

also be wrongful." (citation omitted)).  These are important limitations because "fear of

economic harm is a part of many legitimate business transactions," as well as "a necessary

consequence of many legitimate exercises of official authority."  *Brissette*, 919 F.3d at 685

(citation omitted).  The mere allegation that Mr. Tompkins violated state ethical standards, not

even punishable criminally under state law, is not sufficient.  *See Brissette*, 2020 WL 718294, at

*18.

---

[5] *Available at* https://masscannabiscontrol.com/wp-content/uploads/2020/01/Guidance-on-Plans-to-Positively-Impact-Disproportionately-Harmed-People-1.pdf.

v.    *Alternatively, dismissal is required for failure to allege that Mr. Tompkins received benefits under color of his office*

Mr. Tompkins alternatively and independently preserves the argument, discussed favorably by two current and one former Supreme Court Justices, that "*Evans* erred in equating common-law extortion with taking a bribe." *Ocasio*, 578 U.S. at 302 (Thomas, J., dissenting); *see also id.* at 300 (Breyer, J., concurring) ("agree[ing] with the sentiment expressed in the dissenting opinion of" Justice Thomas that *Evans* "may well have been wrongly decided," but concluding that the Court was nonetheless bound by *Evans*); *Silver v. United States*, 141 S. Ct. 656, 657 (2021) (Gorsuch, J., and Thomas, J., dissenting) (opining that Justices "would have granted this case to reconsider *Evans* in light of the[] thoughtful criticisms" by Justices Thomas and Breyer).

As Justice Thomas observed in dissent, the *Evans*'s majority's reading of the Hobbs Act as essentially a prohibition on bribery "bears scant resemblance to the common-law crime Congress presumably codified in 1946." *Evans*, 504 U.S. at 280 (Thomas, J., dissenting).  At common law, "[t]he 'under color of office' element of extortion . . . had a definite and well-established meaning." *Id.* at 279.  "[I]t was essential that the money or property be obtained under color of office, *that is, under the pretense that the officer was entitled thereto by virtue of his office.*" *Id.* (citation omitted); *see also id.* at 281 (citing *Collier v. State*, 55 Ala. 125 (1877), which held it was not extortion for a local prosecutor to provide legal advice to a criminal suspect for a fee because, "[t]hough the defendant may have been guilty of official infidelity, the wrong was to the State only, and no wrong was done the person paying the money"); *id.* at 282 n.3 (citing other cases); Kate Stith, *No Entrenchment: Thomas on the Hobbs Act, the Ocasio Mess, and the Vagueness Doctrine*, 127 Yale L.J. Forum 233, 234 (2017) (describing Justice

25

Thomas's reading of the common law as requiring that "[t]he official . . . dupe[d] the payor into thinking that the official was *due* the payment"). The Indictment here does not support any plausible inference that Individual A believed Mr. Tompkins **was entitled** to the stock or subsequent refund **by virtue of his office**.

"An official who solicits or takes a bribe does *not* do so 'under color of office'; *i.e.*, under any pretense of official entitlement." *Evans*, 504 U.S. at 283 (Thomas, J., dissenting). Rather, "the payor *knows* the recipient official **is not** entitled to the payment," and "he, as well as the official, may be punished for the offense." *Id.* (emphasis added). Accordingly, the *Evans* majority's construction of extortion by color of official right as equivalent to *quid pro quo* bribery was an unjustified expansion of the common law offense that Congress sought to codify in § 1951. *See Evans*, 504 U.S. at 259 ("[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed." (quoting *Morissette v. United States*, 342 U.S. 246, 263 (1952)).

There are additional reasons to doubt *Evans*'s reading of the Hobbs Act as a bribery prohibition. For one thing, "the maximum sentence for conviction of Hobbs Act extortion has always been *twenty years* in prison, whereas the four principal federal bribery statutes at the time the Hobbs Act was enacted had a maximum penalty of *three* years in prison (plus disqualification from holding office)." Smith, 127 Yale L.J. Forum at 235.[6] It strains credulity

---

[6] When "federal bribery laws were consolidated in 1962 into a new provision," 18 U.S.C. § 201, "the maximum prison sentence was increased to (and remains) fifteen years in prison . . . ." *Id.* at 235 n.13.

to suggest that Congress intended the Hobbs Act to *sub silentio* effect a more than six-fold increase in the maximum sentence for bribery. Additionally, "[b]eginning with its first bribery law in 1789, Congress had clearly and consistently limited federal criminalization of bribery only to the bribing of federal officials. There is nothing in the legislative history of the Hobbs Act that suggests that in 1946 . . . Congress thought it was making all state and local bribery a federal crime." *Id.* at 235-36. Rather, "[t]he words of the Hobbs Act prohibition were far more limited, setting federal prosecutors loose only on those non-federal officials who obtained payment under *the pretense of official right*." *Id.* at 236.

The result of the *Evans* Court's departure from statutory text and common law is an unconstitutionally vague criminal prohibition, exposing public officials to up to 20 years' imprisonment without fair notice as to the conduct proscribed. Indeed, the mere fact that Supreme Court Justices have sharply disagreed regarding the scope of the common law definition of extortion suggests that a vagueness challenge to the Hobbs Act "has force." *Skilling*, 561 U.S. at 405 (recognizing strength of vagueness argument based on "considerable disarray" in judicial decisions that honest-services fraud statute intended to incorporate). If the common law extortion precedents have a "solid core" for which application of the Hobbs Act may be salvaged, *id.* at 407, it is in the category of cases identified by Justice Thomas, and not applicable here, where a public official receives payment under a claim of entitlement by virtue of his office. "Reading the statute," as the *Evans* majority did, "to proscribe a wider range of offensive conduct, . . . raise[s] the due process concerns underlying the vagueness doctrine." *Id.* at 408. Afterall, "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Id.* at 410 (citation omitted).

**D.     Conclusion**

For the foregoing reasons, the Indictment is insufficient as a matter of law to support a conviction under the Hobbs Act.  Accordingly, Mr. Tompkins respectfully requests that the Court dismiss Counts 1 and 2.

<u>**COMPLIANCE WITH LOCAL RULE 7.1(a)(2)**</u>

Undersigned counsel conferred with the Government, and the Government opposes the relief requested in this Motion.

Respectfully Submitted,
STEVEN TOMPKINS
By His Attorney,

<u>**/s/ Martin G. Weinberg**</u>
Martin G. Weinberg, Esq.
Mass. Bar No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

Dated: October 10, 2025

<u>**CERTIFICATE OF SERVICE**</u>

I, Martin G. Weinberg, hereby certify that on this date, October 10, 2025, a copy of the foregoing document has been served via Electronic Court Filing system on all registered participants.

<u>**/s/ Martin G. Weinberg**</u>
Martin G. Weinberg, Esq.