UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| | CRIMINAL No. 25-CR-10334 |
| v. | |
| STEVEN WAYNE TOMPKINS | |
| Defendant | |

**OPPOSITION TO MOTION TO DISMISS**

Now comes the United States of America and hereby opposes the defendant Steven

Wayne TOMPKINS's Motion to Dismiss (Docket No. 28). For those reasons stated below, the

motion should be denied.[1]

**INTRODUCTION**

On August 7, 2025, the grand jury returned an Indictment against TOMPKINS for Hobbs

Act Extortion, in violation of 18 U.S.C. § 1951. TOMPKINS engaged in schemes to extort

Individual A, who was an executive and owner of a holding company that held shares of a

national cannabis cultivation and retail company ("Company A"), (i) into selling TOMPKINS a

pre-IPO equity interest in Company A in exchange for TOMPKINS's favorable action or

inaction as the SCSD Sheriff with respect to SCSD's partnership with Company A, and (ii) into

---

[1] The defendant's counsel makes many of the same failed arguments in his motion to dismiss that he made in similar motions in *United States v. DeQuattro* and *United States v. Sean O'Donovan*. *See DeQuattro*, 20-CR-10271, Docket No. 34 and *O'Donovan*, 22-CR-10141, Docket No. 19. The Court denied those motions to dismiss. *DeQuattro*, Docket No. 92; *O'Donovan*, Docket No. 46. Despite such rulings, defense counsel continues to press these same arguments even as the Court has rejected them in light of longstanding Supreme Court and First Circuit precedent.

refunding the entire $50,000 equity interest in Company A to TOMPKINS at later dates in exchange for the same.

## FACTS ALLEGED IN THE INDICTMENT

The following facts are taken from the Indictment (Docket No. 1):

**A. Background Information Regarding Company A and Cannabis Control Commission**

The extortion charges against TOMPKINS involve Company A, a national cannabis cultivation and retail company, that operated dispensaries in Massachusetts and several other states.  Indictment, ¶ 5.  Company A was founded in 2018 and became a publicly listed and traded company at the time of its initial public offering ("IPO") in or about 2021.  Indictment, ¶ 5.  Prior to becoming a publicly listed company, sales of Company A's stock were restricted by various Company A agreements that generally prohibited the transfers of shares, and by securities laws that prohibited the sale of non-public stock to the general public unless certain conditions were met.  Indictment, ¶ 6.  "Individual A" was a company executive and the owner of "Holding Company A."  Indictment, ¶ 7.  Individual A owned shares of non-public Company A stock through Holding Company A.  Indictment, ¶ 7.

The Massachusetts Cannabis Control Commission (the "CCC") oversaw licenses for cannabis companies; after obtaining an initial license, cannabis companies had to renew their licenses with the CCC annually.  Indictment, ¶ 8.  Cannabis companies that sought to operate in communities that had been disproportionately impacted by cannabis prohibition and enforcement were required to implement a positive impact plan intended to benefit areas of disproportionate impact, as defined by the CCC (the "PIP Requirement"), as part of its license and annual licensure renewal process.  Indictment, ¶ 9.  Company A sought to open a retail cannabis

dispensary in Boston, Massachusetts and applied to the CCC for a dispensary license beginning in or about 2019.  Indictment, ¶ 10.

### B.  The SCSD Entered Into A Partnership-Agreement with Company A

To satisfy the PIP Requirement, Company A entered into a partnership with the Suffolk County Sheriff's Department (the "SCSD") whereby the SCSD would help screen and refer graduates of its re-entry program to apply for work at Company A's retail store.  Indictment, ¶ 10.  Company A's partnership with the SCSD was memorialized in a September 2019 letter signed by TOMPKINS on SCSD letterhead and submitted to the CCC in its completed dispensary license application in or about March 2020.  Indictment, ¶10.   TOMPKINS signed a second letter memorializing the partnership on or about October 13, 2020.  Indictment, ¶ 10, n.4. This letter, too, was on SCSD letterhead and was addressed to the CCC, which reaffirmed SCSD's ongoing partnership with Company A.  Indictment, ¶ 10, n.4.  In or about March 2021, the CCC approved a license for Company A to operate a cannabis dispensary in Boston and, thereafter, Company A submitted annual license renewal applications in 2021, 2022 and 2023, each of which included Company A's ongoing partnership with SCSD as part of its fulfillment of the PIP Requirement.  Indictment, ¶ 11.

### C.  TOMPKINS Extorted Individual A

From in or about 2020 to July 2023, TOMPKINS engaged in schemes to extort Individual A (i) into selling TOMPKINS a pre-IPO equity interest in Company A for $50,000 in exchange for TOMPKINS's favorable action or inaction as the SCSD Sheriff with respect to SCSD's partnership with Company A, and (ii) thereafter refunding the entire $50,000 equity interest in Company A to TOMPKINS at later dates in exchange for the same.  Indictment, ¶ 12.

Since its inception in 2018, one of Company A's goals was to grow its cannabis business nationwide by raising sufficient capital to launch an IPO. Indictment, ¶ 13. Because Company A was then a non-public, privately-owned company, Company A officials, including Individual A, sought large-scale, multimillion-dollar investments from institutions or other high net-worth, sophisticated investors in order to raise capital efficiently and in accordance with general restrictions applicable to the sale of privately-held securities. Indictment, ¶ 14. Company A was not looking to raise capital from the general public or small, individual investors. Indictment, ¶ 14. Beginning in or about mid-2020, Company A began preparing for its IPO, which included producing audited financial statements, hiring attorneys for compliance with securities laws, and obtaining financing from large scale and high net-worth investors, among other things. Indictment, ¶ 15. Around this same time in 2020, Company A actively sought to obtain its license from the CCC to operate a retail cannabis dispensary in downtown Boston. Indictment, ¶ 16. Being one of the first recreational marijuana dispensaries to open in downtown Boston was an important strategic goal for Company A's successful IPO launch. Indictment, ¶ 16.

**D. TOMPKINS Pressured Individual A To Sell TOMPKINS Pre-IPO Stock**

Beginning in or about mid-2020 and continuing in the following months, TOMPKINS told Individual A on several occasions, in sum and substance, that TOMPKINS wanted to "take part in the IPO" and "wanted to get in on the stock so [he] could make some cannabis money." Indictment, ¶ 17. Individual A did not want to sell any pre-IPO Company A stock to TOMPKINS. Indictment, ¶ 17.

After being initially rebuffed in his requests to buy Company A stock before the IPO, TOMPKINS increased his pressure on Individual A to sell him Company A stock by reminding Individual A that TOMPKINS should get Company A stock because TOMPKINS had helped

Company A in its Boston licensing efforts and that Company A would continue to need

TOMPKINS's help for license renewals.  Indictment, ¶ 18.  After increased pressure from

TOMPKINS on Individual A, which caused Individual A to believe and fear that TOMPKINS

would use his official position as Sheriff to jeopardize Company A's partnership with the SCSD,

and thus imperil both (i) the dispensary license for Company A's cannabis store in Boston, and

(ii) the timing of Company A's IPO, Individual A relented and agreed to TOMPKINS's demands

for a pre-IPO interest in Company A stock.  Indictment, ¶ 19.

**E.  TOMPKINS Obtained a $50,000 Pre-IPO, Equity Interest in Company A Stock**

As described above, Individual A owned shares of pre-IPO Company A stock through

Holding Company A.  Indictment, ¶ 20.  These shares, however, were subject to various

Company A agreements that prohibited the general transfer of shares of pre-IPO Company A

stock unless certain conditions were met, including compliance with securities law, notice to

other Company A stockholders, and even approval from the Company A board under certain

circumstances.  Indictment, ¶ 20.

To circumvent these restrictions, but still allow TOMPKINS to acquire a pre-IPO equity

interest in Company A, TOMPKINS and Individual A agreed that Individual A would sell

TOMPKINS an ownership interest in Company A through Holding Company A.  Holding

Company A's sole asset was its ownership interest in Company A stock.  Indictment, ¶ 21.  To

complete this transaction, TOMPKINS and Individual A did the following: (a) on or about

November 10, 2020, TOMPKINS wired a $50,000 payment from TOMPKINS's retirement

account to an account controlled by Individual A; and (b) on or about November 13, 2020,

TOMPKINS entered into a side agreement (the "Side Agreement") with Individual A, whereby,

in exchange for TOMPKINS's $50,000 payment, TOMPKINS received a percentage ownership

interest in Holding Company A, "which was equal to 28,833 shares of [Company A stock]." Indictment, ¶¶ 22a, b.

**F.   TOMPKINS Demanded His $50,000 Investment Back**

In or about late 2021 to 2022, TOMPKINS was in the midst of a re-election campaign for Sheriff.  To help pay for his campaign and other personal expenses, TOMPKINS demanded that Individual A refund TOMPKINS's $50,000 investment in Company A stock.  Indictment, ¶ 25. Although the Side Agreement did not grant TOMPKINS a guaranteed risk-free investment in Company A stock, nor any unilateral authority to demand and receive back his investment, much less the full $50,000 payment, Individual A feared that if Individual A not agree to TOMPKINS's demands, TOMPKINS would use his official authority as Sheriff to terminate the SCSD's ongoing partnership with Company A and, thus, jeopardize Company A's Boston and other Massachusetts dispensary license renewals with the CCC.  Indictment, ¶ 26.

Therefore, even though Company A stock had decreased in price such that TOMPKINS's equity interest in Company A stock was worth several thousand dollars less than $50,000, Individual A agreed to TOMPKINS's demands for full repayment.  Indictment, ¶ 27.  Between approximately May 2022 and July 2023, Individual A issued TOMPKINS five checks totaling $50,000.  Indictment, ¶ 28.  In accordance with TOMPKINS's wishes, Individual A wrote memos "loan repayment" and "[company] expense" to disguise the nature of some of the payments.  Indictment, ¶ 28.

## <u>NO NEED FOR ORAL ARGUMENT</u>

The government believes that the Court can summarily deny the defendant's motion without a hearing given that the Court's analysis is guided by the four corners of the Indictment

and all of the defendant's arguments are clearly factual questions outside the scope of a motion to dismiss.

## <u>STANDARD OF REVIEW</u>

When assessing a motion to dismiss, the Court's role is limited to assuring that the allegations in the Indictment are sufficient to inform the defendant of the charge; the Court will not decide whether the government has proven the charges alleged. *United States v. Ngige*, 780 F.3d 497, 502 (1st Cir. 2015) ("[T]he question is not whether the government has presented enough evidence to support the charge, but solely whether the allegations in the Indictment are sufficient to apprise the defendant of the charged offense."). Accordingly, a motion to dismiss cannot be used to "test the sufficiency of the evidence." *United States v. Stewart*, 744 F.3d 17, 21 (1st Cir. 2014); *United States v. Guerrier*, 669 F.3d 1, 4 (1st Cir. 2011) ("[C]ourts routinely rebuff efforts to use a motion to dismiss as a way to test the sufficiency of the evidence behind an indictment's allegations[.]") (internal citations omitted). Dismissing an Indictment is an extreme measure "reserved for extremely limited circumstances" and "exercised with caution." *Whitehouse v. United States Dist. Court,* 53 F.3d 1349, 1359 (1st Cir. 1995). Furthermore, "[i]t is typically sufficient that an Indictment articulate the offense in the words of the statute itself as long as those words set forth all the elements of the offense without any uncertainty or ambiguity." *United States v. Sidoo*, 468 F. Supp. 3d 428, 436 (D. Mass. 2020) (internal citations and quotations omitted).

The defendant's arguments can be summed up as factual arguments - plainly improper for a motion to dismiss. Factual questions are for a jury to decide at trial. *United States v. DiRico*, 78 F.3d 732, 736 (1st Cir. 1996) ("While the trial judge must properly instruct the jury

on the legal definition of materiality, only the jury can decide whether the facts proved at trial

meet that legal standard.").

## ARGUMENT

All of the defendant's arguments for dismissal are without merit and the Court should

deny them all.

### A.  The Indictment Alleges a *Quid Pro Quo*

The defendant first argues that the Indictment should be dismissed because it fails to

allege *quid pro quo* bribery.  The defendant is wrong.  The Indictment clearly and prominently

alleges a *quid pro quo*.  The Indictment sets out that TOMPKINS received stock in Company A

in exchange for his official act regarding the PIP Agreement with Company A.  For example, it

is alleged, "TOMPKINS engaged in schemes to extort Individual A (i) into selling TOMPKINS

a pre-IPO equity interest in Company A for $50,000 *in exchange for TOMPKINS's favorable*

*action or inaction as the SCSD Sheriff* with respect to SCSD's partnership with Company A, and

(ii) thereafter refunding the entire $50,000 equity interest in Company A to TOMPKINS at later

dates *in exchange for the same*."  Indictment, ¶ 12 (emphasis added).

In paragraph 18, it is alleged that the stock was in exchange for the defendant's ongoing

help with Company A's cannabis license: "TOMPKINS increased his pressure on Individual A

to sell him Company A stock because TOMPKINS had helped Company A in its Boston

licensing efforts and that Company A would continue to need TOMPKINS's help for license

renewals."  Indictment, ¶ 18.  The Indictment also alleges facts related to TOMPKINS obtaining

shares of Company A in exchange for SCSD's partnership with Company A: "After increased

pressure from TOMPKINS . . . that TOMPKINS would use his official position as Sheriff to

jeopardize Company A's partnership with the SCSD . . . Individual A relented and agreed to TOMPKINS's demands for a pre-IPO interest in Company A stock." Indictment, ¶ 19.

The government further alleged (in addition to Paragraph 12 described *supra*) that TOMPKINS received his entire investment back in return for the withholding of an official act, i.e. refraining from using his authority as Sheriff to "terminate the SCSD's ongoing partnership with Company A," Indictment, ¶ 26: "Between approximately May 2022 and July 2023, Individual A issued TOMPKINS five checks totaling $50,000. Indictment, ¶ 28. In accordance with TOMPKINS's wishes, Individual A wrote memos "loan repayment" and "[company] expense" to disguise the nature of some of the payments." Indictment, ¶ 28.

The defendant rests his motion to dismiss argument on the Supreme Court decision in *Snyder v. United States*, 603 U.S. 1 (2024), which has no application here. *Snyder* involved a charge under 18 U.S.C. § 666. This case involves a totally different offense with different elements - 18 U.S.C. § 1951. Moreover, *Snyder* did not concern what must be alleged to survive a motion to dismiss; in *Snyder*, the Supreme Court decided that the federal government was not entitled to use 666 to federally criminalize gratuities taken by state officials. *Snyder*, 603 U.S. at 19 ("But a state or local official does not violate § 666 if the official has taken the official act before any reward is agreed to, much less given."). For these reasons, the defendant's recitation of the factors leading the Court to find that 666 applies only to bribes is of no consequence here. *See* Motion to Dismiss, 14.

The defendant's further argument that the Indictment alleges payment of stock after the official act was entirely complete is a misleading, incomplete portrayal of the Indictment. The defendant argues, "[t]aking the Indictment at face value, there could not possibly have been any agreement to exchange Mr. Tompkins's September 2019 letter for a payment that was not

discussed until approximately nine months later." *See* Motion to Dismiss, 15. The defendant is wrong. The Indictment alleges ongoing support and withholding of adverse official action by Tompkins, which is a proper allegation of a 1951 quid pro quo. In both *Evans* and the First Circuit's decisions in *United States v. Turner* and *United States v. DeQuattro*, the Court ruled that in a 1951 prosecution, payments can be made in exchange for an agreement for "ongoing support." *Evans*, 504 U.S. 255, 274-75 (1992) (Kennedy, J., concurring) ("For example, a *quid pro quo* with the attendant corrupt motive can be inferred from an ongoing course of conduct . . . [i]n such instances, for a public official to commit extortion under color of official right, his course of dealings must establish a real understanding that failure to make a payment will result in the victimization of the prospective payor or the withholding of more favorable treatment, a victimization or withholding accomplished by taking or refraining from taking official action, all in breach of the official's trust."); *see also United States v. Correia*, 55 F.4th 12, 31 (1st Cir. 2022) ("the timing of the <u>payment</u> may not provide a conclusive answer as to whether [a] payment is a bribe or a gratuity, [but] the timing of the <u>agreement to make or receive a payment</u> may.") (citing *Fernandez*, 722 F.3d 1, 19 (1st Cir. 2013) (emphases in original)); *United States v. Turner*, 684 F.3d 244, 256 (1st Cir. 2012) ("Read as a whole, the instructions adequately conveyed to the jury the requirement that they find Turner promised to undertake ongoing action in exchange for the $1,000."); *see also United States v. DeQuattro*, 118 F.4th 424, 444-46 (1st Cir. 2024).

In this case, the Indictment clearly alleges that the defendant's receipt of the stock was in exchange for his ongoing support of the PIP agreement and him abstaining from terminating that partnership. Indictment, ¶¶ 11, 12, 19, 26. The defendant's distinction between taking a bribe and a gratuity is irrelevant because the official action and withholding of official action was

ongoing according to the Indictment – TOMPKINS could have canceled or decided not to continue with the PIP partnership with Company A at any point.  Because these facts are alleged in the Indictment, this argument should be rejected.

**B.  The Indictment Alleges An "Extortionate Demand"**

The defendant's argument that the Indictment does not allege an extortionate demand also fails.  The Indictment does allege an extortionate demand.  Under the First Circuit pattern jury instructions, extortion is defined as "obtaining property from another with his or her consent, but where that consent is obtained by the wrongful use of fear [or] under color of official right."  First Circuit Pattern Jury Instructions, 18.1951.  The instructions go on to provide that "fear" includes fear of economic loss.

The Indictment alleges that the purpose of his scheme was to <u>extort</u> Individual A: "Defendant TOMPKINS engaged in schemes to extort Individual A (i) into selling TOMPKINS a pre-IPO equity interest in Company A for $50,000 in exchange for TOMPKINS's favorable action or inaction as the SCSD Sheriff with respect to SCSD's partnership with Company A, and (ii) thereafter refunding the entire $50,000 equity interest in Company A to TOMPKINS at later dates in exchange for the same."  Indictment, ¶ 12; *see also* ¶ 30 "TOMPKINS, did obstruct, delay and affect . . . by extortion . . . that is by obtaining property not due to the defendant . . . under color of official right and by wrongful use of fear, including fear of economic loss."

The Indictment further alleges that TOMPKINS "wrongfully" pressured Individual A into selling him a pre-IPO interest in Company A:   "Beginning in or about mid-2020 and continuing in the following months, TOMPKINS told Individual A on several occasions, in sum and substance, that TOMPKINS wanted to "take part in the IPO" and "wanted to get in on the stock so [he] could make some cannabis money."  Indictment, ¶ 17.  Moreover, TOMPKINS

caused "wrongful fear" into Individual A in demanding the stock interest - by reminding Individual A of the help he already provided and the future help that would be needed to keep Company A's license:  "TOMPKINS increased his pressure on Individual A to sell him Company A stock by reminding Individual A that TOMPKINS should get Company A stock because TOMPKINS had helped Company A in its Boston licensing efforts and that Company A would continue to need TOMPKINS's help for license renewals."  Indictment, ¶ 18.

The Indictment then alleges that the pressure from TOMPKINS caused Individual A to believe that if Individual A did not give into TOMPKINS demands, TOMPKINS would pull the PIP agreement and thus cause economic hardship for Company A: "TOMPKINS would use his official position as Sheriff to jeopardize Company A's partnership with the SCSD, and thus imperil both (i) the dispensary license for Company A's cannabis store in Boston, and (ii) the timing of Company A's IPO, Individual A relented and agreed to TOMPKINS's demands for a pre-IPO interest in Company A stock.  Indictment, ¶ 19.

The Indictment also alleges that TOMPKINS made an extortionate demand when he sought his entire investment back: "TOMPKINS demanded that Individual A refund TOMPKINS's $50,000 investment in Company A stock."  Indictment, ¶ 25.  The Indictment alleges that TOMPKINS wrongfully extorted a full reimbursement knowing that he was not entitled to any of his money back because the "Side Agreement" between him and Individual A "did not grant TOMPKINS a guaranteed risk-free investment in Company A stock, nor any unilateral authority to demand and receive his investment back, much less the full $50,000 payment." Indictment, ¶ 26.

The defendant makes additional factual arguments – again, not a proper basis for a motion to dismiss – by arguing that TOMPKINS was "free to sell it at any time" and he "had a

right to sell it."  This completely misses the point because the Side Agreement, as alleged in the Indictment, gave TOMPKINS no right to get any of his money back, let alone, a different amount than what he invested.  *See* Motion to Dismiss, 2-3 ("At the time that he requested repayment of his investment . . . the value of the shares was higher than the $50,000 he requested.").  The extortion as alleged in the Indictment focuses on the fact that TOMPKINS demanded his entire investment back, risk-free with no right to do so against the backdrop of the continuing PIP agreement.  The allegations of extortionate conduct by TOMPKINS are thus consistent with the First Circuit Pattern Jury Instructions.[2]

The defendant's citation to *Brissette* also does not rescue his factual arguments.  In that case, the First Circuit held that "whether the use of economic fear is wrongful within the meaning of the Hobbs Act extortion provision turns, at least in part, on whether it was employed to achieve a wrongful purpose." *United States v. Brissette,* 919 F.3d 670, 685 (1st Cir. 2019).[3] Here, the fear of economic harm caused by TOMPKINS is alleged to have been for a "wrongful purpose" in that he sought to obtain a pre-IPO investment in Company A to which he was not entitled because of the ongoing PIP partnership; and he also demanded his entire $50,000 investment back risk-free because of the same.

_____

[2] The Indictment further alleges that TOMPKINS was not entitled to this pre-IPO interest as he did not fit the types of investors that Company A targeted for pre-IPO shares in the company, "Company A officials, including Individual A, sought large-scale, multimillion-dollar investments from institutions or other high net-worth, sophisticated investors. . . . Company A was not looking to raise capital from the general public or small, individual investors." Indictment, ¶ 14.  These allegations only underscore that TOMPKINS had no right to the pre-IPO investment and that he engaged in wrongful extortion.

[3] Moreover, *Brissette,* too, offers no guidance on pleading a 1951 charge.   The Court held it was "express[ing] no view as to whether the Indictment sufficiently alleges the other elements of Hobbs Act extortion."  *Brissette,* 919 F.3d at 684–85.

The defendant's contention that this was an above-board, bona fide transaction is a bald attempt at arguing facts that can be rejected summarily. This is a question of fact, which must be assumed to be true by the Court at the motion to dismiss stage. *See Stewart*, 744 F.3d at 21; *Guerrier*, 669 F.3d at 3-4.

### C.  The Indictment Alleges An Official Act

The defendant's argument that the Indictment fails to allege an official act[4] should be rejected as another attempt to inappropriately litigate facts at the motion to dismiss stage. Whether the defendant agrees or disagrees on what constitutes an official act, it is the province of the jury to determine whether the facts, as alleged in the Indictment, constitute official acts.  "It is up to the jury, under the facts of the case, to determine whether the public official agreed to perform an 'official act' at the time of the alleged *quid pro quo*.  The jury may consider a broad range of pertinent evidence, including the nature of the transaction, to answer that question." *McDonnell*, 579 U.S. at 572-73.  Of course, the defendant is free to argue at trial that the government's evidence of official act does not pass muster, but there is no question that the Indictment alleges an official act.  First, the Indictment describes the official act by TOMPKINS in the SCSD's agreement to partner with Company A: "Company A entered into a partnership with the SCSD whereby the SCSD would help screen and refer graduates of its re-entry program to apply for work at Company A's retail store."   Indictment ¶ 10.   It is further alleged that

---

[4]  "[A]n 'official act' is a decision or action on a 'question, matter, cause, suit, proceeding or controversy.'  The 'question, matter, cause, suit, proceeding or controversy' must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee.  It must also be something specific and focused that is 'pending' or 'may be law be brought' before a public official.  To qualify as an 'official act,' the public official must make a decision or take an action on that 'question, matter, cause, suit, proceeding or controversy,' or agree to do so."  *McDonnell v. United States*, 579 U.S. 550, 574 (2016).

"Company A's partnership with the SCSD was memorialized in a September 2019 letter signed by TOMPKINS on SCSD letterhead and submitted to the CCC in its completed dispensary license application in or about March 2020." Indictment ¶ 10.[5]

Moreover, as alleged in the Indictment, TOMPKINS also engaged in an official act by continuing in the partnership with Company A and not using his position to terminate the partnership: "Company A submitted license renewal applications to the CCC in 2021, 2022, and 2023, which were each ultimately approved. *In each of the renewal applications, Company A included its ongoing partnership with the SCSD as part of its fulfillment of the PIP Requirement*." Indictment ¶ 11 (emphasis added).

The Indictment also clearly sets out an official act in alleging that Individual A feared TOMPKINS "us[ing] his official authority as Sheriff to terminate the SCSD's ongoing partnership with Company A." Indictment ¶ 26. The defendant's arguments on this point are unconvincing because even the defendant, whose attorney cited to *United States v. DeQuattro* in his Motion to Dismiss (at 13) and personally litigated the *DeQuattro* appeal, must concede that the First Circuit has decided that refraining from taking official action constitutes an official act. *DeQuattro*, 118 F.4th at 444-46 (holding that "a public official violates § 1951 if he intends the payor to believe that absent payment the official is likely to abuse his office and his trust to the detriment and injury of the prospective payor or to give the prospective payor less favorable treatment if the *quid pro quo* is not satisfied.").[6]

---

[5] The defendant's argument that the official act amounts to "ministerial action" is, again, a factual argument that ignores the facts alleged that it was an ongoing, continuing partnership between the SCSD and Company A. *See* Indictment ¶¶ 10, n.4, 11, 12, 19, and 26.

[6] There are numerous examples from other Courts of Appeals holding that refraining from action constitutes an official act. *United States v. Urban*, 404 F.3d 754 (3rd Cir. 2005);

Despite the defendant's focus on *McDonnell*, that case has no application here. *McDonnell* was not concerned with what must be alleged in an Indictment to survive a motion to dismiss, but about erroneous jury instructions submitted for an official act. The official acts in *McDonnell* did not survive Supreme Court review because they included only a telephone call, a meeting, and an event with nothing more. *McDonnell*, 579 U.S. at 567 ("Under that interpretation, setting up a meeting, calling another public official, or hosting an event does not, standing alone, qualify as an official act."). Here, in contrast, the government's allegation that the defendant entered into a specific, concrete, and formal agreement over the course of several years with a private company is completely different than the facts in *McDonnell*.

The defendant's citation to *United States v. Johnson*, 981 F.3d 1171, 1179 (11th Cir. 2020) is also misplaced. *Johnson* was concerned with whether an Indictment properly alleged the language in the felon in possession of firearm/ammunition statute. Here, in contrast, the Indictment tracks the language of 1951: "[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be" punished. Indictment ¶ 30. The defendant's citation to *Woodward v. United States*, 905 F.3d 40, 45 (1st Cir. 2018) is similarly unavailing because that case concerned whether the jury instruction for "official act" was consistent with *McDonnell*. The Second Circuit's decision in *United States v. Silver*, 864 F.3d 102 (2d Cir. 2017), is similarly not relevant because that, too, concerned a defective jury instruction regarding the definition of official act.

---

*United States v. Wright*, 797 U.S. 245 at 250-51 (5th Cir. 1986); *United States v. Braasch*, 505 F.2d 139, 150-52 (7th Cir. 1974).

### D.  The Indictment Alleges Reasonable Fear of Economic Loss

The Indictment clearly alleged that Individual A had a reasonable fear of economic loss. Defendant's argument to the contrary is wrong.  As described in the Indictment, TOMPKINS "committed extortion . . . by obtaining property not due to the defendant . . . including fear of economic loss."  Indictment ¶ 26.  Moreover, the Indictment alleges that the fear of economic loss was directly tied to the license for Company A's cannabis store and the timing of Company A's IPO:  "Finally, after increased pressure from TOMPKINS on Individual A, which caused Individual A to believe and fear that TOMPKINS would use his official position as Sheriff to jeopardize Company A's partnership with the SCSD, and thus imperil both (i) the dispensary license for Company A's cannabis store in Boston, and (ii) the timing of Company A's IPO, Individual A relented and agreed to TOMPKINS's demands for a pre-IPO interest in Company A stock."  Indictment ¶ 19.[7]

The Indictment further alleges again that Individual A feared economic loss from the cannabis dispensary license renewals for the Boston location and other dispensary locations in Massachusetts: "Individual A feared that . . . TOMPKINS could use his official authority as Sheriff to terminate the SCSD's ongoing partnership with Company A and . . . *jeopardize*

---

[7] The allegations related to the IPO and licensing are clearly within the ambit of the statute seeing that lost business opportunities are proof of a reasonable fear of economic loss. *United States v. Hathaway*, 534 F.2d 386, 396 (1st Cir. 1976) ("[s]imilarly we think the possibility of lost business opportunities can create a fear of economic loss"); *United States v. Rivera Rangel*, 396 F.3d 476, 483 (1st Cir. 2005) (victim's testimony that he feared economic loss if he did not pay the defendant was sufficient to establish the first prong of extortion through fear of economic loss).

*Company A's Boston and other Massachusetts dispensary license renewals*." Indictment ¶ 26 (emphasis added).[8]

Moreover, just as with all his other arguments, here, too, the defendant wrongly conflates what must be alleged in the Indictment with what must be proven at trial. The defendant's first case in support of this argument dealt not with the sufficiency of an Indictment, but what must be proven at trial. *United States v. Falcon-Nieves*, 79 F.4th 116, 121 (1st Cir. 2023) ("These consolidated appeals concern challenges by two sisters, Ivonne Falcón-Nieves ("Ivonne") and Marielis Falcón-Nieves ("Marielis"), to their convictions on various federal charges that relate to alleged public corruption in the Commonwealth of Puerto Rico.").

The defendant's other arguments that there could not be economic loss because Company A "utilized many alternative options" to satisfy its PIP requirement, *see* Motion to Dismiss at 24, is yet another improper factual argument, outside the bounds of the four corners of the Indictment, that misses the mark. The defendant's set of dueling, and out-of-bounds, facts amount to nothing more than an improper attempt to litigate matters (facts) that are inappropriate at the motion to dismiss stage. Whether or not Company A *could* have satisfied the PIP requirement through partnerships with other agencies or organizations does not make disappear the allegations that Individual A feared that not agreeing to the pre-IPO investment by TOMPKINS would jeopardize both Individual A's license and its planned IPO. Whether that fear was "reasonable" or not is a question for the jury at trial; not something to be determined by

---

[8] The Indictment provides further allegations related to economic loss in alleging that"[b]eing one of the first recreational marijuana dispensaries to open in downtown Boston was an important strategic goal for Company A's successful IPO launch. Indictment, ¶ 16.

the Court at the motion to dismiss stage.  And the viability of other options is a clearly a factual

argument that has no bearing on whether the Indictment is sufficient.

### E.  The Supreme Court Has Rejected the Defendant's "Benefits Under Color Of Law" Argument

Defense counsel's final argument is that this Court should adopt and hold the reasoning

in a dissent opinion and rule contrary to *Evans.*  Defense counsel argues that the dissent in *Evans*

was correct regarding the need to show the defendant caused the victim to believe the defendant

was entitled to a payment by virtue of their public position. Motion to Dismiss at 26.  However,

the Supreme Court explicitly considered and rejected this argument. *Evans*, 504 U.S. at 269.[9]

This Court is of course bound by Supreme Court precedent and cannot make the broad policy

decisions urged by the defendant.  Furthermore, in *Evans*, the dissent was unable to point to a

single case where a public official was guilty only if he or she deceived the victim into believing

that he or she was entitled to the payment. *Id.*  This final argument by the defendant can easily be

rejected by the Court.

[CONTINUED ON NEXT PAGE]

---

[9] The defendant also argues that federalism concerns should derail this prosecution, but those arguments have been rejected soundly in *Evans* and subsequently in *Ocasio v. United States*, 578 U.S. 282, 295 n.9 (2016) ("We are not unmindful of the federalism concerns implicated by this case, but those same concerns were raised – and rejected – in *Evans* . . . which we accept as controlling here.").

## <u>CONCLUSION</u>

For all of those reasons stated herein, the United States respectfully requests that the

Court deny the defendant's Motion to Dismiss (Docket No. 28).

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By:    <u>/s/ John T. Mulcahy</u>
John T. Mulcahy
Dustin Chao
Assistant United States Attorneys
617/748-3641

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the
registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies
will be sent to those indicated as non-registered participants .

<u>/s/ John T. Mulcahy</u>
John T. Mulcahy

Date: October 23, 2025