UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>STEVEN WAYNE TOMPKINS<br><br>Defendant | CRIMINAL No. 25-CR-10334 |

## OPPOSITION TO MOTION TO SUPPRESS

Now comes the United States of America and hereby opposes the defendant Steven

Wayne TOMPKINS's Motion to Suppress (Docket No. 39) and request for a hearing pursuant to

*Franks v. Delaware*, 438 U.S. 154 (1978).  For those reasons stated below, the motion should be

denied without a *Franks* hearing: (1) the search warrant affidavits set forth probable cause of a

bribery scheme; (2) the defendant has not made the requisite substantial showing for a *Franks*

evidentiary hearing; (3) the affidavits did not violate the particularity requirement of Rule 41;

and (4) the categories of documents to be seized were not overbroad.  In the alternative, the *Leon*

good faith exception applies and precludes suppression.

## SEARCH WARRANTS - PROBABLE CAUSE

According to the search warrant affidavits for the defendant's Comcast Account (the

"Comcast Aff") and the defendant's Gmail Account (the "Gmail Aff"), the investigation of

TOMPKINS concerned 18 U.S.C. § 371 (conspiracy); 18 U.S.C. § 666(a)(1)(B) (federal

programs bribery); 18 U.S.C. §§ 1343, 1346 (honest services wire fraud); 18 U.S.C. § 1951

(extortion under color of official right); and 15 U.S.C. § 77e (sale of unregistered securities).

Email Affs., ¶ 2.  The affidavits also stated that they did not provide all information regarding the

investigation, but only what was necessary for probable cause for the search warrant.  Email

Affs., ¶ 6. ("This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.").

The affidavits' "overview" section explains that agents were investigating TOMPKINS for "illegally invest[ing] in a then-non-public company, Company A[1]." Email Affs., ¶ 7. Individual A "illegally sold unregistered securities of Company A to TOMPKINS." *Id.* The affidavits further articulate that these facts are linked to potential violations of federal bribery laws: "in exchange for TOMPKINS's continued official actions in support of Company A's Boston marijuana dispensary, in violation of federal bribery laws (i.e., 18 U.S.C. § 666(a)(1)(B) (federal programs bribery), 18 U.S.C. §§ 1343 and 1346 (honest services wire fraud) and 18 U.S.C. § 1951 (Hobbs Act extortion)), as well as securities offenses (15 U.S.C. § 77(e))." *Id.*

The Email Affs. describe how "[t]he Massachusetts State Ethics Commission censured and fined TOMPKINS for violating state ethics laws on multiple occasions during his tenure as Sheriff." Email Affs., ¶ 10. The affidavits further state, "[f]irst, in 2015, the Commission found that TOMPKINS had violated M.G.L. ch. 268A, 23(b)(2)(ii) . . . when . . . TOMPKINS used his position and official Sheriff credentials in August 2013 to cause several shop owners to take down election signs of his Democratic primary challenger." Email Affs., ¶ 10.

About eight years later, in 2023, the Commission issued a disposition agreement for two violations by TOMPKINS of the same conflicts of interest law: "(i) TOMPKINS had hired his niece as an SCSD employee at a salary of $45,000 in 2016, until she resigned in 2018; and (ii) TOMPKINS, between 2014 and 2022, had on multiple occasions asked SCSD employees to personally care for and transport TOMPKINS's children, and had caused his then-Chief of Staff to perform private errands, all during SCSD business hours." Email Affs., ¶ 11. The affidavits

---

[1] Company A is how this company is referred to in the Indictment. It is referred to by its full name in the affidavits. Individual A is referred to by his/her full name in the affidavits, but the government will use Individual A here like the Indictment.

provide probable cause of other unethical conduct by TOMPKINS: "former SCSD employees alleged that TOMPKINS fostered a pay-to-play culture where SCSD employees felt compelled to donate to TOMPKINS's political campaigns for fear of retaliation or negative employment consequences." Email Affs., ¶ 12. The affidavits further state that while, "public campaign finance records showed that almost one out of every four donors self-reported as an SCSD employee . . . ." *Id.*

Further along, the Email Affs. describe the licensing and licensing renewal process for cannabis companies in Massachusetts: "[c]annabis companies that seek to do business in Massachusetts are subject to the approval, licensure, oversight, and renewal licensure process by the Massachusetts Cannabis Control Commission ('CCC')." Email Affs., ¶ 18. The affidavits further provide, "in particular . . . the CCC requires cannabis companies (e.g., Company A) . . . to establish a plan to positively impact areas of disproportionate impact, as defined by the [CCC]." Furthermore, "**CCC's 'positive impact' ('PIP') requirement, however, is continual.**" Email Affs., ¶ 19. The PIP requirement is part of a cannabis company's license renewal: "in order to obtain renewal licensure, the cannabis company is required to demonstrate that its PIP has actually been put into practice with measurable results." Email Affs., ¶ 19.

The affidavits provide that, "the SCSD and TOMPKINS play an integral role in Company A's PIP, and thus, Company A's continued re-licensure in Massachusetts. Public records pertaining . . . revealed that the PIP for Company A's Boston cannabis dispensary relies significantly upon its planned, and ongoing, partnership with the SCSD and TOMPKINS. Company A made disclosures in April 2020 regarding its PIP." Email Affs., ¶ 20. Next, the affidavits reiterate that the nature of the investigation was a pay-to-play scheme involving TOMPKINS and Individual A: "based upon Company A's reliance upon TOMPKINS and the SCSD to fulfill its PIP obligations . . . Sheriff TOMPKINS's power and official authority to decide the SCSD's ongoing partnership with Company A . . . there is reasonable cause to believe

that Individual A engaged in a pay-to-play scheme with TOMPKINS by secretly selling

TOMPKINS $50,000 of Company A securities in exchange for Company A's continued official

actions in support of the Company A-SCSD partnership." Email Affs., ¶ 21.

As described in the affidavits, "in early 2020," TOMPKINS sought to "diversify his stock

portfolio" and Company A "was still seeking to raise capital with the goal of an initial public

offering (IPO) of its common stock." Email Affs., ¶ 22. Because Company A was "a non-public

company," its sale of securities had to comply with SEC rules and "[c]ompany A was required to

file Form D with respect to any such non-public sale of its securities. Sales of unregistered

securities . . . were criminally prohibited under 15 U.S.C. § 77e." Email Affs., ¶ 22.

Next, "on or about November 9, 2020, TOMPKINS wired $50,000 from his Fidelity

retirement account payable to . . . Individual A's lobbying and consulting firm." Email Affs., ¶

24. According to the affidavits, "[a]t the time of this payment, bank records for Individual A and

Company A gave no indication that either party was in financial distress or seeking loan

financing. Company A, on the other hand, was still actively raising capital in its leadup to the

IPO." Email Affs., ¶ 24. The affidavits provide that "[f]urther corroboration of the illegal nature

of the sale of $50,000 of unregistered Company A securities by Individual A to TOMPKINS was

the fact that . . . [n]one of the Form Ds or registration statements filed for Company A disclosed

the $50,000 securities transaction." Email Affs., ¶ 25.

TOMPKINS faced a hotly contested election in 2022: "[i]n 2022, TOMPKINS faced . . .

his most competitive election campaign to date." Email Affs., ¶ 26. TOMPKINS's campaign

account also included "thousands of dollars from Individual A, which TOMPKINS and

Individual A both knew were the funds that TOMPKINS has already used to purchase $50,000 in

Company A stock." Email Affs., ¶ 26. The affidavits state that "[f]rom May 2022 to July 2023,

Individual A [through companies he controlled] . . . issued 5 checks to TOMPKINS, totaling

$50,000." Email Affs., ¶ 27. TOMPKINS had received a money-back guarantee on his

investment: "Individual A's $50,000 in payments . . . demonstrated that TOMPKINS's

investment . . . was completely risk-free." Email Affs., ¶ 28.  TOMPKINS's investment had lost

value since the time he bought the stock: "[a]t a share price of $4/share, TOMPKINS's $50,000

purchase entitled him to 12,500 shares, assuming TOMPKINS's purchase price was similar to

that of other Company A investors during 2020.  By May 2022 to July 2023, however, the share

price of Company A had fallen from approximately $3 per share to $0.72 per share in July

2023."  Email Affs., ¶ 28.

TOMPKINS used the cash infusion from his 100% reimbursement to defray mounting

personal expenses and to support his re-election campaign.  Email Affs., ¶¶ 29-31.  The

affidavits then reiterated that these allegations provided probable cause to believe that

TOMPKINS had violated public corruption laws: "Regardless, Individual A's sale of risk-free

securities . . . to TOMPKINS – who, as Sheriff sanctioned SCSD's participation in Company A's

PIP program – was contrary to federal bribery laws which prohibit corrupt payments made as

part of a quid pro quo arrangement with a public official."  Email Affs., ¶ 32.

The affidavits further provide that, "given TOMPKINS's history with the State Ethics

Commission and Individual A's years of experience as a registered lobbyist, both parties likely

recognized the incriminating nature of these payments."  Email Affs., ¶ 33.  Therefore, as the

affidavits set out, two of the payments were categorized as a "loan repayment" and an "expense"

even though they clearly were not.  Email Affs., ¶¶ 33-35.

## STANDARD OF REVIEW

A magistrate judge is afforded "great deference" as to the probable cause finding.  *See*

*Illinois v. Gates*, 462 U.S. 213, 236 (1983).  The magistrate judge's "task in a probable-cause

determination is simply to make a practical, common-sense decision whether, given all the

circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence

of a crime will be found in a particular place."  *United States v. Chiu*, 36 F.4th 294, 297 (1st Cir.

2022) (internal citations and quotations omitted); *see also United States v. Dixon*, 787 F.3d 55,

58-59 (1st Cir. 2015) ("we afford an ample amount of deference to the issuing magistrate's

finding of probable cause").  The standard for probable cause is relatively low -- "the judicial

task in a probable-cause determination is simply to make a practical, common-sense decision . . .

there is a fair probability that contraband or evidence of a crime will be found in a particular

place." *Chiu*, 36 F.4th at 297.  "Fair probability," the Supreme Court has held "is not a high bar."

*Kaley v. United States*, 571 U.S. 320, 338 (2014).[2]

## ARGUMENT

### A.  The Affidavits Set Forth Probable Cause of Bribery

The defendant first argues that the affidavits do not include sufficient probable cause of a

bribery scheme (see Motion to Suppress, 11-12).  That argument fails.  The affidavits set out

facts establishing probable cause that the defendant had engaged in Hobbs Act[3] extortion.[4]  The

government does not have to *prove* its charge of Hobbs Act extortion in a search warrant

affidavit, it only has to allege probable cause that a crime has been committed.  *See United States*

*v. Syphers*, 426 F.3d 461, 465 (1st Cir. 2005) ("This case concerns the sufficiency of the affidavit

to support probable cause, not the sufficiency of evidence for a conviction.  Probable cause only

requires a probability or substantial chance of criminal activity, not an actual showing of such

---

[2] Suppression is a rarely used, last resort.  Courts are loathe to suppress evidence and exclusion is not a constitutional requirement but, rather "a judicially created means of deterring illegal searches and seizures." *Penn. Board. of Probation & Parole v. Scott*, 524 U.S. 357, 357 (1998).  As the Supreme Court emphasized, the suppression of evidence "has always been our last resort, not our first impulse."  *Hudson v. Michigan*, 547 U.S. 586, 591 (2006).

[3] To be clear, because the target offenses in the Email Affs. alleged violations of both 18 U.S.C. §§ 666 and 1346 (in addition to 18 U.S.C. §1951), references to Hobbs Act violations herein should be understood to include violations of both Sections 666 and 1346 as stated in the Email Affs.

[4] The defendant's argument is a repackaged version of his motion to dismiss argument that the indictment does not allege *quid pro quo* bribery making out a Hobbs Act extortion claim.  No matter what motion the defendant uses to press his claims, they fail.

activity."); *see also United States v. Simpkins*, 978 F.3d 1, 7 (1st Cir. 2020) ("A finding of

probable cause does not demand proof beyond a reasonable doubt . . . .").

The affidavits set out probable cause to believe that the defendant engaged in Hobbs Act

extortion.  Paragraph Seven of the affidavits describes how the investigation centers on Hobbs

Act extortion, "there is reasonable cause to believe that Individual A illegally sold unregistered

securities of Company A to TOMPKINS in exchange for TOMPKINS's continued official

actions in support of Company A's Boston marijuana dispensary."  The affidavits further

describe how TOMPKINS entered into a partnership with Company A to fulfill Company A's

PIP requirement as memorialized in an April 2020 disclosure by Company A.  Email Affs., ¶ 20.

The affidavits describe how TOMPKINS leveraged this partnership to extort Individual A:

"[t]here is reasonable cause to believe that Individual A engaged in a pay-to-play scheme with

TOMPKINS by secretly selling TOMPKINS $50,000 of Company A securities in exchange for

Company A's continued official actions in support of the Company A-SCSD partnership."

Email Affs., ¶ 21.  Importantly, these statements of probable cause were sufficient because they

were not based on "conclusory statements, or more suspicion [or] rumor" but actually

corroborated evidence.  *United States v. Samboy*, 433 F.3d 154, 159 (1st Cir. 2005); *see also*

*United States v. Cordero-Rosario*, 786 F.3d 64, 71 (1st Cir. 2015).  The probable cause is based

on a variety of sources, including, but not limited to, (i) publicly available documents from the

CCC website about the partnership[5] showing the partnership (Email Affs., ¶ 20); (ii) wire records

---

[5] At the time these search warrants were signed on February 15, 2024 (Comcast Search Warrant) and March 15, 2024 (Gmail Search Warrant), the government had not yet served a grand jury subpoena on the CCC.  Therefore, the information regarding the PIP agreement was based on public information, not based on documents received by the CCC (*see* Email Affs., ¶ 20).  As described below, this is the basis for the defendant's frivolous *Franks* bad conduct allegation.  Defendant assumes the government had the CCC documents before the search warrants and therefore the agent omitted material information. The government did not in fact have any CCC documents, including the September 2019 letter, when the warrants were obtained.

for TOMPKINS's investment (Email Affs., ¶ 24); and (iii) bank account checks showing the refund to TOMPKINS (Email Affs., ¶ 27).

The affidavits further characterize this conduct as extortion through numerous other examples. For example, the affidavits describe how, "in an effort to create the impression" that he "had significant assets and/or was a sophisticated investor, TOMPKINS artificially inflated his primary bank statement balance." Email Affs., ¶ 23. Also, TOMPKINS's $50,000 investment was made at the same time Company A "was still actively raising capital in its leadup to the IPO," and the sale of securities to TOMPKINS "was concealed from the SEC" by not including it on Company A's Forms D. Email Affs., ¶¶ 24-25. The affidavits further describe how TOMPKINS had extorted Individual A to provide a 100% refund of his investment at the same time SCSD continued its partnership with Company A: "Regardless, Individual A's sale of risk-free securities . . . to TOMPKINS – who, as Sheriff sanctioned SCSD's participation in Company A's PIP program – was contrary to federal bribery laws which prohibit corrupt payments made as part of a quid pro quo arrangement with a public official." Email Affs., ¶ 32. In short, all of the above paragraphs show that the affidavits provided more than ample probable cause to believe that TOMPKINS had engaged in Hobbs Act extortion.

**B. The Defendant Has Not Met the Standard for a *Franks* Hearing**

The defendant's second argument requesting a *Franks* hearing for "material omissions" also fails. (Motion to Suppress, 12). The defendant misconstrues the *Franks* hearing standard. While a "material omission" can give rise to a *Franks* hearing, the "material omission" must be "necessary to the finding of probable cause." In other words, there must be both (i) a material omission that was made intentionally or recklessly and (ii) a showing that the false statement or omission was necessary for probable cause. *See United States v. Tanguay*, 787 F.3d 44, 49 (1st Cir. 2015) ("[T]he required showing is two-fold: first, the omission must have been either intentional or reckless; and second, the omitted information, if incorporated into the affidavit,

8

must be sufficient to vitiate probable cause."); *see also United States v. Rigaud*, 684 F.3d 169, 173 (1st Cir. 2012).[6]  To be entitled to a *Franks* hearing, the defendant must first make a "substantial preliminary showing" entitling him to a hearing.  *United States v. Arias*, 848 F.3d 504, 511 (1st Cir. 2017).

### a.  No Intentional or Reckless Material Omissions

First, omission of the 2019 letter was neither intentional nor reckless because the probable cause for extortion was based upon Individual A "selling TOMPKINS $50,000 of Company A securities in exchange for TOMPKINS's *continued official actions in support of the Company A-SCSD partnership*." Email Affs., ¶ 21 (emphasis added).   The defendant offers zero proof this omission was made intentionally or recklessly.  He makes numerous bald-faced allegations in this section of his brief with absolutely no authority supporting his contentions. For example, he argues, "At the very least, the government certainly had access to the letter." Not true.  The government did not have a copy of the letter until *after* these search warrants were executed.  The government accessed the CCC documents referenced in the search warrants from the CCC's website and the records are still publicly available online.[7]   The defendant has no basis to claim that there were intentional or reckless omissions here.  Such a hollow attempt to impugn the credibility of the agent should be squarely rejected by the Court.

---

[6] An omission is made intentionally if it was "designed to mislead," and "[n]egligent omissions— even negligent omissions of highly probative information—do not satisfy this strict [*Franks*] standard." *Tanguay*, 787 F.3d at 49.  To prove "reckless disregard for the truth, the defendant must prove that the affiant in fact entertained serious doubts as to the truth of the allegations."  *United States v. Ranney*, 298 F.3d 74, 78 (1st Cir. 2002).  Put another way, "recklessness may be inferred from circumstances evincing obvious reasons to doubt the veracity of the allegations."  *Id.*

[7] https://masscannabiscontrol.com/wp-content/uploads/2020/04/04.08.20_Positive_Impact_Plan_Ascend_Mass_LLC.pdf (last accessed October 31, 2025).

The defendant wrongfully attempts to reduce TOMPKINS's side of the deal to only the

September 5, 2019 letter.  Not true.  TOMPKINS's side of the deal comprised the overall

"ongoing partnership with Company A" to which he agreed behalf of the SCSD and his

continued participation in the partnership.  Paragraph 21 of the affidavits emphasizes that it was

the ongoing partnership that was TOMPKINS's side of the *quid pro quo*, and not just the letter:

"Sheriff TOMPKINS's power and official authority to decide the SCSD's ongoing partnership

with Company A."  Email Affs., ¶ 21.  Indeed, inclusion of the letter in the affidavits would have

provided *more* probable cause, not less supporting the evidence that TOMPKINS had engaged in

a bribery scheme.  The defendant's mischaracterization that this a gratuity case, and not a 1951

extortion case, repeats the failed argument from his motion to dismiss conflating the Hobbs Act

with the Supreme Court's reasoning in *Snyder*, which has nothing to say about 18 U.S.C. § 1951,

and instead concerns a charge under 18 U.S.C. § 666.  *See* Motion to Dismiss, 12-16; Motion to

Suppress, 13.

Second, the omission of "alternative means of satisfying the PIP requirement" does not

matter.  Again, the defendant offers no authority establishing that the information was omitted

intentionally or recklessly.  He claims, "there is no doubt that the affiant had reviewed Company

A's PIP submissions." (Motion to Suppress, 15).  The defendant has zero proof for this

contention.  And, even so, whatever other options might have been available to Company A does

not undercut the essential allegation that TOMPKINS traded on his partnership with Company A

to extort Individual A and obtain a pre-IPO interest in Company A.  Bottom line – the

defendant's misguided argument does not satisfy the "vitiate" standard articulated above.  The

fact that there were alternative means does not change the calculus or allegation that

TOMPKINS traded official action (the SCSD partnership) for Company A stock.

Paragraphs 7, 21 and 32 of the affidavits describe the *quid pro quo* - in exchange for

TOMPKINS's continued official action in supporting the Company A-SCSD partnership,

TOMPKINS received $50,000 in securities.  What, if anything, agents knew about other potential partnerships is irrelevant; investigators do not have to pursue every investigative lead in order for there to be probable cause. *United States v. Gianelli*, 585 F. Supp. 2d 150, 167 (D. Mass. 2008), *aff'd sub nom. United States v. Albertelli*, 687 F.3d 439 (1st Cir. 2012) ("Moreover, the fact that law enforcement officials did not observe evidence of gaming activity at Puopolo's home prior to the search does not disprove the existence of probable cause.").  Whether agents obtained information about some other theoretical partnerships before authoring the affidavits does not require a *Franks* hearing because "[f]ailure to investigate . . . does not evidence a reckless disregard for the truth."  *United States v. Santana*, 342 F.3d 60, 66 (1st Cir. 2003) (upholding denial of *Franks* hearing request); *Ranney*, 298 F.3d at 78 ("Under the circumstances, his failure to probe further does not amount to reckless disregard.").

The third "omission" cited by the defendant is that when TOMPKINS "requested a refund of his $50,000 investment . . . publicly available data demonstrates that Company A's stock price remained above Mr. Tompkins's ostensible purchase price."  First, the defendant offers no proof that this omission was intentional or reckless - indeed there was no information as to when TOMPKINS asked for his investment back.  According to affidavit, TOMPKINS gets his money back at times when stock price is low.   Second, these omissions were not material. Even if TOMPKINS gets back his $50,000 when stock is valued higher, that does not change the allegation that Tompkins is getting a benefit as part of pay-to-play to maintain the PIP partnership. *See Santana*, 342 F.3d 66; *Ranney*, 298 F.3d at 78.  Moreover, in fact, the affidavits alleged that by the time Individual A started reimbursing TOMPKINS in May 2022, the share price had drastically fallen and it continued going down through the time of the last reimbursement check in July 2023:  "By May 2022 to July 2023, however, the share price of Company A had fallen from approximately $3 per share to $0.72 per share in July 2023."  Email Affs., ¶ 28.  The defendant conveniently omits these statements from his brief.  The defendant's

contention that these omissions were "reckless" is plainly preposterous.  The defendant has made

no showing "that the affiant in fact entertained serious doubts as to the truth of the allegations."

*Ranney*, 298 F.3d at 78.

### b.  Inclusion of the Omitted Information Would Not Vitiate Probable Cause

Furthermore, while these omissions were in no way material, even if they were included

in the affidavits, their inclusion would not vitiate probable cause.  Therefore, the Court need not

reach the second prong of the *Franks* analysis.  *Rigaud*, 684 F.3d at 176 (finding that defendant

must satisfy both prongs to get a *Franks* hearing).  That said, the defendant has not satisfied the

second prong, either.  First, the fact that the September 5, 2019 letter was not included does not

vitiate probable cause.  As the affidavits make clear, this timing distinction is irrelevant because

the probable cause for extortion was based upon Individual A "selling TOMPKINS $50,000 of

Company A securities in exchange for TOMPKINS's **continued official actions in support of**

**the Company A-SCSD partnership**." Email Affs., ¶ 21 (emphasis added). The letter would

simply have provided more evidence of the initial entry into the PIP Agreement with Company

A, and the actual capacity of TOMPKINS to provide continued support through official acts.

Second, the existence of alternative means of satisfying the PIP is irrelevant as to

probable cause. This is essentially calling for resolution of the factual question of whether

Individual A's fear that he would suffer harm from TOMPKINS's adverse action was

reasonable. This is a question for the jury.  *See United States v. Middlemiss*, 217 F.3d 112, 118

(2d. Cir. 2000) (discussing how it is up to the jury to decide whether the victim's fear was

reasonable).  Something ultimately left to the jury certainly cannot be grounds for vitiating a

magistrate's finding of probable cause.  *See Gates*, 462 U.S. at 236 (granting great deference to

magistrate's finding of probable cause).

The defendant's argument regarding the stock price also does not vitiate probable cause.

This is not a fact in the affidavit.  Plus, regardless of the value of the stock, it does not matter

because property in exchange for official action is still a crime, regardless of the value of that property.  The defendant received periodic payments representing portions of his "initial investment" with all of the actual payments taking place from "May 2022 to July 2023" where he would have sold "at a loss like any other Company A shareholder who had purchased Company A shares in 2020." Email Affs., ¶ 27, 28.   It is important to the finding of probable cause that Tompkins received his full $50,000 back regardless of the stock's performance, not that he demanded his money back at a time when the stock was up as he claims.[8]

## C. The Initial Production of the Email Accounts Did Not Violate Particularity

The defense counsel's argument that the production of the defendant's email account violates the particularity requirement (Motion to Suppress, 17) fails.  First Circuit precedent upholds the two-step process employed by agents here.  In *United States v. Aboshady*, 951 F.3d 1, 5 (1st Cir. 2020), the First Circuit examined the validity of a two-step warrant for a Gmail account and stated that an initial seizure of electronic storage media, such as email accounts, and a subsequent search of that material was authorized under Federal Rule of Criminal Procedure 41(e)(2)(B).  *Id.*, n.2.  Moreover, the District Court below found that the two-step search was "about the narrowest definable search and seizure reasonably likely to obtain" the sought after information. *United States v. Aboshady*, 2017 WL 4540958, at *2 (D. Mass. Nov. 11, 2017) (internal citations and quotations omitted); *see also United States v. Upham*, 168 F.3d 532, 535 (1st Cir. 1999) (allowing two-step procedure to search computer).

Courts have endorsed this two-step process because in their view it would not be appropriate to delegate a "prescreening" function to the host company to determine relevant emails in the first instance.  *See United States v. Taylor*, 764 F.Supp.2d 230, 237 (D. Me. 2011)

---

[8] In addition, as the government argued in its opposition to the defendant's motion to dismiss, TOMPKINS had no right to any return of his investment, let alone a full reimbursement.

("The fourth amendment does not require the government to delegate a prescreening function to the internet services provider or to ascertain which e-mails will be relevant."). Moreover, a seizure of the entire account is appropriate where, as in this case, there are limitations on what can actually be searched in the seized data. *See United States v. Klyushin*, 643 F.Supp.3d 261, 270 (D. Mass. 2022) (the seizure and search of an entire iCloud account was permissible because . . . the government was then only authorized to search for specific categories of information in that seized account); *see also United States v. Kanodia*, 2016 WL 3166370, at *5 (D. Mass. June 6, 2016) (holding that email search warrant was proper where the government specified the evidence of the particular crimes it sought).

The Fourth Amendment does not require specific search protocols like keyword searches as urged by the defendant. *See* Motion to Suppress, 18-19 (citing *United States v. Matter of Search of Info. Associated With Fifteen Email Addresses Stored at Premises Owned*, 2017 WL 4322826, at *6 (M.D. Ala. Sept. 28, 2017)). As the Supreme Court held, the Fourth Amendment is not so "extreme to require that . . . the court must set forth precisely the procedures to be followed by the executing officers." *Dalia v. United States*, 441 U.S. 238, 258 (1979). Defendant has not cited any First Circuit case that requires such search protocols. Indeed, he acknowledges, albeit in passing (*See* Motion to Suppress, 20) that a magistrate judge decision that he cited (*See, e.g.* Matter of Search of Info. Associated with [redacted]@mac.com ...., 25 F. Supp. 3d 1, 8 (D.D.C. 2014)) ***was overturned*** by the District Judge who endorsed the two-step process for an email account under Rule 41.[9] There is good reason for this. Keyword searches

---

[9] *See Matter of Search of Info. Associated with [redacted]@mac.com that is Stored at Premises Controlled by Apple, Inc.*, 13 F. Supp. 3d 157, 165 (D.D.C. 2014) ("In addition, because the government's proposed procedures comply with the Fourth Amendment and are authorized by Rule 41, there is no need for Apple to search through e-mails and electronic records related to the target account and determine which e-mails are responsive to the search warrant. Enlisting a service provider to execute the search warrant could also present nettlesome problems.").

may capture some responsive documents, but other relevant evidence may not get captured

because targets use terminology different from the keywords or coded terminology that taken in

isolation may appear to be innocuous.  The First Circuit has specifically rejected keyword

searches.  *See United States v. Crespo-Rios*, 645 F.3d 37, 43-44 (1st Cir. 2011) (holding that

"government agents cannot simply search certain folders or types of files for keywords" because

they could miss relevant evidence, and rejecting other similar limitations).[10]  Rule 41 allows the

use of a two-step process and the defendant offers no case from the First Circuit repudiating the

procedure employed here.

### D.  The Enumerated Categories Did Not Lack Particularity

The defendant's argument that the search warrants violated the particularity requirement

under the Fourth Amendment because they "represent quintessential fishing expeditions"

(Motion to Suppress, 24) is wrong.  For a warrant to satisfy the fourth amendment's particularity

requirement it "(1) must supply enough information to guide and control the executing agent's

judgment in selecting where to search and what to seize, and (2) cannot be too broad in the sense

that it includes items that should not be seized." *United States v. Kuc*, 737 F.3d 129, 133 (1st Cir.

2013).  A warrant's "language must be read in context, such that the general tail of the search

warrant will be construed so as not to defeat the particularity of the main body of the warrant."

*Id.*  (internal citations and quotations omitted).

The defendant first argues that the temporal limits on the search render it too broad. That

argument fails because, while the attachments here did actually include temporal limitations, the

First Circuit has held that a temporal limitation is not actually necessary.  *See United States v.*

---

[10] *See also United States v. Ulbricht*, 858 F.3d 71, 101-02 (2d Cir. 2017) (rejecting defendant's argument that warrants for Google and Facebook accounts should require keyword searches), *abrogated on other grounds by Carpenter v. United States*, 138 S. Ct. 2206 (2018); *United States v. Adjani*, 452 F.3d 1140, 1149-50 (9th Cir. 2006) (holding that restricting computer search to specific search terms "would likely have failed to cast a sufficiently wide net to capture the evidence sought").

*Bucuvalas*, 970 F.2d 937, 942 (1st Cir. 1992), *abrogated on other grounds by Cleveland v.*

*United States*, 531 U.S. 12 (2000), (holding that the Court has "never required such arbitrary

limitations in warrant descriptions."); *Id.* at 942, n.7 ("Temporal delineations are but one method

of tailoring a warrant description to suit the scope of the probable cause showing.").  In a case

also involving an email search warrant like this one, *Kanodia*, 2016 WL 3166370, at *5, the

Court rejected an argument that the search warrant was invalid for lacking a temporal limitation;

*see also United States v. Scott,* 83 F. Supp. 2d 187, 199 (D. Mass 2000) ("Although a time

limitation helps to make a search warrant sufficiently particular, it is not an absolute necessity.").

The temporal limitations here were tied to the probable cause in the warrants.  For the

Comcast Aff., the records to be seized were limited to "from January 1, 2013."  *See* Comcast

Aff., Attachment B, § III(A).  There are many statements in the Comcast Aff. related to the 2013

time limitation:  TOMPKINS's election in 2013 (Email Affs., ¶ 8); first ethics investigation

related to opponent's signs in August 2013 (Email Affs., ¶ 10); donations by Individual A to

TOMPKINS since 2013 (Email Affs., ¶ 14); consulting services to a company controlled by

Individual A since 2013 (Email Affs., ¶ 15); communications between Individual A and

TOMPKINS starting in 2013 (Comcast Aff., ¶ 37); and regular communications between

TOMPKINS and SCSD employees since 2013 (Comcast Aff., ¶ 40).  There was further probable

cause to believe that TOMPKINS had emailed with other high-level executives at Company A

since 2013.  (Email Affs., ¶ 38).  For the Gmail Aff., the records to be seized were limited to

"from January 1, 2016."  See Gmail Aff., Attachment B, § III(A).  The Google SW contained

allegations related back to 2016: communications between Individual A and TOMPKINS

starting in 2016 (Gmail Aff., ¶ 37) and regular communications between TOMPKINS and SCSD

employees since 2016 (Gmail Aff., ¶ 40).

The rest of the defendant's arguments focus on what he claims are overly broad search

parameters.  This argument fails because the categories of communications are specifically

16

limited to the crimes specified in Attachment B, III(A).[11]  Courts have squarely held that when

categories of documents are tethered to the crimes under investigation, those categories are

appropriate.  For example, in *Klyushin,* the Court held that while "nineteen categories are

broadly phrased," they "*must be read in context of the crimes at issue.*" *See Klyushin,* 643

F.Supp.3d at 270 (citing *Kuc*, 737 F.3d at 133-34) (emphasis added).  Here, all of the categories

enumerated in Attachment B of the Email Affs. are limited to the crimes specified in Attachment

B.  Therefore, contrary to defendant's portrayal, the warrants did not give agents carte blanche to

search any topic, but only documents relevant to the enumerated offenses.

The defendant contests the category concerning communications with SCSD personnel.

That argument holds no water.  The affidavits set out numerous instances of the defendant

abusing his official position as the SCSD Sheriff to commit public corruption crimes.  *See* Email

Affs., ¶¶ 7, 21, 32.  Therefore, internal SCSD communications by TOMPKINS would be

relevant to the suspected bribe scheme.  This is buttressed by the fact that email headers for the

Comcast account revealed extensive communications between TOMPKINS and SCSD

personnel, including the SCSD Legislative Affairs Director.  *See* Comcast Aff., ¶ 40; Gmail Aff.,

¶ 41.

The defendant also takes issue (*see* Motion to Suppress, 24), with the warrant's category

of "communications about and/or pertaining to TOMPKINS's finances, lending, borrowing,

expenses, investing, investments, real estate, . . ., campaign finances, . . . food, travel, and

entertainment."  First off, again, the defendant ignores that this category is limited by the

offenses enumerated in III(A) and agents were allowed to seize only communications related to

those offenses.   Evidence of the defendant's "finances" or "travel" related to the Target Offenses

---

[11] The enumerated crimes in Section III(A) are: "18 U.S.C. § 371 (conspiracy); 18 U.S.C. § 666(a)(1)(B) (federal programs bribery); 18 U.S.C. §§ 1343, 1346 (honest services wire fraud); 18 U.S.C. § 1951 (extortion under color of official right); and 15 U.S.C. § 77e (sale of unregistered securities)."

would certainly be relevant here.  TOMPKINS's financial knowledge is probative of his intent

and knowledge, which is an element of bribery laws.  The affidavits describe how TOMPKINS

artificially inflated his bank accounts to appear to be a sophisticated investor before buying

Company A stock (see Email Affs., ¶ 23), therefore making information about his "finances,

lending, borrowing and expenses" relevant to the investigation.  *See United States v. Tsarnaev*,

53 F. Supp. 3d 450, 457 (D. Mass. 2014) (validating a warrant category authorizing seizure of

financial records because when "read in context it authorizes the seizure of documents within the

broad categories *if* they are evidence of the listed crimes.").  Such financial information also

corroborates that TOMPKINS's $50,000 wire was not a loan, but an unlawful investment in

Company A.  *See* Comcast Aff., ¶ 41; Gmail Aff., ¶¶ 42.

Moreover, the affidavits also described how TOMPKINS sought to get his entire

investment back because of campaign-related and personal debts: "TOMPKINS's 2022 financial

records also showed that TOMPKINS was facing other economic pressures in addition to his need

to raise campaign funds."  *See* Email Affs., ¶ 30.  The warrants described refund checks "to

contemporaneously defray [TOMPKINS's] burgeoning personal expenses."  See Email Affs., ¶

30.  Therefore, communications about TOMPKINS's personal finances, as well as about food,

travel and entertainment expenses are relevant based on the foundation laid out in the affidavits.

Such emails would also, as the affidavits explain, "shed light on the financial origin of these

expenditures and provide evidence that TOMPKINS's $50,000 wire . . . was a corrupt investment,

and not an arm's length loan transaction."  *See* Comcast Aff., ¶ 43; Gmail Aff., ¶¶ 44.

The defendant next takes issue with the warrant's "identity, location, ownership, or any

computers used to access" the relevant "e-mail accounts." This argument is unavailing.

Information regarding location or identity, which is specifically tied to the enumerated/target

offenses is appropriate to confirm individuals' identities and relevant locations.  *Bucuvalas*, 970

F.2d at 942 (upholding search warrant category for "records . . . evidencing ownership or

control"); *Tsarnaev*, 53 F. Supp. 3d at 457 (holding that generic categories related to defendant's residence, identity of defendant, identity of other individuals and organizations, and travel schedules did not violate Rule 41.).

The cases cited by the defendant from the Ninth Circuit are inapplicable here. *United States v. Holocomb*, was withdrawn by the court. 132 F.4th 1118, 1124 (9th Cir. 2025). *Millender v. Cnty. Los Angeles* is not relevant to the present case. 620 F.3d 1016 (9th Cir. 2010). There, the court held that searching for other firearms could not be justified as necessary to prove the defendant's ownership of a specific sawed-off shotgun. *Id.* This is not analogous at all to this case, and the email search is instead like the traditional indicia of control cases recognized in that opinion. *See id.* (discussing that this theory applies to documents like utility bills, receipts, mail, and envelopes). Additionally, the court invalidated the search in *United States v. Rettig* because the Court found that the affiant had failed to advise the judge of all material facts, including the purpose of the search and its intended scope. 589 F.2d 418, 422 (9th Cir. 1978). That decision has no bearing here.

### E. The Good Faith Exception Applies

Finally, even if the Court were to find that the Comcast Aff. and the Gmail Aff. did not include sufficient probable cause, the searches comfortably fall within the parameters of the good faith exception under *Leon* (holding that reasonable reliance on a subsequently invalidated search warrant does not justify invoking exclusionary rule). Suppression is a last resort remedy to be used only to deter future Fourth Amendment violations and only when the deterrence outweighs the heavy costs of suppression. *See Davis v. United States*, 564 U.S. 229, 237 (2011); *Herring v. United States*, 555 U.S. 135, 140-41 (2009). "The fact that a Fourth Amendment violation occurred—*i.e.,* that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies." *Herring*, 555 U.S. at 140 (citing *Gates*, 462 U.S. at 223). "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can

19

meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Id.* at 144. Here, the search warrants were neither lacking in probable cause nor facially deficient. Magistrate Judge Kelley was not knowingly or recklessly misled nor acting in derogation of her judicial duties. *See Leon*, 468 U.S. at 922-23. The search warrant affidavits contained ample probable cause and they were not materially misleading. However, even if this Court found otherwise, the *Leon* good faith exception applies and the evidence should be admissible.

## CONCLUSION

For those reasons stated above, the government respectfully requests that the Court deny the defendant's Motion to Suppress (Docket No. 39).

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By:    /s/ John T. Mulcahy
John T. Mulcahy
Dustin Chao
Assistant United States Attorneys
617/748-3641

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants .

/s/ John T. Mulcahy
John T. Mulcahy

Date: November 3, 2025