UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>)<br>v. )<br>) Criminal Action No. 25-10334-MJJ<br>)<br>STEVEN WAYNE TOMPKINS, )<br>)<br>Defendant )<br>) | |

**MEMORANDUM OF DECISION**

March 3, 2026

JOUN, D.J.

      Defendant Steven Wayne Tompkins ("Tompkins" or "Defendant"), the Sheriff of Suffolk County, is charged with two counts of Hobbs Act extortion, 18 U.S.C. § 1951. He moves to (1) dismiss the Indictment; (2) strike two paragraphs of the Indictment, if the Indictment is not dismissed; and (3) suppress the evidence resulting from two search warrants. For the reasons set forth below, the Motion to Dismiss, [Doc. No. 28], the Motion to Strike, [Doc. No. 23], and the Motion to Suppress, [Doc No. 39], are <u>DENIED</u>.

**I.   RELEVANT PROCEDURAL HISTORY**

      On August 7, 2025, Tompkins was indicted on two counts of Hobbs Act extortion in violation of 18 U.S.C. § 1951. [Doc. No. 1 at 9]. Count I relates to Tompkins' acquisition of a pre-initial public offering ("IPO") equity interest in stock and Count II relates to his receiving a full refund of his investment in said stock. [*Id*.]. On August 21, 2025, Tompkins entered pleas of not guilty and was released on his personal recognizance, with conditions. [Doc. Nos. 13–16].

On October 9, 2025, Tompkins filed a Motion to Strike. [Doc. No. 23]. One day later, he filed a Motion to Dismiss. [Doc. No. 28]. I held a hearing on these motions on November 18, 2025. [Doc. No. 58]. On October 20, 2025, Tompkins filed a Motion to Suppress. [Doc. No. 39]. I held a hearing on that motion on December 10, 2025. [Doc. No. 62].

## II.    FACTUAL BACKGROUND[1]

Defendant Tompkins is the Sheriff for the Suffolk County Sheriff's Department ("SCSD"), a role to which he was first appointed in 2013. [Doc. No. 1 at ¶¶ 1–2]. Tompkins was elected as Sheriff in a special election in or around 2014, and after that, he was elected to six-year terms beginning in 2016. [*Id*. at ¶ 2]. In this role, Tompkins managed the operations of the correctional facilities in Boston and oversaw approximately 1,000 employees. [*Id*.].

As Sheriff, Tompkins was a Massachusetts state employee and was therefore subject to Massachusetts state ethics laws. These laws prohibit Tompkins from soliciting or receiving anything of substantial value for or because of his official position or from using his position to obtain any unwarranted privilege that was not properly available to other similarly situated individuals.[2] [*Id*. at ¶ 3]. Tompkins knew these laws applied to him because he (1) entered into a disposition agreement with the Massachusetts State Ethics Commission ("Commission") and admitted to violating them during his 2013 election campaign when he asked retail shop providers to take down his political opponent's campaign signs, and (2) received a preliminary inquiry notice from the Commission and subsequently admitted that he violated the prohibition when he hired his niece and used other SCSD employees to provide childcare to his children. [*Id*. at ¶ 4 and n.1].

---

[1] The facts are taken from the Indictment. [Doc. No. 1].

[2] These laws are codified at M.G.L. c. 268A § 23(b)(2). [Doc. No. 1 at ¶ 3].

2

"Company A" (or "Company"), a national cannabis company, operated cannabis dispensaries in Massachusetts and several other states. [*Id*. at ¶ 5]. The Company was founded in or around 2018 and became a publicly traded company at the time of its IPO in or around 2021. [*Id*.]. Prior to its IPO, the Company's stocks were generally not available to be transferred or sold to the public. [*Id*. at ¶ 6]. "Individual A" was a Company executive who owned "Holding Company A," and who owned non-public stock in the Company through "Holding Company A." [*Id*. at ¶ 7].

The Massachusetts Cannabis Control Commission ("CCC") oversaw licensure and regulation of cannabis companies in Massachusetts, and cannabis companies in the Commonwealth were required to annually renew their license with the CCC. [*Id*. at ¶ 8]. The CCC had a positive impact plan requirement ("PIP Requirement") for cannabis companies that operated in communities disproportionately impacted by cannabis prohibition and enforcement. [*Id*. at ¶ 9]. The PIP Requirement was part of the annual licensing process. [*Id*.].

Company A started its annual licensing process with the CCC upon opening in Boston in 2019 and, as part of satisfying its PIP Requirement, the Company entered into a partnership agreement with the SCSD. [*Id*. at ¶ 10]. The agreement, memorialized in a September 2019 letter signed by Tompkins and submitted to the CCC by Company A in its CCC license application, provided that SCSD would assist in referring graduates of its re-entry program to apply for work with Company A's retail store. [*Id*.]. In its 2021, 2022, and 2023 renewal applications (after its first license was approved in March 2021), Company A listed its ongoing partnership with SCSD as part of its fulfillment of the PIP Requirement. [*Id*. at ¶ 11].

In or around mid-2020, Company A began preparing for an IPO of Company A stock. [*Id*. at ¶ 15]. Around this same time, Company A was actively seeking to obtain its license from the CCC so it could operate a retail store in downtown Boston. [*Id*. at ¶ 16]. While these preparations

were underway, Tompkins told Individual A on several occasions that he wanted to "take part in the IPO" and "wanted to get in on the stock so [he] could make some cannabis money." [*Id*. at ¶ 17]. Individual A did not want to sell any pre-IPO stock to Tompkins. [*Id*.].

Individual A initially declined to sell Tompkins stock in Company A. [*Id*. at ¶ 18]. Tompkins told Individual A that he should get Company A stock because (1) he helped Company A in its licensing efforts with the CCC, and (2) Company A would need his continued support for license renewals. [*Id*.]. After these interactions, Individual A believed and feared that Tompkins would use his role as Sheriff to jeopardize Company A's partnership with SCSD which Company A needed to satisfy its PIP Requirement. [*Id*. at ¶ 19]. Individual A thus agreed to Tompkins' request for a pre-IPO interest in Company A stock. [*Id*.].

Since the pre-IPO stock shares were subject to securities laws and restrictions, including a prohibition on the general transfer of shares, Tompkins and Individual A agreed that Individual A would sell Tompkins an ownership interest in Holding Company A as a way around those restrictions. [*Id*. at ¶ 20–21]. Holding Company A's sole asset was its ownership interest in Company A's stock. [*Id*. at ¶ 21]. To complete the sale, Tompkins wired a $50,000 payment from his retirement account to an account controlled by Individual A. [*Id*. at ¶ 22]. In exchange for the payment, Tompkins received a percentage ownership interest in Holding Company A, equal to 28,833 shares of Company A's stock. [*Id*. at ¶ 22]. This arrangement constituted the "Side Agreement." [*Id*.].

In or around late 2021 to beginning of 2022, Tompkins—who was in the middle of his re-election campaign—told Individual A to refund his $50,000 investment in Company A stock. [*Id*. at ¶ 25]. The Side Agreement did not grant Tompkins the right to demand and receive his investment back. [*Id*. at ¶ 26]. Individual A, however, fearing that Tompkins could use his official

authority as Sheriff to jeopardize Company A's license renewals if Individual A did not agree to give the full $50,000 payment back, agreed. [*Id.*]. From approximately May 2022 to July 2023, Individual A refunded Tompkins' investment by issuing five separate checks to Tompkins, and in compliance with Tompkins' wishes, Individual A wrote memos on the checks (*e.g.*, "loan repayment" and "[company] expense") to conceal the nature of some of the payments. [*Id.* at ¶ 28].

### III. MOTION TO DISMISS

#### A. Legal Standard

"[A] technically sufficient indictment handed down by a duly empaneled grand jury 'is enough to call for a trial of the charge on the merits.'" *United States v. Guerrier*, 669 F.3d 1, 3–4 (1st Cir. 2011) (quoting *Costello v. United States*, 350 U.S. 359, 363 (1956)). "Under Federal Rule of Criminal Procedure 12(b)(3), a defendant must 'raise[] by pretrial motion' any 'defect in the indictment or information, including . . . failure to state an offense.'" *United States v. Brissette*, 919 F.3d 670, 675 (1st Cir. 2019) (quoting Fed. R. Crim. P. 12(b)(3)(B)(v)).

"At the indictment stage, the government need not 'show,' but merely must allege, the required elements," including "'a plain, concise, and definite written statement of the essential facts constituting the offense charged.'" *United States v. Stewart*, 744 F.3d 17, 21 (1st Cir. 2014) (quoting Fed. R. Crim. P. 7(c)(1)). The facts are not tested for their sufficiency at this stage; rather, the court's role is to determine "whether the allegations in the Indictment are sufficient to apprise the defendant of the charged offense." *United States v. Ngige*, 780 F.3d 497, 502 (1st Cir. 2015). "The indictment's allegations are assumed to be true, and 'courts routinely rebuff efforts to use a motion to dismiss as a way to test the sufficiency of the evidence behind an indictment's allegations.'" *Id.* (quoting *Guerrier*, 669 F.3d at 3–4).

B. **Analysis**

"The Hobbs Act makes it a felony to 'obstruct[], delay[], or affect[] commerce or the movement of any article or commodity in commerce, by . . . extortion.'" *United States v. Correia*, 55 F.4th 12, 29 (1st Cir. 2022) (quoting 18 U.S.C. § 1951(a)). *See also Evans v. United States*, 504 U.S. 255, 261 (1992). Extortion is defined as "the obtaining of property from another, with his consent, induced by wrongful use of . . . fear, or under color of official right." 18 U.S.C. § 1951(b)(2). The First Circuit Pattern Jury Instructions, 4.18.1951, stipulate that "fear" in this context may include fear of "economic loss," including the "possibility of lost business opportunities." These instructions likewise stipulate that "extortion under color of official right" does not require "that [defendant public official] actually had the ultimate authority to achieve the desired result," nor is it "necessary for the government to show that the official action or inaction actually occurred." *Pattern Criminal Jury Instructions for the District Courts of the First Circuit*, Instruction No. 4.18.1951.

Defendant argues that the "Indictment is predicated upon a number of factual infirmities," [Doc. No. 28 at 1], then makes several attempts to find insufficiencies in the Indictment. None are accurate. Moreover, weighing factual strength is not proper on a motion to dismiss; that is the quintessential inquiry for the jury. Assuming the Indictment's allegations are true, as I must, *see Guerrier*, 669 F.3d at 3–4, and for the reasons below, Defendant's Motion to Dismiss is denied.

1. **Quid Pro Quo**

The Indictment alleges that Tompkins "increased his pressure on Individual A to sell him Company A stock by reminding Individual A" that Company A needed ongoing support from Tompkins for the annual business license renewal process. [Doc. No. 1 at ¶ 18]. Individual A "believe[d] and fear[ed] [Tompkins] would use his official position as Sheriff to jeopardize"

Company A, and for that reason, Individual A sold Tompkins a pre-IPO interest in Company A stock. [*Id*. at ¶ 19]. Tompkins claims these facts "are legally insufficient to support a *quid pro quo* agreement." [Doc. No. 28 at 1]. I disagree. The *quid pro quo* may not be as explicitly spelled out as to Defendant's liking, but the hallmark of something-for-something is sufficiently alleged: Tomkins received $50,000 pre-IPO interest in Company A stock and Company A received Tompkins' official support to renew its annual business license. [Doc. No. 1 at ¶¶ 10, 11, and 22].

The Indictment further alleges, when Tompkins wanted his $50,000 investment back, "Individual A feared that if Individual A did not agree to [Tompkins'] demands, [Tompkins] could use his official authority as Sheriff" to "jeopardize" Company A's business license renewal. [*Id*. at ¶ 26]. Again, the something-for-something is sufficiently clear: in exchange for Individual A giving Tompkins his money back, Tompkins would use his official authority to keep Company A licensed.

While Defendant attempts to classify these as "everyday business transaction[s]," [Doc. No. 28 at 16], and certainly, he may make that argument to a jury, it is not my role at this stage to accept that characterization over the Government's allegations. Tompkins' "reminder" that the Company will need his support can be inferred to be a condition on the Company selling the stocks to him. The facts as alleged are sufficient to support a *quid pro quo*.

    **2. Official Acts**

Defendant next focuses on the September 2019 letter memorializing SCSD's partnership with Company A. [Doc. No. 28 at 2–3]. However, whether the signing of that letter and the entering into a partnership with Company A was an official act or "ministerial action [that] cannot support a federal extortion prosecution of an elected state official," [*id*. at 3], it cannot be determined on this motion; it hinges on what the Government "prove[s]" at trial. *United States v. Falcon-Nieves*,

79 F. 4th 116, 127 (1st Cir. 2023) (citing *McDonnell v. United States*, 579 U.S. 550 (2016)). Further, the Government does not allege this letter is the sole official act in question, and other facts in the Indictment—including Tompkins' continuance of the partnership and Individual A's fear that Tompkins would revoke the partnership—support the Government's proposition that this was "an ongoing, continuing partnership." [Doc. No. 40 at 15]. The charge of "extortion under color of official right" does not require "the government to show that the official action or inaction actually occurred." *Pattern Criminal Jury Instructions for the District Courts of the First Circuit,* Instruction No. 4.18.1951. Sufficient facts exist in the Indictment to support the "official act" element, which is the only proper inquiry on this motion.

### 3. Fear of Economic Loss

Finally, Defendant argues that "[t]he [G]overnment's alternative theory of extortion by fear of economic loss similarly fails." [Doc. No. 28 at 3]. The number of PIP Requirement options Company A could or did pursue is irrelevant. The Indictment states that Individual A "feared" Tompkins would terminate SCSD's partnership with Company A, and that this termination would "jeopardize" the Company's license renewals. [Doc. No. 1 at ¶ 26]. The fear of economic loss is alleged, and whether that fear was reasonable is an inquiry for the jury.

## IV. MOTION TO STRIKE

### A. Legal Standard

"Under Federal Rule of Criminal Procedure 7(d), the defendant may move to strike surplusage from the indictment. This serves to protect the defendant 'against immaterial or irrelevant allegations in an indictment, . . . which may . . . be prejudicial.'" *United States v. Lewis*, 40 F. 3d 1325, 1346 (1st Cir. 1994) (quoting Fed. R. Crim. P. 7(d), advisory committee note) (citing *United States v. Fahey*, 769 F. 2d 829, 841–42 (1st Cir. 1985)). "This decision rests in the

sound discretion of the district court." *Id*. The inclusion of information in an indictment relevant to the defendant's motive often has probative value and is not unfair. *See United States v. Berroa*, 856 F. 3d 141, 157 (1st Cir. 2017).

### B. Analysis

Defendant challenges paragraphs 3 and 4 of the Indictment. Paragraph 3 states, *inter alia*:

> As a Massachusetts state employee, TOMPKINS was subject to Massachusetts state ethics laws, including Massachusetts General Laws, Chapter 268A, which prohibited TOMPKINS from (i) soliciting or receiving anything of substantial value, for or because of his official position, or (ii) using his official position to obtain any unwarranted privilege of substantial value for himself, and that which was not properly available to other similarly situated individuals, M.G.L., c. 268A § 23(b)(2).

[Doc. No. 1 at ¶ 3].

Paragraph 4 states, *inter alia*:

> Sheriff TOMPKINS was aware of the above prohibitions because . . . [i]n August 2015, [he] entered into a disposition agreement . . . in which [he] acknowledged that he had read the prohibition of M.G.L., c. 268A § 23(b)(2) and admitted that he had violated such prohibition when, during his 2013 election campaign, [he] used his position as Sheriff to cause retail shop proprietors to take down his political opponent's campaign signs" and "[i]n November 2020," he was "served . . . with a preliminary inquiry notice" stating he was "being investigated for violations of M.G.L., c. 268A § 23(b)(2) stemming from [his creation of] a paid position at the SCSD for his niece in or about 2017, which facilitated her to assist with [his] childcare, and TOMPKINS using other SCSD staff to perform childcare for [him] from 2014 to at least 2020.

[Doc. No. 1 at ¶ 4].

Defendant argues that these paragraphs "are both irrelevant to the charges in this case and unfairly prejudicial to Mr. Tompkins," [Doc. No. 23 at 3], and advances four separate arguments. First, Defendant highlights the distinction between gratuities and bribery. [*Id*.]. Second, Defendant argues that his "alleged violations of state ethics rules are factually far removed from the charges in this case," [Doc. No. 23 at 4], citing Federal Rules of Evidence 401 and 404(b). [*Id*.]. Third,

9

Defendant argues that even if I find a permissible Rule 404(b) purpose for paragraphs 3 and 4 of the Indictment, they are not necessary to the charges. [*Id*. at 4]. Finally, Defendant argues that these ethical violations are "irrelevant with respect to the government's alternative theory of extortion by fear of economic loss." [*Id*. at 5]. As explained below, none of these arguments are persuasive.

To start, while I agree with Defendant that "bribery and gratuities are 'two separate crimes' with 'two different sets of elements,'" [Doc. No. 23 at 3–4, quoting *Snyder v. United States*, 603 U.S. 1, 13 (2024) (further quotations omitted)], my task on a motion to strike is not to compare the elements of the different crimes. Rather, my task is to determine whether the Indictment contains immaterial, irrelevant allegations that would prejudice a defendant. I agree with the Government that the facts alleged in paragraphs 3 and 4 of the Indictment do not involve "mere gratuities," [Doc. No. 42 at 4–5], but more importantly, I find this portion of the Indictment to be material and relevant. The Government must prove as an element of the crimes that Tompkins "knowingly and willfully obtained" Company A stock, and a return of his $50,000 investment, "in return for official acts." *Pattern Criminal Jury Instructions for the District Courts of the First Circuit*, Instruction No. 4.18.1951. Thus, Tompkins' understanding of the permissible and impermissible limits of his official position is material and relevant. Presumably, the Government will argue at trial that, based on his experience in prior state ethics matters, Tompkins knew—or at least should have known—that he could not use his position as Sheriff to leverage a benefit that he could not otherwise have received.

Throughout his argument, Defendant hodge-podges together several cases to support his propositions, but ignores the different procedural postures in those cases. For example, while Defendant quotes Judge Sorokin's opinion in *United States v. Brissette*, Defendant fails to note

that this opinion came on post-trial motions—not on a motion to strike. *United States v. Brissette*, No. 16-cr-10137, 2020 WL 718294, at *13 (D. Mass. Feb. 12, 2020) (Sorokin, J.). In *Brissette*, Judge Sorokin wrote that "the government neither proved, nor even alleged, a quid pro quo." *Id*. In that case, the government sought to use a state ethics rule as the basis for rendering the defendants' conduct wrongful. *Id*. at *17. Neither applies to the Government's current case against Tompkins. The Indictment alleges a *quid pro quo*, a something-for-something. [Doc. No. 1 at ¶ 12]. The facts in paragraphs 3 and 4 of the Indictment go to "the defendant's intent, motive, and general scienter" in committing Hobbs Act extortion—not as the factual basis for extortion. [Doc. No. 42 at 8]. Information relevant to Defendant's motive often has probative value. *See Berroa*, 856 F. 3d at 157. Defendant's citation to *United States v. Cortijo-Diaz*, 875 F. 2d 13, 15 (1st Cir. 1989), to support the assertion that propensity inferences are forbidden under Fed. R. Evid. 404(b), does not move the needle. A motion to strike does not turn on the admissibility of evidence. Defendant's reliance on *Brissette* and *Cortijo-Diaz* are therefore misplaced.

I need not dwell long on Defendant's remaining arguments. The applicable standard does not require an inquiry on whether a fact is "necessary to the charges," [Doc. No. 23 at 4], and an Indictment is itself not evidence, *see United States v. Stepanets*, 879 F. 3d 367, 372–73 (1st Cir. 2018) (holding that a sufficient indictment "gives the defendants enough info to prepare a defense" and can list the crime's statutory elements); *Lowther v. United States*, 455 F. 2d 657, 666 (10th Cir. 1972) (court can instruct jury that the indictment is not evidence). Nor can Defendant raise evidentiary objections at this time ignoring the procedural posture of the case; it is premature. The standard for a motion to strike is not found in the Federal Rules of Evidence. Defendant may, at the appropriate time, move for pretrial rulings on any such evidentiary issues.

The Motion to Strike, [Doc. No. 23], is DENIED.

### V.     MOTION TO SUPPRESS

#### A. <u>Legal Standard</u>

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *United States v. Klyushin*, 643 F. Supp. 3d 261, 268 (D. Mass. 2022) (citing U.S. Const. amend. IV). When reviewing a probable cause determination, the court does not undertake de novo review, but "gives 'significant deference to the magistrate judge's initial evaluation' and reverses only if there is 'no substantial basis' for concluding that probable cause existed." *Id.* (citing *United States v. Ribeiro*, 397 F.3d 43, 48 (1st Cir. 2005)); *United States v. Feliz*, 182 F.3d 82, 86 (1st Cir. 1999); *see also United States v. Taylor*, 985 F.2d 3, 5 (1st Cir. 1993) (citing *United States v. Ciampa*, 793 F.2d 19, 22 (1st Cir. 1986)).

"A warrant application must demonstrate probable cause to believe that (1) a crime has been committed—the 'commission' element, and (2) enumerated evidence of the offense will be found at the place to be searched—the so-called 'nexus' element." *Feliz*, 182 F.3d at 86. The task of a magistrate judge in determining whether probable cause exists is "'to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [her] . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Id*. (citing *Illinois v. Gates,* 462 U.S. 213, 238 (1983)).

Defendant seeks a so-called *Franks* hearing on his motion to suppress. An affidavit in support of probable cause is presumed to be valid. *See Franks v. Delaware*, 438 U.S. 154, 171 (1978). To find that he is entitled to a *Franks* hearing, Defendant must make a "substantial preliminary showing of the same two requirements that he must meet at the hearing." *United States v. Arias*, 848 F. 3d 504, 511 (1st Cir. 2017) (internal quotations omitted). These two independent

requirements are (1) "that a false statement or omission in the affidavit was made knowingly and intentionally or with reckless disregard for the truth," and (2) "that the false statement or omission was necessary to the finding of probable cause." *United States v. O'Neal,* 17 F. 4th 236, 244 (1st Cir. 2021) (internal citations omitted). "[T]he omission of a particular detail, without more, is not enough to satisfy the [first] element of the *Franks* test." *United States v. Tanguay,* 787 F. 3d 44, 49 (1st Cir. 2015).

Finally, when officers "acting with objective good faith" have "obtained a search warrant from a judge or magistrate and acted within its scope," there is no Fourth Amendment violation to deter. *United States v. Leon*, 468 U.S. 897, 920 (1984). "[S]uppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." *Id*. at 922. *See also Davis v. United States*, 564 U.S. 229, 237 (2011).

### B. Analysis

#### 1. Probable Cause

Defendant argues, similarly to his arguments supporting the Motion to Dismiss, that "the affidavits submitted in support of the search warrants fail to establish probable cause to believe that Mr. Tompkins engaged in *quid pro quo* bribery." [Doc. No. 39 at 1]. Given my rulings, *see* sec. III, B., *supra*, along with the deference I must show to Judge Kelley's determination of probable cause, *see Ribeiro*, 397 F.3d at 48, I must disagree.

#### 2. *Franks* Test

Defendant next argues that the Government "recklessly omitted material information that, if truthfully disclosed, would have defeated such probable cause finding." [Doc. No. 39 at 1]. However, the *Franks* test contains a second, independent prong requiring "that the . . . omission

was necessary to the finding of probable cause." *O'Neal,* 17 F. 4th at 244. The inclusion of facts relating to (1) the September 2019 letter, (2) the multiple means by which Company A satisfied its PIP Requirement, (3) Company A removing mention of the SCSD re-entry program from its PIP Requirement submission before the first affidavit, and (4) the value of shares in Company A, [Doc. No. 39 at 2], would not have defeated a probable cause finding. The affidavits contain allegations that Tompkins, using the authority of his official position, pressured Individual A to sell him a non-public interest in Company A in exchange for Tompkins' continued official support of Company A. [Doc. No. 52 at 7; Doc. Nos. 39-1 and 39-3, ¶ 7].

### 3. Two-Step Warrants

Defendant then argues that the Government "engaged in a seize now, narrow later approach akin to the very general warrants that the Fourth Amendment was specifically intended to proscribe." [Doc. No. 39 at 2]. The First Circuit, however, upheld this two-step process in *United States v. Aboshady*, 951 F.3d 1, 5 (1st Cir. 2020). In that case, "all data files" for a certain Gmail account were produced and subsequently filtered down into a data set provided to the prosecution team.[3] *Id*. The particulars of the warrant in issue in *Aboshady*, including Section II ("Accounts and Files to be Copied by Google, Inc. Personnel,") and Section III ("Records and Data to be Searched and Seized by Law Enforcement Personnel"), *id*. at 5–6, match the warrants issued to Google and Comcast in this case, [Doc. No. 39-4, Attachment B; Doc. No. 39-2, Attachment B]. The First Circuit noted that this practice is in line with Federal Rule of Criminal Procedure 41(e)(2)(B).[4]

---

[3] Tompkins' argument (based on Ninth Circuit case law) that the warrants' requests were overbroad because the requests included information relating to the identity, location, and ownership of the computer/s fails, as well, for the reasons outlined in *Aboshady*. [Doc. No. 39 at 24–25].

[4] This rule provides that a "warrant . . . may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information. Unless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant." Fed. R. Crim. P. 41(e)(2)(B).

"That a digital seizure of such immense storage capacity will reveal files containing irrelevant information is hardly novel," even if the initially-seized account contains "substantial details" of Defendant's life "that went beyond the temporal and substantive scope of the categories in the search warrants." *Klyushin*, 643 F. Supp. 3d at 270. The warrants issued to Google and Comcast for Tompkins' data were not improper.

### 4. Narrower Categories

Next, Defendant argues that "the purportedly narrower categories set forth in the second step of the warrants far exceeded the bounds of any probable cause." [Doc. No. 39 at 3]. He claims that authorizing "government review of communications dating back to 2013 (for Comcast) and 2016 (for Google)" meant the warrants were not limited to the bribery allegations in this case. [*Id.*]. First, temporal requirements are "not an absolute necessity." *United States v. Scott*, 83 F. Supp. 2d 187, 199 (D. Mass. 2020). Second, the Government did include temporal requirements—2013 and 2016, respectively—and the affidavits explained why. For the Comcast warrant, the affidavit included mention of donations from Individual A to Tompkins in 2013; Tompkins' campaign payment of $95,000 to a company controlled by Individual A in 2013; and communications between Tompkins and Individual A in 2013. [Doc. No. 39-1 at ¶¶ 14, 15, and 37]. For the Google warrant, the affidavit included mention of communications between Individual A and Tompkins in 2016, and communication between Tompkins and other Company A executives beginning in 2016. [Doc. No. 39-3 at ¶¶ 37–38].

Defendant's attempt to exclude the requests for information relating to his ethics violations and communications with SCSD staff does not persuade. He classifies this case solely as a "single suspected bribe." [Doc. No. 39 at 24]. Events, however, often do not occur in a vacuum. Indeed, I must read warrant categories "in context." *United States v. Tsarnaev*, 53 F. Supp. 3d 450, 457 (D.

15

Mass. 2014). As the Government noted, the affidavits in this case "characterize [Tompkins'] conduct as extortion through numerous [] examples." [Doc. No. 52 at 8]. The affidavits allege Tompkins "fostered a pay-to-play culture within SCSD where SCSD employees felt compelled to donate to [his] political campaigns for fear of retaliation," [Doc. Nos. 39-1 and 39-3 at ¶ 12], and that Tompkins' $50,000 payment for Company A stock shares was "concealed from the SEC," [*id*. at ¶ 25]. Further, the affidavits allege not only that Tompkins purchased the unregistered securities, [*id*. at ¶ 24], but that he was able to convince Individual A to give him his money back, [*id*. at ¶ 28]. This is not the story of a single bribe, as Defendant suggests; rather, the allegations contain multiple facets that have given rise to multiple warrant categories.

### 5. Good-Faith Exception

I agree with Judge Kelley's probable cause determination and, as such, I need not reach the good-faith exception question.

The Motion to Suppress, [Doc. No. 39], is DENIED.

## VI. CONCLUSION

For the reasons above, the Motion to Dismiss, [Doc. No. 28], the Motion to Strike, [Doc. No. 23], and the Motion to Suppress, [Doc No. 39], are <u>DENIED</u>.

SO ORDERED.

/s/ Myong J. Joun
United States District Judge