UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | CRIMINAL No. 25-CR-10334-MJJ |
| STEVEN W. TOMPKINS | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

## GOVERNMENT'S TRIAL BRIEF

The Indictment charges the defendant Steven W. Tompkins, Sheriff of Suffolk County, with two counts of Extortion Under Color of Official Right, in violation of 18 U.S.C. § 1951 (Counts One and Two).

Counts One and Two charge Tompkins with violating 18 U.S.C. § 1951 by extorting Francis Perullo, by obtaining a pre-IPO $50,000 equity interest in Ascend Wellness Holdings ("Ascend") in November 2020, and by obtaining the refund of his entire $50,000 equity investment from May 2022 to July 2023, in exchange for Tompkins causing the Suffolk County Sheriff's Department ("SCSD") to continue a partnership with Ascend that Ascend needed to maintain its license to operate in Massachusetts.

Trial is scheduled to begin on August 24, 2026. The government expects the trial to last approximately two weeks.

### Statement of Facts

In 2013, Tompkins was appointed Sheriff of the SCSD. He was elected to the position in a special election in 2014, and thereafter was elected to successive six-year terms beginning in 2016. As Sheriff, Tompkins was subject to Massachusetts state ethics laws, including M.G.L. c.

1

268A, which prohibited Tompkins from soliciting or receiving anything of substantial value, for or because of his official position, or using his official position to obtain any unwarranted privilege of substantial value for himself, and that which was not properly available to other similarly situated individuals.

Ascend, a national cannabis company, was founded in approximately 2018. In 2019, Ascend applied for a dispensary license with the Massachusetts Cannabis Control Commission ("CCC"), the state agency charged with overseeing the regulation, approval, and licensure process for cannabis companies seeking to operate in Massachusetts. As part of the application and renewal process, the CCC required that cannabis companies implement a positive impact plan ("PIP"), intended to benefit areas that had been disproportionately impacted by the criminalization of cannabis.

To satisfy the PIP requirement, Ascend entered into a partnership with the SCSD whereby the SCSD would help screen and refer graduates of its re-entry program to apply for work at Ascend's retail stores. That partnership was memorialized in a September 2019 letter signed by Tompkins, which was submitted to the CCC. A second letter reaffirming the ongoing partnership was signed by Tompkins on or about October 13, 2020.

In or about mid-2020, Ascend began the process of preparing for an IPO of Ascend stock. Around the same time, Tompkins began telling Perullo, an executive and part owner of Ascend, that he wanted to get in on Ascend's stock. Perullo initially rebuffed Tompkins' requests, as Perullo did not want to sell pre-IPO interests to Tompkins. Tompkins continued to ask Perullo to sell him pre-IPO shares of Ascend, and increased the pressure he put on Perullo to do so by reminding Perullo that Tompkins helped Ascend in its licensing efforts, and that Ascend would

continue to need Tompkins' help for license renewals.   Tompkins' increased pressure on Perullo caused Perullo to fear that Tompkins would use his official position as Sheriff to jeopardize Ascend's partnership with the SCSD and thus imperil the dispensary license for the retail location in Boston, and the timing of Ascend's planned IPO.   As a result, Perullo agreed to sell Tompkins a pre-IPO interest in Ascend.

Perullo owned shares of Ascend stock through a holding company, Cannanovus.   Those shares were subject to Ascend agreements that prohibited the general transfer of shares unless certain conditions were met, including compliance with securities laws, notice to other Ascend stockholders, and in some cases, approval from the Ascend board.   To circumvent those restrictions, Perullo sold Tompkins an ownership interest in Cannanovus.   To complete the transaction, or about November 10, 2020, Tompkins wired $50,000 from his retirement account to an account controlled by Perullo, and on or about November 13, 2020, Tompkins and Perullo entered into an agreement whereby in exchange for $50,000, Tompkins acquired a percentage ownership in Cannanovus equal to approximately 28,833 shares of Ascend stock.   The agreement provided that Tompkins was "able to bear the economic risk of an investment … including the risk of a complete loss of [his] investment."   It did not include any mechanism whereby Tompkins could demand and receive back any amount of his investment.

Tompkins' 28,833 shares for $50,000 equated to a pre-IPO price of approximately $1.73 per share.   After a reverse split of Ascend stock, which occurred just prior to the IPO, Tompkins held the equivalent of approximately 14,417 shares of Ascend stock, at a price of approximately $3.46 per share.   In or around May 2021, Ascend launched its IPO at a value of approximately $9.60 per share.   Thus, Tompkins' $50,000 purchase of 14,417 shares had appreciated to an

approximate value of $138,403.

In or around later 2021 to 2022, Tompkins demanded that Perullo refund Tompkins' full $50,000 investment. Perullo feared that if he did not agree to Tompkins' demands, Tompkins could use his official authority as Sheriff to terminate the SCSD's ongoing partnership with Ascend, jeopardizing Ascend's Massachusetts dispensary license renewals in Boston and other locations. Consequently, Perullo agreed to return the full amount of the investment to Tompkins. By that time, Ascend's stock had decreased in price such that Tompkins' equity interest was worth several thousand dollars less than $50,000.

### Legal Elements of the Charged Offenses

### Counts 1 and 2: Extortion Under Color of Official Right

Title 18, United States Code, Section 1951 provides:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

To establish a violation of 18 U.S.C. § 1951, the following elements must be proved beyond a reasonable doubt:

1. The defendant knowingly and willfully obtained property from Perullo;

2. The defendant did so by means of extortion; and

3. The extortion affected interstate commerce.

"Extortion" is "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18

4

U.S.C. § 1951(b)(2); *United States v. Correia*, 55 F.4th 12, 29 (1st Cir. 2022) (internal citations and quotations omitted).

Under the economic fear prong, extortion by fear "can mean fear of economic loss, including the possibility of lost business opportunities." *Cruzado-Laureano,* 404 F.3d 470, 480-81 (1st Cir. 2005) (internal citations omitted). "The government must show that the victim believed that economic loss would result from his or her failure to comply with the alleged extortionist's terms, and that the circumstances. . . rendered that fear reasonable." *Id.* (internal citations and quotations omitted). "The jury must consider the victim's perspective, and the proof need establish that the victim *reasonably* believed: first, that the defendant had the power to harm the victim, and second, that the defendant would exploit that power to the victim's detriment." *United States v. Middlemiss*, 217 F.3d 112, 118 (2d Cir. 2000) (internal quotations and citations omitted). The fear need not result from an implicit or explicit threat.[1] *Id.*

Under the "color of official right" prong, "the Government need only show that a public official has obtained payment to which he was not entitled, knowing that the payment was made in return for official acts." *Cruzado-Laureano*, 404 F.3d at 481 (quoting *Evans v. United States*, 504 U.S. 255, 268 (1992) ("the coercive element is provided by the public office itself.")).

> '[A]n element of duress such as a demand' is not an element of the offense of Hobbs Act extortion under color of official right. 'The 'color of official right' and 'fear' prongs provide alternative, independently sufficient grounds for finding extortion; thus, adequate proof of one obviates any need for proof of the other.' In other words, where the government presents evidence that the government official received a payment under color of official right, it need not prove that the official induced the payment through fear.

---

[1] As noted in the government's Request for Jury Instructions (Dkt. No. 107), attempted extortion is a lesser included offense of extortion, therefore the government need only prove that the defendant <u>attempted</u> to generate fear in the victim under this theory. *United States v. D'Amico*, 496 F.3d 95, 99-100 (1st Cir. 2007) ("The cases hold that attempts are lesser-included offenses of completed Hobbs Act violations.") (internal citations omitted).

*United States v. Buffis*, 867 F.3d 230, 235 (1st Cir. 2017) (cleaned up).

Moreover, a defendant can commit Hobbs Act extortion even when the defendant provides a thing of value (e.g., services) in exchange for the extorted property. *See United States v. Biaggi*, 909 F.2d 662, 683 (2d Cir. 1990) (holding that a transaction can constitute extortion where it "is sought and paid for both lawful and unlawful purposes"). For example, in a Travel Act bribery case where it was alleged that defendant Woodward (a state representative) accepted meals, travel, and golf in exchange for official action beneficial to insurance company executive Sawyer, defendant Woodward argued that the in-kind gratuities could not be bribes because Sawyer gave Woodward such benefits because of their friendship. *United States v. Woodward*, 149 F.3d 46, 58-59 (1st Cir. 1998). The First Circuit rejected defendant Woodward's binary approach to intent, instead recognizing that the jury could accept:

> [T]hat the two men had two types of relationships, a personal friendship and a business relationship. [And the fact that] Woodward's acceptance of expenditures that were part of their friendship was not illegal, but his acceptance of expenditures in the context of their business relationship constituted theft of the honest services that Woodward owed to his constituents.

*Id.* And similar to the *Biaggi* Court, the First Circuit held that "[t]he jury was free to choose among the reasonable alternatives posed by the evidence," in reaching its conviction on bribery charges. *Id.* (internal citations and quotations omitted).

It is immaterial that the extortionate agreement does not state the quid pro quo in express terms. *Evans*, 504 U.S. at 274 (agreement need not state quid pro quo in express terms, otherwise "the law's effect could be frustrated by knowing winks and nods."); *United States v. Ganim*, 510

F.3d 134, 143 (2d Cir. 2007) (agreement need not state quid pro quo in express terms, but "may

be implied from the official's words and actions").

An "official act" is a decision or action on a "focused and concrete" pending question,

matter, cause, suit, proceeding or controversy. *See McDonnell v. United States*, 579 U.S. 550

(2016). As post-*McDonnell* jurisprudence continues to proliferate, courts have readily identified

the various methods and means through which public officials take official action, for example:

> (1) approving a gun license application; (2) promoting or
> transferring a police officer; (3) making an arrest, and then making
> a decision about whether to issue a desk appearance ticket to the
> arrestee; (4) authorizing the use of a police helicopter for a particular
> occasion; (5) authorizing the use of a police boat for a particular
> occasion; and (6) deploying a police escort for a private citizen or
> transporting a private citizen in a police car.

*United States v. Reichberg*, 5 F.4th 233 (2d Cir. 2021) (honest services fraud case recognizing that

each of the alleged acts "are the sort of specific, formal exercises of government power that can

constitute official acts"). *See also United States v. Fattah*, 914 F.3d 112, 156-157 (3d Cir. 2019)

(public official's letter of recommendation could constitute official act under the pressure-advise

prong in HSF case).

Refraining from performing an official act is also an official act. *United States v.*

*DeQuattro*, 118 F.4th 424 (1st Cir. 2024). In *DeQuattro*, the First Circuit agreed with the

government's theory that defendant DeQuattro's payments to Tribal President Cromwell

constituted the *quid*, and that Cromwell's protection of the RGB contract thus served as the *quo*.

*Id.* at 444-45.

> [T]he requirement of a quid pro quo means only[ ] "that without
> pretense of any entitlement to the payment, a public official violates
> § 1951 if he intends the payor to believe that absent payment the
> official is likely to abuse his office and his trust to the detriment and

> injury of the prospective payor or to give the prospective payor less
> favorable treatment if the quid pro quo is not satisfied."

*Id.* (citing *Correia*, 55 F.4th at 35).

It is not a defense that the public official's actions (or inaction) would have been the same whether or not the official demanded, obtained, accepted, or agreed to accept the property. *See United States v. Reeves*, 892 F.2d 1223, 1226 (5th Cir. 1990); *United States v. Jannotti*, 673 F.2d 578, 601 (3d Cir. 1982) (it is not a defense to bribery that, had there been no bribe, the official might have made the very recommendation the briber wanted him to make); *United States v. O'Keefe*, 252 F.R.D. 26, 30-31 (D.D.C. 2008) (same); *United States v. Bryant*, 556 F. Supp. 2d 378, 390 (D.N.J. 2008). And the government need not prove that the official action would have been, or was, a misuse of the public official's office. *See, e.g.*, *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365 (1991) (stating "[a] mayor is guilty of accepting a bribe even if he would and should have taken, in the public interest, the same action for which the bribe was paid").

Finally, the Hobbs Act focuses on the victim's involvement in interstate commerce, not the defendant's. The First Circuit has "long . . . held that this statute does not require a substantial interference with commerce; a *de minimis* interference will suffice." *United States v. Vega Molina*, 407 F.3d 511, 521 (1st Cir. 2005). "[T]he government need only show a realistic probability of a *de minimis* effect on interstate commerce [ ] in order to bring extortion within the reach of the Hobbs Act." *United States v. Rivera Rangel*, 396 F.3d 476, 482 (1st Cir. 2005); *see also United States v. Vazquez-Botet*, 532 F.3d 37, 60 n.19 (1st Cir. 2008). Moreover, extortionate conduct meets constitutional requirements when it "has a beneficial effect on interstate commerce … [or] minimally depletes the assets of an entity doing business in interstate commerce." *United States v. Cianci*, 378 F.3d 71, 99 (1st Cir. 2004) (citations omitted).

**Summary of the Evidence**

To prove the extortion charges in the Indictment (Counts One and Two) the government intends to call the individual who was extorted, Francis Perullo.  The government anticipates that Perullo will testify that Tompkins gave him $50,000 to acquire an equity interest in Ascend.  The government also anticipates that Perullo will testify that he did not want to sell shares to Tompkins, but only did so to preserve Ascend's ongoing partnership with the SCSD pursuant to the PIP agreement and the pressure exerted by Tompkins.  Perullo will also testify regarding the pressure Tompkins placed on him in demanding that his investment be refunded, which forms the basis of Count Two.  The government intends to show how the $50,000 was transferred to Perullo by introducing Fidelity business records.

The government also intends to call current and former Ascend employees, including Daniel Neville, Abner Kurtin, Sarah Levy, and David Glassner, who the government anticipates will offer testimony regarding the nature of Ascend stock, pre-IPO restrictions on the transfer of Ascend stock, and the value of Ascend shares before and after the IPO.  The government also intends to introduce Ascend business records and securities documents showing the nature of investments being sought by Ascend pre-IPO, restrictions on transfer, and the value of the stock post-IPO.  A forensic analyst with the Federal Bureau of Investigations, Courtney Elliott, is also expected to testify regarding the value of Ascend stock following the IPO and at the times when Tompkins requested, and received, a full refund of his investment, as well as Tompkins' personal financial activities at or around the time of the transactions.

The government also intends to call current and former Ascend employees, Mark Wright, Danielle Drummond, and Stacia Lyons, as well as a former Ascend consultant (and Cannanovus

member), Rebecca Rutenberg, who are expected to offer testimony regarding Ascend's compliance with state licensing requirements, Ascend's PIP and diversity plans that were submitted to the CCC for initial applications and renewals, and the implementation of those programs. The government intends to introduce Ascend business records showing those plans, their implementation, and Ascend's efforts to comply with the CCC's licensure requirements. The government also intends to call a witness from the CCC, Tsuko Defoe, who is expected to testify regarding the CCC's license requirements and the materiality of the PIP to a license application and renewal applications. The government also intends to introduce CCC records regarding CCC's licensing requirements and documents submitted by Ascend.

Additionally, the government intends to call former SCSD employees Allen Forbes and Maia Porter who are expected to testify regarding the work of the SCSD, the role of the Sheriff, and the SCSD's implementation of the SCSD's PIP agreement with Ascend.

A former Fidelity employee, Jonathan Kinsky, is expected to testify regarding Tompkins' investment activities, including that he was an experienced investor who regularly conducted trades and sought investment advice from Fidelity financial advisors. The same will be demonstrated through Fidelity business records.

Finally, the government intends to call Massachusetts State Ethics Commission ("SEC") employee Monica Brookman. Ms. Brookman is expected to testify regarding Tompkins' disposition agreements with the SEC in which he agreed that he violated state ethics laws by using his official position to obtain personal benefits.

### Relevant Law

The government anticipates entering into a proposed stipulation as to the proper

authenticity and foundation for business records for various entities, including but not limited to, Ascend, SCSD, the CCC, and Fidelity.    These business records include emails and email attachments, which altogether, consist of records kept in the ordinary course of business, where it was a regular practice of each business to maintain such records, and the records were made at or near the time such events therein were recorded.    *See* Fed. R. Evid. 803(6); 902(11). Additionally, the records include codes of conduct, employment records, guidance documents, and with respect to Fidelity, financial statements and notes taken by employees to memorialize phone calls and meetings with clients, all of which were kept in the ordinary course of business, where it was a regular practice of each business to maintain such records, and the records were made at or near the time such events therein were recorded.    *Id.*

For the purposes of Fed. R. Evid. 801(d)(2)(A), defendant Tompkins is a party opponent to the United States and, as such, his statements are properly admissible as exceptions to the hearsay rule.    *See United States v. Kattar*, 840 F.2d. 118, 130-131 (1st Cir. 1988); *United States v. Rivera-Hernandez*, 497 F.3d 71, 82-83 (1st Cir. 2007).    This is so even where his statements are relayed by a witness, or are included in documents otherwise admissible, such as business records.

The government also intends to introduce records from the Massachusetts State Ethics Commission.    The parties' disagreements regarding those records have been fully briefed in their motions in limine.    The government does not intend to ask questions on direct examination that would elicit facts regarding details of the commission's investigation; it simply wishes to introduce the notice and disposition agreements to show the defendant's knowledge and intent.

11

**Conclusion**

This trial brief is meant only as a summary of the evidence that the United States intends to present at trial.   It does not describe every witness who will testify at trial, every topic on which witnesses will testify at trial, nor every type of document or material the United States intends to admit at trial.   The government respectfully reserves the right to call other witnesses and introduce other documents in its case-in-chief as circumstances necessitate.

This memorandum does not exhaust all the issues that may be presented at trial. It is intended to assist the Court and present the position of the United States with respect to the above matters.   If any legal issues arise that have not been covered in this trial brief, the government respectfully requests permission to file supplemental briefing.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney,

Date:   July 23, 2026           By:     /s/ *Lauren Maynard*
Dustin Chao
Lauren Maynard
Assistant U.S. Attorneys

12

## <u>CERTIFICATE OF SERVICE</u>

Undersigned counsel certifies that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/ Lauren Maynard*
Lauren Maynard
Assistant United States Attorney

Dated:   July 23, 2026