UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>STEVEN W. TOMPKINS<br>Defendant | No. 25-CR-10334-MJJ |

**OPPOSITION TO GOVERNMENT'S MOTION TO ADMIT CONTESTED EXHIBITS**

Defendant Steven W. Tompkins respectfully opposes the Government's Motion to Admit Exhibits, Dkt. 145. The motion should be denied, except that Mr. Tompkins withdraws his objections to Exhibits P-4 and PP-3.

Across the challenged categories, the proposed exhibits exceed 1,800 pages. The Fidelity category alone contains approximately 1,233 pages. Many of the CCC, investor, and Friend Street exhibits are exact duplicates of exhibits the government separately intends to offer and the defense did not object to. Others are later emails attaching older applications or plans whose contents already appear (sometimes more than once) in the undisputed exhibit list. Rule 403 does not require the Court to admit each copy merely because every copy clears Rule 401's relevance bar.

Several challenged exhibits present a different and more fundamental problem: the government's motion does not accurately describe them. Exhibit OO is not a collection of the checks Mr. Tompkins received. It is a government created, chart headed "Check Amount (Stock Sale Proceeds)." It assumes, without evidentiary support – and despite the absence from pretrial discovery of any documentary or statements indicating that Mr. Perullo sold shares of Ascend to

fund the checks – that the payments listed under the misleading heading "Stock Sale Proceeds" were, in fact, proceeds of stock sales.[1]

The proposed stock charts contain similar assumptions. The operative November 13, 2020 Purchase and Sale Agreement describes a transfer of a 0.0014% in Cananovus, LLC and recites an asserted equivalence to a number of AWH shares. It does not convey freely tradable AWH shares. Yet Exhibits GG–JJ and OO recast that private, restricted LLC interest as 14,416.5 freely tradable public shares, assign daily public market prices to that assumed quantity, and, most significantly, treat later repayments as though public shares were actually sold. The government identifies no trade confirmation, brokerage record, or witness who will testify that Mr. Perullo or Mr. Tompkins sold those shares. An argumentative chart cannot supply the missing evidence. It also misleadingly suggests that the defendant had anything to do with the timing of the receipt of checks or the stock price for Ascend on any one of the five days Mr. Perullo chose to partially return the investment.

The Court can permit the government to prove the actual charged transactions, the existence and timing of Ascend's Massachusetts licenses, the SCSD partnership, and Ascend's public offering without admitting cumulative documents, years of unrelated financial account activity by a defendant who is not charged with receiving illegal proceeds as in a fraud case but who paid for what he believed to be an investment, thus making his cash expenditures, selective lifestyle evidence, or summaries built on contested assumptions irrelevant and prejudicial. Accordingly, the defense requests the Court to deny blanket admission, exclude the irrelevant and argumentative exhibits identified below, and require the government to make targeted offers at trial with an adequate foundation.

---

[1] The actual check images are separate exhibits that were undisputed by the defense.

## I. LEGAL STANDARDS

The government bears the burden of establishing an admissible purpose and foundation for each exhibit it offers. Relevance is only the beginning. Rule 403 authorizes exclusion for unfair prejudice, confusion, wasted time, and "needlessly presenting cumulative evidence." Fed. R. Evid. 403. The First Circuit has applied the rule where evidence had, at most, a "scintilla" of additional probative value but was "wholly cumulative and, thus, gratuitous." *United States v. Kilmartin*, 944 F.3d 315, 337–40 (1st Cir. 2019). The government's burden of proof thus does not confer a license for evidentiary overload.

Rule 106 admits only material that "in fairness ought to be considered at the same time." It does not make an email and every attachment indivisible. The Court must identify a "reasonable unit of wholeness" and determine whether the excerpt otherwise omits "revealing context." *United States v. Boylan*, 898 F.2d 230, 256-57 (1st Cir. 1990). And a Rule 1006 summary must accurately and non-prejudicially represent voluminous admissible records. *United States v. Milkiewicz*, 470 F.3d 390, 395-98 (1st Cir. 2006). Indeed, the 2024 Advisory Committee Note confirms that a summary may be excluded under Rule 403 when it is inaccurate or argumentative.

## II. ARGUMENT

### A. CCC RELATED EXHIBITS (EXS. C-1–H-2, T-6–T-8, V-1–V-2, X-2–X-3) ARE NEEDLESSLY CUMULATIVE.

The defense does not dispute that Ascend's licensing history and its early agreement to attempt to hire outgoing inmates from SCSD provide relevant background. Rather, it disputes the need to admit every duplicate application and plan, as well as later emails that merely reattach plans in evidence.

Appendix A, which the defense did not oppose, already includes the 2022 diversity and positive-impact plans (F-2 and F-3), the 2019 licensing response (T-1 through T-5), and the

December 2021 email with four updated plans (X-1 and X-4 through X-7). The defense's objection is instead directed at exhibits that are duplicative, needlessly cumulative, and offered for no apparent purpose. For example:

- G-2 and G-4 are also included in Exhibits 103, 68, 128, and X-3.
- G-3 and X-2 are also included in Exhibits 67 and 127.
- C-2 is also included in Exhibits 58, 216, 69, X-4, 122, 129, and 138.
- D-2 is also included in Exhibits 27 and 88.
- V-2 is also included in Exhibits 4, 29, and 197.

Accordingly, the defense does not seek to exclude the relevant background evidence. It seeks only to avoid the unnecessary presentation of repetitive and cumulative exhibits.

The Court should exclude these duplicate exhibits, without prejudice to a targeted nonduplicative excerpt if an actual completeness issue arises at trial or if the government can show a particularized need for an additional exhibit featuring the same application that was already introduced into evidence elsewhere.

### B. ASCEND INVESTOR-FACING DOCUMENTS (EXS. J-1–K-8, M-1–M-3) ARE UNCONNECTED TO MR. TOMPKINS AND CUMULATIVE.

The investor documents comprise approximately 276 pages. They includes two copies of the same investor deck (J-2 and K-2), two copies of the same "Key Press" packet (J-3 and K-3), a 62-page industry report (K-6), a 32-page third-party JM10 investor deck (K-7), and an 86-page AWH operating agreement (K-8) that also appears at Exhibit 180. Most contain no reference to Mr. Tompkins at all. The government identifies no evidence that these documents were sent or shown to him, that he knew their revenue projections, or that those projections informed the charged transaction. Documents shown only to prospective investors cannot establish Mr. Tompkins's knowledge, intent, or valuation of the private interest that he acquired in Cananovus. The government's assertion that the documents prove how "excited" investors were and describe

the "landscape" of cannabis investing equally have no bearing on the alleged *quid pro quo*. Dkt. 145 at 4-5.

The suggested inference about Ascend's "regular practices" is equally unsupported. *Id.* An investor deck sent to a potential institutional investor does not establish a routine practice governing private transfers of interests in Cananovus, much less show that Mr. Tompkins's transaction was outside that practice. Ascend's multistate operations and the interstate-commerce element can be proved through a corporate witness, a targeted business record, or another narrowly tailored exhibit.

The importance of the Boston store is likewise established by other unobjected-to exhibits without any need to admit hundreds of pages of projections, press clips, and third-party industry materials. Because the documents were not shown to Mr. Tompkins, contain substantial duplication, and threaten delay and confusion, Exhibits J-1 through K-8 and M-1 through M-3 should be excluded.

### C. ASCEND FRIEND STREET OPENING EXHIBITS (EXS. I-1–I-10, L-1–L-2) REPEAT OTHER EVIDENCE.

The Friend Street category presents the same problem on a smaller scale. The government offers ten internal communications, talking points, draft press materials, and message guides, plus an email and outreach list. Yet the allegedly relevant propositions are narrow: Ascend opened the Friend Street store in 2021, the company considered the opening important, some materials mentioned the SCSD partnership, and Mr. Tompkins appeared on a prospective VIP list. Those points do not require the entire packet and certain unobjected-to exhibits establish those same points.

Exhibit I-7 is materially the same social equity narrative as M-2. Exhibit L-1 overlaps Exhibit 153, and its attachment L-2 is the outreach list offered as Exhibit 154. Accordingly, all the

relevant information will already be in evidence. These exhibits should therefore be excluded as cumulative and insufficiently connected to the charged conduct, or reserved for targeted rulings at trial.

**D. DEFENDANT'S FINANCIAL RECORDS (EXS. O, Q, R, S, KK, LL, MM, NN, OO, AAAA–DDDD) DO NOT SHOW FINANCIAL NEED OR ILLEGAL PROCEEDS.**

The government argues Mr. Tompkins's "personal financial situation" supplies motive and that the challenged records show how he spent "proceeds from the repayments." Dkt. 145 at 6. Neither premise fits the evidence or the charged theory.

First, the government does not allege that Mr. Tompkins lacked legitimate funds to make the purchases depicted in the records. The defense does not object to the 2020 Fidelity statements, which show a portfolio worth nearly $1 million around the November 2020 wire. *See* Exhibit 232. The government also seeks to admit W-2s showing substantial legitimate wages. This is not a case in which sudden wealth appeared after a crime or spending exceeded known lawful means.

Second, the payments charged in Count Two were repayments of Mr. Tompkins's own $50,000 investment. Even under the government's theory, they were not newly acquired profits used to finance purchases that otherwise could not be made.

Third, Exhibit MM reveals the actual prejudice and the government's reason for these exhibits. The government slides highlight a $2,656.25 Louis Vuitton charge and $6,988.83 in "Charges in Jamaica" as well as other travel and restaurant charges. Those transactions do not prove financial distress, an extortionate demand, receipt of illicit gain, or consciousness of guilt. They invite jurors to judge Mr. Tompkins's vacations and consumer choices. Appeals to class prejudice are, however, improper. *See United States v. Stahl*, 616 F.2d 30, 32-33 (2d Cir. 1980); *United States v. Jackson-Randolph*, 282 F.3d 369, 377 (6th Cir. 2002) ("[I]t is illogical and

improper to equate financial success and affluence with greed and corruption. Much, probably most, wealth and affluence are gained through honest and socially desirable or socially neutral means such as hard work, innovation, successful investments, inheritance, good luck, etc.") (citation omitted). Here, the government identifies no gap between Mr. Tompkins's spending and legitimate resources and instead proposes a selective lifestyle presentation. While lifestyle evidence has probative force where the government shows that the money spent was not available from legitimate sources and the spending is tied to the alleged unlawful activity, or if the proof of expenditures is necessary to prove the receipt of money in the amounts spent, here there is no dispute about Mr. Tompkins' directly proven receipt of five checks totaling the amount of his investment thus no need to rely on prejudicial circumstantial evidence.

The government's cases similarly involve concrete links absent here. *Díaz-Colón* involved evidence of actual financial strain. *United States v. Díaz-Colón*, 163 F.4th 1, 29 (1st Cir. 2025). *Appolon* involved expenditures of fraud proceeds where the defendant lacked a legitimate source of disposable income. *United States v. Appolon*, 695 F.3d 44, 60 (1st Cir. 2012). *DeCicco* involved tax liabilities offered to show the intended use of fraudulent insurance proceeds. *United States v. DeCicco*, 370 F.3d 206, 214 (1st Cir. 2004). *McGauley* involved actual refund checks that directly proved a mail fraud element. *United States v. McGauley*, 279 F.3d 62, 72–73 (1st Cir. 2002). None authorizes unrelated lifestyle evidence where legitimate resources are undisputed.

Fourth, the motion materially misidentifies Exhibit OO. OO does not contain "the checks that the defendant received from Perullo." Dkt. 145 at 7. The actual check images appear at Exhibits 223 through 227 and are uncontested. OO is an advocacy chart with a heading that declares each check from Mr. Perullo to be "Stock Sale Proceeds." It assumes a starting balance of 14,416.5 shares, chooses daily public market prices, invents a "Shares Sold" figure for each

payment, and calculates a negative remaining share balance, built on two assumptions, neither proven, the first is that shares in fact were sold to fund the checks and the second is that Mr. Tompkins bore responsibility for the delays in repayment that alone corresponded to the shrinking stock price. No underlying record shows that those sales occurred. The chart thus converts the government's disputed inference into the heading of proposed evidence. Rule 1006 does not permit that. *Milkiewicz*, 470 F.3d at 397-98.

Finally, Exhibit S is a generic set of 2025 W-2 instructions, not a financial record of Mr. Tompkins and not a record from the period charged. The government does not explain its relevance at all.

The Court should exclude Exhibits O, Q, R, S, KK, LL, MM, NN, OO, and AAAA through DDDD. If the government establishes that a specific transaction line is necessary to trace an actual charged payment, the Court can consider a narrowly redacted record outside the jury's presence. But the government should not publish account balances, unrelated transactions, vacation charges, luxury purchases, or an argumentative "stock sale" chart under the label of motive when the evidence will clearly show that Mr. Tompkins received a return of his investment via checks deposited into his Bank of America account on the five occasions chosen by Mr. Perullo.

### E. DEFENDANT'S FIDELITY RECORDS (EXS. BB, CC, DD, EE, FF) ARE CUMULATIVE, AND EXHIBIT CC DOES NOT SHOW CONCEALMENT.

The challenged Fidelity exhibits comprise approximately 1,233 pages: 53 pages of account opening forms from 2000 (BB), eight pages of interaction notes spanning 2017-2023 (CC), 484 pages of 2021 statements (DD), 470 pages of 2022 statements (EE), and 218 pages of 2023 statements (FF). A business record certification may address a hearsay foundation, but it does not make every page relevant or overcome Rule 403.

The government already has the unobjected-to 2020 Fidelity statements. Exhibit 232. Those records show the source account for the $50,000 wire, Mr. Tompkins's holdings, his investment activity, and his overall financial position. If investment experience is genuinely probative, that single exhibit supplies it. Account opening forms from two decades earlier and three additional years of monthly statements add volume, not meaningful proof. The government does not identify any particular trade showing that Mr. Tompkins understood the value or transferability of a private Cananovus interest, or, had he received shares in the company, any relevant particular knowledge that would advance the proof in this case as contrasted to providing years of unrelated stock and mutual fund transactions. Moreover, general experience with publicly traded securities does not establish knowledge about that distinct private investment.

The interaction notes fare no better. The government relies on a November 9, 2020 interaction note stating that Mr. Tompkins sought assistance with a wire to "some political group." Dkt. 145 at 8. The contemporaneous records show that the wire was completed the following day and identify "SAGE CONSULTING SERVICES, LLC" – Mr. Perullo's political consulting entity – as the beneficiary. Exhibit 232 at 41. The note's general description of the intended recipient is therefore consistent with the wire record. It does not show that Mr. Tompkins misled Fidelity. Nor is there evidence that the adviser asked about the purpose or legal structure of any outside investment. Fidelity managed some of the assets held in Mr. Tompkins's Fidelity accounts, and the government identifies no contractual, regulatory, or customary duty requiring him to disclose a private LLC investment to an adviser assisting with wire instructions.

The government's alternative inference that the absence of cannabis references from other interaction notes shows Mr. Tompkins knew the transaction was impermissible rests on speculation from silence. Silence is inherently ambiguous unless the circumstances would

naturally call for a statement. *See United States v. Hale*, 422 U.S. 171, 176 (1975). Nothing indicates that Fidelity advisers routinely documented all outside investments or that an ordinary customer would disclose every external transaction during unrelated calls. The absence of a cannabis reference does not become evidence of concealment merely because the government accumulated years of advisory notes. Fidelity was not acting as an investment manager for all of Mr. Tompkins' non-Fidelity investments and there was neither a reason nor duty to advise anyone at Fidelity of a purchase constituting a modest % of his overall assets.

Accordingly, if the Court permits any Fidelity proof beyond the unobjected 2020 statements, it should require the government to identify the exact page and purpose first and redact all unrelated holdings, transactions, objectives, and personal financial information.

**F. ASCEND STOCK SUMMARY CHARTS (EXS. GG, HH, II, JJ) AND EXHIBIT OO ARE INACCURATE AND ARGUMENTATIVE.**

These inaccurate and argumentative charts begin with Exhibit GG. The government describes Ascend stock as becoming available on a "U.S. stock exchange" on May 26, 2021. Dkt. 145 at 9. That is incorrect. AAWH was quoted in the United States on the over-the-counter market. It was never listed on a U.S. national securities exchange. Exhibit GG nevertheless supplies 31 pages of pricing data from the third-party website stockquote.io and treats OTC closing quotations as established market prices available for Mr. Tompkins's interest. An OTC quotation, however, does not establish that any trade occurred at the quoted price or that the price is accurate. *See* https://www.finra.org/investors/insights/no-finra-did-not-approve-that-security

The remaining exhibits continue from that underlying problem. Exhibit HH adds a 25-page comparison of Canadian and U.S. quotations that the defense previously noticed, while Exhibits II and JJ graph selected portions of the same pricing information. The government itself characterizes the difference between the Canadian and U.S. prices as "*de minimis*." Dkt. 145 at 9.

If so, presenting both series is needlessly cumulative. Explaining the Canadian listing, the U.S. OTC market and the significance of competing quotations would consume substantial trial time and confuse the jury about a collateral issue.

More fundamentally and as discussed above, none of those public quotations establish the value of what Mr. Tompkins allegedly acquired and what he gave back. The November 13, 2020 Purchase and Sale Agreement states that Mr. Perullo was transferring ".0014 percent of ownership of Cannanovus which is equal to 28,833 shares of AWH" in exchange for $50,000. Exhibit 182 at 1. But at the time Cananovus did not hold any Ascend shares. Instead, it held an approximate 22.11% interest in AGP (a different LLC) that equated to approximately 6,060,000 shares. Exhibit 213.

The government therefore has not established the necessary bridge between Mr. Tompkins's restricted interest in a private LLC that itself held no shares and 14,416.5 freely transferable public shares.[2] There is no evidence that Mr. Tompkins held AWH or AAWH shares in a brokerage account, that someone recognized him as a shareholder, that the Cananovus interest could be converted to actual shares, or that either Mr. Tompkins or Mr. Perullo sold public shares to fund the repayments. Public quotations cannot establish the value of a restricted, indirect interest that could not necessarily be sold at those prices or sold at all.

Exhibit OO goes even further. It labels the payments "Stock Sale Proceeds," converts each payment into an invented number of "Shares Sold," and ultimately calculates a negative share balance. No trade confirmation, brokerage statement, or witness establishes that any such sale

[2] Prior to the actual IPO of Ascend, the company did a reverse 2-1 stock split that cut the number of outstanding shares in half.

occurred. OO thus embeds the government's disputed theory in the chart and presents that theory as evidence.

Calling the assumed share quantity "theoretical" does not cure these defects. Dkt. 145 at 10. A Rule 1006 summary must accurately summarize admissible evidence. It cannot supply facts missing from the underlying records or place a disputed inference before the jury as substantive proof.

The Court should accordingly exclude Exhibits GG, HH, II, JJ, and OO. The defense recognizes that stock price evidence may have limited relevance for a narrow purpose: comparing Ascend's value at the IPO with its value when Mr. Tompkins first requested the return of his investment. Even accepting the government's assumption that Mr. Tompkins acquired 28,833 shares of Ascend, solely for that comparison, the value attributed to Mr. Tompkins's interest exceeded $50,000 when he requested repayment. That evidence supports the defense position that Mr. Tompkins was seeking the return of his principal – not a windfall – and was willing to surrender an interest then worth more than the amount he requested. Accordingly, if a market benchmark becomes relevant, the defense does not object to one neutral price covering a stipulated period, accompanied by an instruction that a public quotation does not establish that Mr. Tompkins's private Cananovus interest was freely tradable or actually sold.

### G. CODES OF CONDUCT (EXS. N, W, SSS–YYY) ARE PROPENSITY-LADEN.

The government seeks the 2019 SCSD Employee Handbook (N), the AWH Code of Business Conduct and Ethics (W), and seven annual versions of the SCSD Personnel Code of Conduct from 2017 through 2023 (SSS–YYY). The seven SCSD codes are substantially identical. The government does not identify the provision it claims Mr. Tompkins violated, explain how any

provision is related to an element of Hobbs Act extortion, or justify placing seven versions before the jury.

The government's reliance on the Court's March 3, 2026 order is misplaced. This Honorable Court expressly distinguished a motion to strike allegations from a ruling on evidence: "A motion to strike does not turn on the admissibility of evidence." Dkt. 94 at 11. It further held that evidentiary objections were "premature" and that Mr. Tompkins could "at the appropriate time, move for pretrial rulings on any such evidentiary issues." *Id.* at 11. Nor does *United States v. Devin* support wholesale admission. There, department regulations governing the charged police officer were tied to the conduct at issue and were "helpful to the jury" in deciding whether the officer knowingly disregarded sworn obligations by accepting things of value that influenced official duties. 918 F.2d 280, 287 (1st Cir. 1990). Here, the government has not identified a comparable operative provision or an alleged violation distinct from its assertion that the charged conduct itself was wrongful.

Furthermore, inviting the jury to reason that Mr. Tompkins directed employees to follow ethical rules and therefore must have committed the charged offense is precisely the forbidden character inference in another form. Rule 404 applies whenever character evidence is offered to show action in conformity. Evidence must have special relevance without bad character or propensity as a necessary link in the inferential chain, and it remains subject to Rule 403. The government's asserted chain – Mr. Tompkins approved broad workplace rules, knew ethical conduct was expected, and therefore knowingly committed extortion – depends on a generalized propensity inference and risks allowing internal policy to become a surrogate criminal standard.

Exhibit W is still further removed. It applies to AWH personnel, not Mr. Tompkins. It was adopted on April 22, 2021, months after the November 2020 purchase agreement, and the copy

offered was revised in March 2024. The government offers it to argue that Mr. Perullo "likely acted contrary" to his employer's rules and therefore knew the transaction was wrongful. Dkt. 145 at 12. But the government identifies no evidence that Mr. Perullo received, read, and understood the operative provision, consulted the legal department, *or viewed the private transaction as a gift* to a government official. Again, admitting a revised corporate code suggesting that a witness violated company policy, potentially at a time when it was not in effect, would create a collateral trial concerning policy compliance and invite the jury to treat an internal rule as proof of a federal offense.

Accordingly, the Court should exclude N, W, and SSS through YYY.

### H. SIGNATURE BLOCKS (EXS. P-4, PP-3): THE DEFENSE WITHDRAWS ITS OBJECTIONS.

The defense withdraws its objections to Exhibits P-4 and PP-3.

## III. CONCLUSION

Mr. Tompkins respectfully requests that the Court deny blanket admission; exclude the cumulative, irrelevant, and argumentative exhibits identified above; require targeted, redacted offers outside the jury's presence where appropriate; and deem the objections to Exhibits P-4 and PP-3 withdrawn.

Respectfully Submitted,

**/s/ Martin G. Weinberg**
Martin G. Weinberg
Mass. Bar No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

**CERTIFICATE OF SERVICE**

I, Martin G. Weinberg, hereby certify that on this date, August 17, 2026, a copy of the foregoing document has been served on the government via ECF.

**/s/ Martin G. Weinberg**
Martin G. Weinberg