UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| v. | ) | No. 25-CR-10334-MJJ |
| STEVEN WAYNE TOMPKINS, Defendant | ) | |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL**

Defendant Steven Tompkins, by and through undersigned counsel, respectfully submits this Memorandum of Law in support of his Motion for Judgment of Acquittal, respectfully contending that pursuant to Fed. R. Crim. P. 29(a) this Honorable Court should enter a judgment of acquittal on both counts of Hobbs Act extortion pending against him on the grounds that the government has failed to meet its constitutional obligation to prove each of the essential elements beyond a reasonable doubt.[1]

Mr. Tompkins did not agree to exchange any official acts for payment, as required to prove *quid pro quo* bribery sufficient to support the charge of extortion under color of official right. There was no direct evidence whatsoever of any such agreement, even from the government's immunized witness Mr. Perullo, and the circumstantial evidence cannot support any finding of such agreement without impermissibly "piling inference upon inference." *Ingram*

[1] In the interest of clarity, this Motion constitutes a general challenge to the sufficiency of the evidence and the specific deficiencies enumerated herein are merely illustrative. *See United States v. Marston*, 694 F.3d 131, 134-35 (1st Cir. 2012).

*v. United States*, 360 U.S. 672, 680 (1959).

There is no evidence supporting a finding that Mr. Tompkins acted with the "corrupt intent" to exchange his official acts for payment.

The evidence established that, more than two years prior to any discussion of Mr. Tompkins receiving anything at all from Mr. Perullo, Mr. Tompkins and Andrea Cabral, CEO of Ascend in Massachusetts, reached an agreement for Ascend to have the ability to hire graduates of the Suffolk County Sheriff Department's ("SCSD") Common Ground Institute ("CGI"). *See* Exhibit 349 (June 9, 2018, Boston Globe article). Any alleged benefit provided to Mr. Tompkins after such agreement was already in place was, at the very most, a mere gratuity insufficient as a matter of law to support conviction under the Supreme Court's opinion in *Snyder v. United States*, 603 U.S. 1 (2024), or under clear binding precedents defining the essential elements of extortion under color of official right. *See, e.g.*, *Evans v. United States*, 504 U.S. 255, 260 (1992) (describing extortion under color of official right as "the rough equivalent of what we would . . . describe as 'taking a bribe'").

There is, independently, no evidence sufficient to prove that Mr. Tompkins took or agreed to take any official act cognizable under the Supreme Court's decision in *McDonnell v. United States*, 579 U.S. 550 (2016). The SCSD's passive (and utterly unsurprising) failure to withdraw its agreement that Ascend (like many other employers) was permitted to hire graduates of the CGI program was a mere ministerial act insufficient to satisfy binding precedent. It is the antithesis of "a formal exercise of governmental power . . . similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee . . . ." *McDonnell*, 579 U.S. at 574.

The government's alternative allegation of extortion by fear of economic loss similarly suffers from a number of glaring deficiencies. To support a conviction on this basis, "the proof need establish that the victim *reasonably* believed: first, that the defendant had the power to harm the victim, and second, that the defendant would exploit that power to the victim's detriment." Dkt. 130 (Govt. Trial Br.) at 5 (quoting *United States v. Middlemiss*, 217 F.3d 112, 118 (2d Cir. 2000)). Here, there is no evidence sufficient to support any reasonable fear on Mr. Perullo's part that economic loss would result from the hypothetical termination of the SCSD's relationship with Ascend.

To the contrary, Ascend always possessed alternative means of satisfying the regulatory Positive Impact Plan requirement, and no evidence supports an objectively reasonable belief that Ascend's licenses—or even the timing of its licenses—depended upon having or continuing the SCSD partnership. Ms. Defoe testified that there was "no rigid formula": an applicant needed "a goal, program and metrics," could satisfy those requirements "in a million different ways," and could change programs or partnerships when one was not working without obtaining the CCC's permission. Aug. 27, 2026 Morning Tr. 18-19, 24, 31-32. The CCC's additional guidance expressly recognized record-sealing and expungement services, job-creation programs, and funding charitable efforts as acceptable PIP programs. *See* Exhibit 161 at 4. Ms. Drummond likewise confirmed that Ascend "at all times had other goals, other programs that they informed the CCC about," and that "no individual program necessarily presents a risk." *Id*. at 74, 82. Thus, even if the SCSD partnership had ended or never existed, Ascend could continue satisfying its PIP through its other programs.

Indeed, long before any of the alleged conversations between Mr. Tompkins and Mr.

Perullo, Ascend's 2019 application contained two separate PIP goals and programs, either of which was independent of the other: contributing a percentage of net revenue to the WeGrow Foundation and hiring six individuals referred by SCSD. Exhibit 1 at 2. The CCC determined that Ascend's submitted plans were "substantially compliant," and recommended provisional licensure. *Id*. at 2-3. The CCC then issued the Friend Street provisional license on January 9, 2020 – at least 7 months before the alleged 2020 conversations in which Tompkins purportedly stated, "I helped you get that spot on Friend Street and you wouldn't be this big company without me." Exhibit 8 at 1; Aug. 28, 2026 Afternoon Tr. 19-20. Thus, by the time of the alleged statement, Ascend already possessed the Friend Street provisional license and already had a separate, CCC-approved WeGrow component that did not depend upon SCSD.

By the time Tompkins made his $50,000 investment on November 10, 2020, Ascend had still more independent means of satisfying the PIP requirement. Exhibit 182 at 1. Its renewal application continued WeGrow as a separate PIP program, increased the proposed contribution to 0.5% of net revenue, and reported that WeGrow had appointed its initial directors and was independently operated. Exhibit 10 at 17. AWH had also launched its Last Prisoner Project partnership in July 2020 with an initial commitment to raise $250,000 through customer contributions and company matching, and Ascend had developed a separate program of CORI-expungement and record-sealing clinics, the first of which had been postponed only because of COVID-19. Exhibit 9 at 1-3. Each was independently the type of program that the CCC's guidance recognized as capable of satisfying a PIP when accompanied by an appropriate goal and metrics. Exhibit 161 at 3-4; Exhibit 241 at 2-4. Indeed, the LPP program was substantial and fulfilled its initial commitment five months early. Exhibit 307 at 1. Accordingly, neither at the

time of the alleged statement nor at the time of Mr. Tompkins's investment did the possible loss of the SCSD partnership present an objectively reasonable threat to Ascend's license. Ascend already had multiple independent, recognized avenues for PIP compliance, and the CCC required only one compliant goal supported by a program and metrics, not the continued participation of SCSD.

Every witness other than Mr. Perullo who addressed the issue rejected the existence of any licensing risk. Ms. DeFoe testified that Ascend continued receiving license renewals despite hiring no one through the SCSD program and was never "in trouble with the CCC" for that failure. *Id*. at 28–29. Mr. Wright testified that no one ever informed him of any CCC concern about Ascend's PIP or its lack of SCSD hiring, that Ascend's licenses remained in good standing, and that Mr. Perullo never told him either that the SCSD relationship was in jeopardy or that Ascend's licenses depended upon it. Aug. 26, 2026 Afternoon Tr. 23-26. Ms. Drummond was equally unequivocal: the CCC never warned Ascend that it was failing to meet its PIP; there was no risk to Ascend's licenses from replacing the SCSD program with MassCultivatED; and there was no licensing risk arising from Ascend's failure to hire anyone through SCSD. Aug. 27, 2026 Morning Tr. 79-80. This uniform testimony demonstrates that Mr. Perullo's asserted fear was personal, uncommunicated, and objectively irrational.

The timing alleged in Count Two makes the government's theory still less plausible. Count Two charges Tompkins with obtaining the return of his original $50,000 investment between May 2022 and July 2023. On March 3, 2022, Andrea Cabral informed Mr. Wright and Ms. Drummond that Ascend could not rely upon SCSD as a meaningful source of employees and offered to contact probation departments. Exhibit 139; Ex. 290 at 1-2 (March 1, 2022 Newton

ADI Plan Progress Summary reporting that several of the seven SCSD referrals were disqualified because of prior convictions, only two eligible candidates responded to interview requests, and the sole candidate offered employment was subsequently disqualified). Shortly thereafter, Ascend shifted its hiring emphasis to MassCultivatED, and neither Mr. Perullo nor anyone else at Ascend objected. Aug. 27, 2026 Morning Tr. 71-74. Ms. Drummond explained that SCSD remained in Ascend's paperwork merely to preserve the historical account of the program, "not because [Ascend was] looking to them as a source of any future employees." *Id*. at 84. There is therefore no rational exchange linking the refund charged in Count Two to the continuation of a program that Ascend did not need, was no longer relying upon, and was already replacing. Nor is there evidence that Tompkins ever threatened to withdraw permission for Ascend to participate in CGI. Mr. Perullo's singular and unsupported apprehension cannot convert the repayment of an investment into property obtained by an objectively reasonable fear of economic harm. *See United States v. Capo*, 817 F.2d 947, 951 (2d Cir. 1987) (reversing convictions where there was no evidence "to suggest that it would have been reasonable for the 'victims' to believe that if they did not pay, the defendants would exploit [their] power to diminish their employment opportunities").

At the very least, there is a substantial doubt regarding the Hobbs Act's application in the present circumstances, such that the Court can and should limit the statute to its "solid core." *United States v. Skilling*, 561 U.S. 358, 407 (2010); *see also United States v. Brissette*, No. 16-CR-10137, 2020 WL 718294, at *12 (D. Mass. Feb. 12, 2020) (citing the need to "'define[] the forbidden zone of conduct' for public officials exercising their government authority 'with sufficient clarity,' thereby avoiding serious constitutional, federalism, and other policy concerns"

(quoting *McCormick v. United States*, 500 U.S. 257, 273 (1991)); *id.* (also noting importance of "preserv[ing] states' 'prerogative to regulate the permissible scope of interactions between state officials and their constituents' by preventing federal prosecutors and courts from setting and policing 'standards of good government for local and state officials.'" (quoting *McDonnell*, 579 U.S. at 576-77)). The instant prosecution, for reasons set forth *infra*, falls decidedly outside the "core" conduct that Congress sought to proscribe in enacting the Hobbs Act.

**REQUEST FOR HEARING**

The defense respectfully requests that oral argument be held on this motion.

**MEMORANDUM OF LAW**

## I. Legal Standard

Mr. Tompkins is entitled to a judgment of acquittal if "no rational trier of fact could" find each and every element of the offenses charged satisfied "beyond a reasonable doubt." *O'Laughlin v. O'Brien*, 568 F.3d 287, 300 (1st Cir. 2009). In engaging in this inquiry, the Court views the evidence in the light must favorable to the government. It must, however, "reject those evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative." *United States v. Stewart-Carrasquillo*, 997 F.3d 408, 418 (1st Cir. 2021) (citation omitted).

"Guilt beyond a reasonable doubt cannot be premised on pure conjecture." *O'Laughlin*, 568 F.3d at 301 (citation omitted); *see also Juan H. v. Allen*, 408 F.3d 1262, 1279 (9th Cir. 2005) ("Speculation and conjecture cannot take the place of reasonable inferences and evidence—whether direct or circumstantial . . . ."). "[S]uspicion and innuendo" are not enough. *United States v. Aguiar*, 610 F.2d 1296, 1303-04 (5th Cir. 1980) (citation omitted). "[I]f the evidence

viewed in the light most favorable to the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged," the Court must grant an acquittal. *O'Laughlin*, 568 F.3d at 301 (citation omitted). "This is so because . . . where an equal or nearly equal theory of guilt and a theory of innocence is supported by the evidence viewed in the light most favorable to the prosecution, a reasonable jury *must necessarily entertain* a reasonable doubt." *Id.* (citation omitted) (emphasis in original).

Here, for all of the reasons set forth below, the defense respectfully contends that it is only by impermissibly "piling inference upon inference" that the evidence could support a finding of guilt beyond a reasonable doubt. *Ingram*, 360 U.S. at 680; *see also United States v. Burgos*, 703 F.3d 1, 15 (1st Cir. 2012) ("We find that in evaluating the evidence as a whole, . . . we must stack inference upon inference in such a way as to make the conclusion that [the defendant] had knowledge of . . . [the alleged co-conspirator's] drug distribution too speculative to sustain [the defendant's] conviction."); *United States v. Perez-Melendez*, 599 F.3d 31, 45 (1st Cir. 2010) ("Any conclusion by the jury . . . specifically imputing to appellants knowledge of . . . contents of the pallets, was the product of pure speculation. This is particularly true when one considers that the burden is proof *beyond a reasonable doubt*." (emphasis in original)).

## II. Extortion Under Color of Official Right

### A. Insufficient evidence of corrupt *quid pro quo* bribery agreement

In order to convict Mr. Tompkins of extortion under color of official right, the government was required to prove that he and Mr. Perullo entered into a *quid pro quo* agreement for Mr. Tompkins to receive an equity interest in Ascend and/or a subsequent refund of his investment in exchange for one or more specific official acts. *See United States v. DeQuattro*,

118 F.4th 424, 444; (1st Cir. 2024); *United States v. Correia*, 55 F.4th 12, 29 (1st Cir. 2022); *United States v. Sun-Diamond Growers of Calif.*, 526 U.S. 398, 404-05 (1999); *United States v. Fernandez*, 722 F.3d 1, 19 (1st Cir. 2013). The government's case-in-chief lacked any direct evidence whatsoever to prove a *quid pro quo* agreement between Mr. Tompkins and Mr. Perullo. There was no document reflecting such an agreement introduced into evidence, and no party (even Mr. Perullo, who testified pursuant to a grant of immunity) claimed to have knowledge of such an agreement having been made. It is only by impermissibly "piling inference upon inference" that the evidence in this case could conceivably support a finding of *quid pro quo* bribery beyond a reasonable doubt. *Ingram*, 360 U.S. at 680.

As the Supreme Court has recently explained in the context of the federal programs bribery statute, 18 U.S.C. § 666, federal law:

> distinguish[es] between two kinds of payments to public officials—bribes and gratuities. As a general matter, bribes are payments made or agreed to *before* an official act in order to influence the official with respect to that future official act. American law generally treats bribes as inherently corrupt and unlawful. But the law's treatment of gratuities is more nuanced. Gratuities are typically payments made to an official *after* an official act as a token of appreciation. . . . ***[G]ratuities after the official act are not the same as bribes before the official act***. After all, unlike gratuities, bribes can corrupt the official act—meaning that the official takes the act for private gain, not for the public good.

*Snyder*, 603 U.S. at 5-6 (emphasis added).

The First Circuit, before *Snyder*, had held that extortion under color of official right requires "a quid pro quo," meaning "the giving of something of value -- the quid -- in exchange for influence over some official conduct of the recipient -- the quo." *DeQuattro*, 118 F.4th at 444; *see also supra* page 6 (citing cases). This is a hallmark of bribery. *See Fernandez*, 722

F.3d at 19 ("[F]or bribery there must be a *quid pro quo*—a specific intent to give or receive something of value in exchange for an official act. An illegal gratuity, on the other hand, may constitute merely a reward for some future act that the public official will take (and may already have determined to take), *or for a past act that he has already taken*." (quoting *Sun-Diamond*, 526 U.S. at 404-05). The Supreme Court has also described this prong of Hobbs Act extortion as "the rough equivalent of what we would . . . describe as 'taking a bribe.'" *Evans*, 504 U.S. at 260 (1992). As the Supreme Court noted in *Snyder*, "[t]he Government identifie[d] no . . . provision in the U. S. Code that prohibits bribes and gratuities in the same provision." 603 U.S. at 13.

*Snyder* was decided in a manner consistent with First Circuit § 1951 color of right law, holding that the federal programs bribery statute applies only to bribes, not gratuities. *See id.* at 10. The defense respectfully contends that the same is true of the Hobbs Act's prohibition on extortion under color of official right. The government, notably, has not contended otherwise in its pre-trial filings in this case. Several of the considerations that led the *Snyder* Court to hold that the federal programs bribery statute does not include gratuities are equally applicable to the analysis under the Hobbs Act. First, the "statutory punishments" suggest that § 1951 does not extend to gratuities. 603 U.S. at 13. "[A]ccepting an illegal gratuity as a federal official is punishable by only up to 2 years." *Id.* Accordingly, the Hobbs Act, which carries a 20-year maximum sentence, should not be construed to apply to that same conduct. Second, this result is supported by federalism concerns. "The carefully calibrated policy decisions that the States and local governments have made about gratuities would be gutted" if the Hobbs Act were read to encompass all such conduct. *Snyder*, 603 U.S. at 14. Third, a broad reading of § 1951 would

violate principles of fair notice, "creat[ing] traps for unwary state and local officials." *Snyder*, 603 U.S. at 15. "It is unfathomable that Congress would authorize a [20]-year criminal sentence for gifts to 19 million state and local officials without any coherent federal guidance (or any federal guidance at all) about how an official can distinguish the innocuous from the criminal." *Id.* at 17.

Here, as the government argued to the jury in opening statements, the pertinent facts underlying the criminal charges "start in or about 2020," more specifically November 2020 when Mr. Tompkins received an interest in Mr. Perullo's company in exchange for a $50,000 payment. Aug. 25, 2026 Morning Tr. 4. At that time, the SCSD had already agreed, more than two years ago, to permit Ascend to hire inmates graduating from the SCSD's CGI program. According to Mr. Perullo, Ms. Cabral had "set . . . up" the agreement between Ascend and the SCSD "in June 2018." Aug. 28, 2026 Afternoon Tr. 12; *see also* Exhibit 349 (June 9, 2018, Boston Globe article). A letter drafted by Ms. Cabral was affixed with Mr. Tompkins's signature stamp in September 2019 memorializing the agreement, and that letter was submitted to the CCC. *See* Exhibit 157. Ascend received a provisional retail license for its Friend Street location on January 9, 2020. Aug. 28, 2026 Afternoon Tr. 14.

Mr. Tompkins did not even learn of Ascend's planned IPO until after all of the foregoing events had occurred, in "late summer" or "early fall" of 2020. Aug. 28, 2026 Afternoon Tr. 19. In the initial conversations, Mr. Tompkins merely stated to Mr. Perullo, in sum and substance, that he "wanted to get in on the IPO" and "wanted to be able to make some cannabis money." Aug. 28, 2026 Afternoon Tr. 19. At some unspecified point, Mr. Tompkins made "added statements" along the lines of, "I helped you get that spot on Friend Street and you wouldn't be

this big company without me." Aug. 28, 2026 Afternoon Tr. 20.

Even taking this testimony of the government's cooperating witness at face value, this is a quintessential gratuity, legally insufficient to prove *quid pro quo* bribery beyond a reasonable doubt. It was, at worst, a request for a "reward . . . *for a past act that [Mr. Tompkins had] already taken*." *Fernandez*, 722 F.3d at 19 (citation omitted). While Mr. Perullo claims to have been "worried about" the SCSD withdrawing its permission for Ascend to participate in the CGI program, there is no legally sufficient nexus between that claimed fear and any action by Mr. Tompkins. To permit a cooperating witness's sheer speculation to transform a clear gratuity into Hobbs Act extortion punishable by 20 years imprisonment would be to all but demolish the dividing line between gratuity offenses and bribery that the Supreme Court recently emphasized in *Snyder*.

To permit a conviction on these facts would be to leave public officials "to guess at where the 'forbidden zone of conduct' might end." *Brissette*, 2020 WL 718294, at *31. A jury should not be entitled to simply speculate that the fact of an existing relationship between the defendant public official's agency and an alleged bribe payor, coupled with the provision of items of value to the public official during the course of that relationship, evinces a *quid pro quo* bribery agreement. There was no trial evidence that Mr. Tompkins or anyone at the SCSD contemplated terminating that relationship at any time, nor is there any evident reason why the SCSD or Mr. Tompkins would terminate a relationship that he had reached with Mr. Cabral for Ascend to participate in a program that had dozens of other similar partners. *See* Exhibit 5 ("CGI trained and prepared candidates for employment and regularly works with employers who are willing to hire them."). The foregoing is simply too thin a read to support a federal extortion

conviction, subjecting the public official to up to 20 years' imprisonment. *Cf. Brissette*, 2020 WL 718294, at *31 (rejecting government position that "would allow a jury to find that a public official intended to exploit a permit applicant's fears, based solely on the fact that the official met in his office with the applicant in the final days of the permitting process").

*DeQuattro* is readily distinguishable. There, the First Circuit found sufficient evidence for the jury to convict a tribal chairman of extortion under color of official right predicated on the allegation that the defendant performed or agreed to perform "specific official acts to 'protect'" a "casino contract" with an architecture firm "from termination." 118 F.4th at 444. The defendant had received "multiple monetary checks ranging from $4,000 - $10,000," a Bowflex machine, and a "Seaport Boston Hotel stay" from representatives of the firm, all of which "were for [the defendant's] personal use." *Id.* at 444-45. Beyond simply receiving these items, the defendant "requested multiple specific things of value . . . and acted like he was entitled to them . . . ." *Id.* at 445. Additionally, the defendant "took steps to conceal the monetary payments . . . ." *Id.* All of this is a far cry from Mr. Tompkins's receipt, for a fair-market-value payment of $50,000, of an equity interest in Mr. Perullo's company. Moreover, there was evidence in *DeQuattro* that the casino contract "provided a large portion of" the architecture firm's revenue. *Id.* at 446. Here, by contrast, the evidence showed that the importance of Ascend's participation in the CGI program was negligible at best to the company. *See infra*.

B. Insufficient evidence that Mr. Tompkins performed or agreed to perform any cognizable official act(s)

The Supreme Court has held that the federal bribery statute's reference to an "official act," *see* 18 U.S.C. § 201, requires that the official in question "make a decision or take an action

on [a] 'question, matter, cause, suit, proceeding or controversy,' or agree to do so." *McDonnell*, 579 U.S. at 574. The matter at issue "must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee," which must also "be something specific and focused that is 'pending' or 'may by law be brought' before a public official." *Id.* "'Pending' and 'may by law be brought' suggest something that is relatively circumscribed—the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete. In particular, 'may *by law* be brought' conveys something within the specific duties of an official's position—the function conferred by the authority of his office." *Id.* at 570. Not every "favorable action or inaction" by an official will suffice. *See* Dkt. 1 at ¶ 12; *Woodward v. United States*, 905 F.3d 40, 45 (1st Cir. 2018) (discussing Second Circuit opinion holding that definition of official act to include "any action taken or to be taken under color of official authority" did not comport with *McDonnell* (citing *United States v. Silver*, 864 F.3d 102 (2d Cir. 2017)). "[A] typical meeting, telephone call, or event arranged by an official," for example, is not an official act. *McDonnell*, 579 U.S. at 567-68.

The government concedes that the "official act" requirement applies to the Hobbs Act. *See* Dkt. 107 (government instruction requests) at 25-26; *McDonnell*, 579 U.S. at 580 (applying official act requirement where "the parties defined . . . Hobbs Act extortion with reference to § 201 of the federal bribery statute").

1. *Insufficient evidence that Mr. Tompkins conveyed agreement to Mr. Perullo to take any official act on a specific matter or question*

*McDonnell* "requires identification of a particular *question or matter* to be influenced" at the time of payment. *United States v. Silver*, 948 F.3d 538, 552 (2d Cir. 2020) (emphasis in

original); *see also United States v. De Moya*, No. 24-3013, 2026 WL 1955627, at *4 (D.C. Cir. July 7, 2026) ("[A] bribery conviction needs to rest on a connection between the intent to give or receive a thing of value and a specific official act" (citation omitted)); *Sun-Diamond*, 526 U.S. at 406 ("The insistence upon an 'official act,' carefully defined, seems pregnant with the requirement that some particular official act be identified and proved."); *United States v. Hills*, 27 F.4th 1155, 1179 (6th Cir. 2022) ("[T]he official must make a decision or take action, or promise to do so, on the particular question or matter *at the time* he receives payment or other things of value."). The question or matter must be "focused and concrete." *Silver*, 948 F.3d at 553 (quoting *McDonnell*, 579 U.S. at 570-71). Here, the government introduced no evidence that Mr. Tompkins either agreed or conveyed an agreement to take an official action on any specific question or matter. Instead, the evidence merely showed that he received an equity interest in Mr. Perullo's company (and a subsequent refund of his investment) during the same time period in which Ascend (like many other employers) was permitted to participate in the CGI program, and that Mr. Tompkins reminded Mr. Perullo of his help in the prior licensure process. Mr. Tompkins's alleged failure to take some negative action regarding Ascend's relationship with the SCSD is not sufficiently specific to satisfy the foregoing caselaw.

2. *Ministerial action of signing letter memorializing pre-existing permission for Ascend to participate in CGI program is insufficient*

A purely ministerial action cannot constitute an "official act" sufficient to support conviction. *See Woodward*, 905 F.3d at 48 (holding that legislator's "carrying" bills was not "merely ministerial in nature" and could therefore be a cognizable official act (citation omitted)). To hold that the mere failure to terminate an employer's ability to participate in a widely available program, absent evidence suggesting any likelihood of or basis for such termination,

constitutes an "official act" under *McDonnell* would be to trivialize that requirement, one of the very purposes of which was to avoid a construction of the Hobbs Act "that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of good government for local and state officials." 579 U.S. at 577 (citation omitted). Certainly, the alleged conduct at issue here is far afield from paradigmatic examples of official acts, such as legislative votes and procurement decisions. *See, e.g.*, *United States v. Woodward*, No. 17-CV-12036, 2017 WL 4684000, at *6 (D. Mass. Oct. 18, 2017) (Woodlock, J.) ("Leading the opposition to a major piece of legislation plainly qualifies as an 'official act' under *McDonnell*. So too would the many instances where [the defendant] 'carried' pro-insurance bills through the legislative process after they left the committee." (citation omitted)); *cf. United States v. Tavares*, 844 F.3d 46, 57 (1st Cir. 2016) (finding official act requirement under state gratuity statute not satisfied where the evidence failed to show that a state representative "subsequently introduced a bill based on either of [the defendant's] proposals or took some official act with respect to such a bill proposed by another legislator").

### 3. *Insufficient evidence that Mr. Tompkins altered an official act*

The Hobbs Act prohibits only *quid pro quo* bribery, not mere gratuities. *See supra* pages 8-10. It follows that, in order to be convicted of accepting a bribe, as opposed to a gratuity, a defendant official must agree "to alter h[is] official acts," *Sawyer*, 85 F.3d at 741, or "to change an official position that he would otherwise have taken or to take official actions that he would not have taken but for the payment." *United States v. Urciuoli*, 613 F.3d 11, 15 (1st Cir. 2010); *see also United States v. Tavares*, 844 F.3d 46, 56 (1st Cir. 2016) (citing, in the context of state gratuity statute, lack of evidence that official "change[d] his voting pattern" (citation omitted)).

*But see United States v. McDonough*, 727 F.3d 143, 160 (1st Cir. 2013). Here, there was no evidence whatsoever that Mr. Tompkins, or any other SCSD personnel for that matter, was at any time considering extending or terminating Ascend's ability to participate in the CGI program. Indeed, blocking reputable employers from participation in the program would undermine its very purpose, to which the evidence established Mr. Tompkins was earnestly committed. The evidence was, therefore, insufficient to prove an intent to impermissibly influence an official act.

C. Insufficient evidence that Mr. Tompkins received benefits under color of his office

Mr. Tompkins alternatively and independently preserves the argument, discussed favorably by two current and one former Supreme Court Justices, that *Evans* "erred in equating common-law extortion with taking a bribe." *Ocasio v. United States*, 578 U.S. 282, 302 (2016) (Thomas, J., dissenting); *see also id.* at 300 (Breyer, J., concurring) ("agree[ing] with the sentiment expressed in the dissenting opinion of" Justice Thomas that *Evans* "may well have been wrongly decided," but concluding that the Court was nonetheless bound by *Evans*); *Silver v. United States*, 141 S. Ct. 656, 657 (2021) (Gorsuch, J., and Thomas, J., dissenting) (opining that Justices "would have granted this case to reconsider *Evans* in light of the[] thoughtful criticisms" by Justices Thomas and Breyer).

As Justice Thomas observed in dissent, the *Evans* majority's reading of the Hobbs Act as essentially a prohibition on bribery "bears scant resemblance to the common-law crime Congress presumably codified in 1946." *Evans*, 504 U.S. at 280 (Thomas, J., dissenting). At common law, "[t]he 'under color of office' element of extortion . . . had a definite and well-established meaning." *Id.* at 279. "[I]t was essential that the money or property be obtained under color of

office, *that is, under the pretense that the officer was entitled thereto by virtue of his office*." *Id.* (citation omitted); *see also id.* at 281 (citing *Collier v. State*, 55 Ala. 125 (1877), which held it was not extortion for a local prosecutor to provide legal advice to a criminal suspect for a fee because, "[t]hough the defendant may have been guilty of official infidelity, the wrong was to the State only, and no wrong was done the person paying the money"); *id.* at 282 n.3 (citing other cases); Kate Stith, *No Entrenchment: Thomas on the Hobbs Act, the Occasion Mess, and the Vagueness Doctrine*, 127 Yale L.J. Forum 233, 234 (2017) (describing Justice Thomas's reading of the common law as requiring that "[t]he official . . . dupe[d] the payor into thinking that the official was *due* the payment"). The trial evidence here does not support any reasonable inference that Mr. Perullo believed Mr. Tompkins ***was entitled*** to the equity interest or subsequent refund ***by virtue of his office***.

"An official who solicits or takes a bribe does *not* do so 'under color of office'; *i.e.*, under any pretense of official entitlement." *Evans*, 504 U.S. at 283 (Thomas, J., dissenting). Rather, "the payor *knows* the recipient official ***is not*** entitled to the payment," and "he, as well as the official, may be punished for the offense." *Id.* (emphasis added). Accordingly, the *Evans* majority's construction of extortion by color of official right as equivalent to *quid pro quo* bribery was an unjustified expansion of the common law offense that Congress sought to codify in § 1951. *See Evans*, 504 U.S. at 259 ("[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed." (quoting *Morissette v. United States*, 342 U.S. 246, 263 (1952)).

There are additional reasons to doubt *Evans*'s reading of the Hobbs Act as a bribery prohibition. For one thing, "the maximum sentence for conviction of Hobbs Act extortion has always been *twenty years* in prison, whereas the four principal federal bribery statutes at the time the Hobbs Act was enacted had a maximum penalty of *three* years in prison (plus disqualification from holding office)." Smith, 127 Yale L.J. Forum at 236.[2] It strains credulity to suggest that Congress intended the Hobbs Act to *sub silentio* effect a more than six-fold increase in the maximum sentence for bribery. Additionally, "[b]eginning with its first bribery law in 1789, Congress had clearly and consistently limited federal criminalization of bribery only to the bribing of federal officials. There is nothing in the legislative history of the Hobbs Act that suggests that in 1946 . . . Congress thought it was making all state and local bribery a federal crime." *Id.* at 235-36. Rather, "[t]he words of the Hobbs Act prohibition were far more limited, setting federal prosecutors loose only on those non-federal officials who obtained payment under *the pretense of official right*." *Id.* at 236.

The result of the *Evans* Court's departure from statutory text and common law is an unconstitutionally vague criminal prohibition, exposing public officials to up to 20 years' imprisonment without fair notice as to the conduct proscribed. Indeed, the mere fact that Supreme Court Justices have sharply disagreed regarding the scope of the common law definition of extortion suggests that a vagueness challenge to the Hobbs Act "has force." *Skilling*, 561 U.S. at 405 (recognizing strength of vagueness argument based on "considerable disarray" in judicial decisions that honest-services fraud statue intended to incorporate). If the

[2] When "federal bribery laws were consolidated in 1962 into a new provision," 18 U.S.C. § 201, "the maximum prison sentence was increased to (and remains) fifteen years in prison . . . ." *Id.* at 235 n.13.

common law extortion precedents have a "solid core" for which application of the Hobbs Act may be salvaged, *id.* at 407, it is in the category of cases identified by Justice Thomas, and not applicable here, where a public official receives payment under a claim of entitlement by virtue of his office. "Reading the statute," as the *Evans* majority did, "to proscribe a wider range of offensive conduct, . . . raise[s] the due process concerns underlying the vagueness doctrine." *Id.* at 408. Afterall, "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Id.* at 410 (citation omitted).

**III. Extortion by Fear of Economic Loss**

While the Hobbs Act may apply to transactions wrongfully induced by fear of economic loss, there are significant limitations upon this general principle, which preclude conviction here.

A. Insufficient evidence of *quid pro quo* agreement

As an initial matter, the Honorable Judge Sorokin has held that, where a prosecution "hinge[s] solely on the defendant['s] status as [a] public official[] and ar[i]se[s] exclusively from actions [he] undertook in that capacity, the decisions of the Supreme Court require[] the government to allege and prove the existence of a quid pro quo" in order to sustain a Hobbs Act conviction under any theory. *Brissette*, 2020 WL 718294, at *1. Where, as here, "the government's theory supporting the threats and wrongfulness elements of extortion . . . rests solely on actions undertaken by the defendant[] using [his] authority as [a] public official[], . . . all of the same considerations that caused the Supreme Court to reject 'expansive interpretation[s]' of federal criminal law proposed by the government in the 'color of official right' context apply with equal force . . . ." *Id.* at *12 (citing *McDonnell*, 579 U.S. at 573). For all of the reasons set forth *supra*, the evidence here fails to establish *quid pro quo* bribery as a

matter of law.

B. Insufficient evidence that Mr. Perullo reasonably feared economic loss

Additionally, in order to support conviction under the Hobbs Act, "[t]he loss feared must be a particular economic loss, not merely the loss of a potential benefit." *United States v. Falcon-Nieves*, 79 F.4th 116, 140 (1st Cir. 2023) (citation omitted). And the alleged victim's fear of such economic loss must be reasonable. *See, e.g.*, *United States v. Cruz-Arroyo*, 461 F.3d 69, 74 (1st Cir. 2006). Here, the government has proceeded exclusively on the theory that Mr. Perullo feared Mr. Tompkins would jeopardize Ascend's ability to participate in the CGI program. Loss of the SCSD's permission to participate in that program does not, however, constitute economic loss. And the evidence undermines the allegation that such a hypothetical development would have jeopardized Ascend's licensure in any respect.

Applicable Cannabis Control Commission ("CCC") standards for satisfying the positive impact plan ("PIP") requirement, the only licensure requirement relied upon by the government here, do not impose any particular demands that would invariably require the SCSD's support. To the contrary, the CCC asked applicants to "establish" their own "specific goals that will make a positive impact on one or more of the . . . five groups" of disadvantaged persons. Exhibit 241. Applicants were expressly "encourage[d] . . . to develop [their] own goals, especially by taking and considering input from the disproportionately harmed people and/or communities . . . ." *Id.* Similarly, applicants "should develop and individualize [their] own programs to reach [their] goals." *Id.*

The objective record demonstrates that Ascend never depended upon the SCSD partnership to satisfy its PIP requirement. Ms. Defoe testified that there was "no rigid formula":

an applicant needed "a goal, program and metrics," could satisfy those requirements "in a million different ways," and could change programs or partnerships when one was not working. Aug. 27, 2026 Morning Tr. 19. She further confirmed that a PIP needed to address "only one goal" and that the alternative programs identified in the CCC's guidance – including hiring, assistance to nonprofits, and donations – could satisfy the requirement. *Id*. at 23-24; Exhibit. 241 at 2-4. The CCC's subsequent guidance likewise expressly recognized record-sealing and expungement services, job-creation programs, and funding charitable efforts as acceptable PIP programs. *See* Exhibit. 161 at 4.

Long before any of the alleged conversations between Tompkins and Perullo, Ascend's 2019 application contained two separate PIP goals and programs, either of which was independent of the other: contributing a percentage of net revenue to the WeGrow Foundation and hiring six individuals referred by SCSD. Exhibit 1 at 2. The CCC determined that Ascend's submitted plans were "substantially compliant," found that Ascend had "demonstrated compliance," and recommended provisional licensure. *Id*. at 2–3. The CCC then issued the Friend Street provisional license on January 9, 2020 – months before the alleged summer 2020 conversations in which Tompkins purportedly stated, "I helped you get that spot on Friend Street and you wouldn't be this big company without me." Exhibit 8 at 1; Aug. 28, 2026 Afternoon Tr. 19-20. Thus, by the time of the alleged statement, Ascend already possessed the Friend Street provisional license and already had a separate, CCC-approved WeGrow component that did not depend upon SCSD.

By the time Tompkins made his $50,000 investment on November 13, 2020, Ascend had still more independent means of satisfying the PIP requirement. Exhibit 182 at 1. Its renewal

application continued WeGrow as a separate PIP goal, increased the proposed contribution to 0.5% of net revenue, and reported that WeGrow had appointed its initial directors and was independently operated. Exhibit 10 at 17. AWH had also launched its Last Prisoner Project partnership in July 2020 with an initial commitment to raise $250,000 through customer contributions and company matching, and Ascend had developed a separate program of CORI-expungement and record-sealing clinics, the first of which had been postponed only because of COVID-19. Exhibit 9 at 1-3. Each was independently the type of program that the CCC's guidance recognized as capable of satisfying a PIP when accompanied by an appropriate goal and metrics. Exhibit 161 at 3-4; Exhibit 241 at 2-4. Indeed, the LPP program was substantial and fulfilled its initial commitment five months early. Exhibit 307 at 1. Accordingly, neither at the time of the alleged statement nor at the time of Mr. Tompkins's investment did the possible loss of the SCSD partnership present an objectively reasonable threat to Ascend's license. Ascend already had multiple independent, recognized avenues for PIP compliance, and the CCC required only one compliant goal supported by a program and metrics, not the continued participation of SCSD.

The trial testimony similarly indisputably established that loss of any single PIP opportunity did not pose any risk of economic harm to Ascend. *See, e.g.*, Aug. 27, 2026 Morning Tr. 82 (Drummond testifying, "no individual program necessarily presents a risk, it's your effort along the program"); *id.* at 74 (Drummond agreeing that "Ascend never relied only on the" SCSD and "at all times had other goals, other programs that they informed the CCC about"); *id.* at 79-80 (Drummond agreeing that there was "[n]o risk to [Ascend's] license because you've chosen one program over another"); *id.* at 18-19 (DeFoe agreeing "you can

satisfy" the PIP requirement "in a million different ways"). This evidence precludes any rational jury finding that Mr. Perullo harbored a reasonable fear of economic loss.

Independently, the evidence fails to support any reasonable belief by Mr. Perullo that Mr. Tompkins would terminate the SCSD's relationship with Ascend. *See, e.g.*, *Capo*, 817 F.2d at 951 (requiring evidence "that the victim reasonably believed . . . that the defendant would exploit [his] power to the victim's detriment"). The trial record contains not a single contemporaneous reference (by Mr. Tompkins or anyone else) to the possible termination of the relationship. Moreover, Mr. Perullo and his business partner Ms. Cabral were both well-aware of Mr. Tompkins's longstanding commitment to the CGI program, decreasing the reasonableness of any belief that he would corrupt the program and his partnership with Ms. Cabral by making Ascend's participation contingent upon personal favors. Mr. Perullo was similarly aware of the close relationship between Mr. Tompkins and Ms. Cabral, his friend and mentor, again undermining any reasonable suggestion that Mr. Perullo reasonably feared that Mr. Tompkins would harm Ascend, the company for which his friend of more than four decades served as CEO.

C. <u>Alternatively, the evidence showed that Mr. Tompkins was entitled to a refund of his investment as matter of contractual rights</u>.

Mr. Tompkins did not knowingly and intentionally obtain any property from Frank Perullo that he knew he was not legally entitled to receive. Rather, he paid $50,000 for a written equity interest in Cananovus that purportedly represented 28,833 AWH shares, at an "Initial Cost" of "$2.40" per share. Ex. 182 at 1. That price was selected by Mr. Perullo and was consistent with Ascend's prior financing rounds. *See* Aug. 28, 2026 Afternoon Tr. 31:2-6 (Mr. Perullo testified that it was "a price that was consistent with the pricing of the previous rounds."). Nor was Mr. Tompkins given a preferential price or terms. Daniel Passcantilli's earlier

agreement also specified the same price and the same terms Ex. 181 at 1, and Mr. Perullo expressly confirmed the equivalence: "Q. … this is the same price that Mr. Passcantilli got as the same price that Mr. Tompkins got? A. Yes." Aug. 28, 2026 Afternoon Tr. 54:15-17.

When Mr. Tompkins sought the return of his $50,000 in late 2021, the investment was purportedly worth substantially more than the refund he requested. *See* Exhibit 298. The 14,416 post-split shares that Mr. Tompkins was purportedly entitled to were worth $95,289.76 on December 31, 2021. Ex. 298 at 3. Mr. Neville likewise testified that the six-month IPO lockup expired in November 2021, after which the shares would have become tradeable. *See* Aug. 28, 2026 Morning Tr. 51:3-17.

AWH's Operating Agreement provided that "[a]ny Transfer or attempted Transfer of any Units or Unit Equivalents in violation of this Agreement shall be null and void," and that the purported transferee "shall not be treated … as the owner." Ex. 180 at 52. When asked whether Mr. Perullo's failure to comply with the agreement's requirements would render the share transfers "null and void," Mr. Neville answered that, "according to this clause, I believe that would be correct." Aug. 28, 2026 Morning Tr. 52:8-15. In short, Mr. Tompkins was entitled to a refund of his $50,000 according to the terms of AWH's Operating Agreement which Mr. Perullo was bound to follow. Likewise, the Cananovus purchase agreement stated that Cananovus itself "agreed to sell a percentage of ownership" and "hereby transfers ownership to the buyer," but expressly made that transaction "subject to the LLC agreement" and provided that, in the event of any inconsistency, the LLC Agreement would control. Ex. 182 at 1. The executed Cananovus Operating Agreement, in turn, provided that an additional person could become a member and receive an ownership interest "only if approved by and on terms determined by an unanimous

written agreement signed by all of the existing Members." Ex. 178 at 4. It separately required "the written consent of all Members" before a person could "acquire Membership Interests directly from the Company." *Id.* at 9. No written consent was ever entered into the record. Thus, Mr. Perullo could not unilaterally confer a valid Cananovus membership interest merely by signing the purchase agreement. Unless the required written approval of every existing member was obtained, the purported transfer was contractually defective, giving Mr. Tompkins a legitimate basis to seek rescission and the return of the money he had paid. The evidence therefore shows a paid, market-priced investment followed by a request to recover only the amount invested – at a time when the investment was purportedly worth considerably more and its contractual validity was legitimately in doubt – not a knowing demand for property to which Mr. Tompkins understood he had no lawful entitlement.

D. Insufficient evidence that Mr. Tompkins acted wrongfully

The Hobbs Act independently requires that the defendant's use of fear of economic loss be "wrongful." To satisfy this requirement, the government must prove that Mr. Tompkins used "wrongful means" to achieve a "wrongful purpose." *Brissette*, 2020 WL 718294, at *13; *see also, e.g.*, *United States v. Burhoe*, 871 F.3d 1, 9 (1st Cir. 2017) ("Setting aside the issue of wrongful ends . . . , there is another principle in play—namely, that the means used to obtain the end must also be wrongful." (citation omitted)). These are important limitations because "fear of economic harm is a part of many legitimate business transactions," as well as "a necessary consequence of many legitimate exercises of official authority." *Brissette*, 919 F.3d at 685 (citation omitted).

Here, the evidence failed to prove that there was anything "wrongful" about the means by

which Mr. Tompkins's received an interest in Cananovus, for which he paid fair market value. There is no suggestion that, for example, that Mr. Perullo had any "pre-existing statutory right to be free" of Mr. Tompkins's request. *Brissette*, 2020 WL 718294, at *17 (quoting *George Lussier Enters., Inc. v. Subaru of N.E., Inc.*, 393 F.3d 36, 50 (1st Cir. 2004)). The same is true of Mr. Tompkins's request for a refund of his investment, especially where, at the time the issue was first raised, the value of shares he purportedly owned exceeded the $50,000 he requested. Nor did the evidence establish a wrongful purpose, meaning "an illegitimate or illegal objective." *Brissette*, 2020 WL 718294, at *27 (citation omitted). Mr. Tompkins merely sought the ability to invest in Ascend, as many others did, and later to receive his money back in order to finance a campaign for reelection.

E. <u>Insufficient evidence that Mr. Tompkins intentionally used Mr. Perullo's fear</u>

Finally, in order to convict Mr. Tompkins under this theory of extortion, the government was required to prove that Mr. Tompkins intentionally used Mr. Perullo's fear to induce his consent. *See Brissette*, 2020 WL 718294, at *11. There was no evidence here "from which the jury could" reasonably infer that Mr. Tompkins "intended to convey a threat of economic harm" or that Mr. Tompkins "knew [Mr. Perullo] feared such harm" related to Ascend's CCC licensure. *Id.* at *27. To the contrary, as set forth *supra*, the evidence established that Ascend's participation in the CGI program was inconsequential to its continued licensure. Certainly, "[t]here was no evidence of menacing conduct" by Mr. Tompkins at any time. *Id.* at *29. Accordingly, Mr. Tompkins did not intentionally use extortionate means and cannot be convicted under this theory.

## IV. Insufficient Evidence of *Mens Rea*

In order to obtain a conviction under either theory of extortion charged here, namely extortion under color of official right and extortion by fear of economic loss, the government was required to prove beyond a reasonable doubt that Mr. Tompkins knew he was not entitled to the property he received from Mr. Perullo. *See United States v. Didonna*, 866 F.3d 40, 47 (1st Cir. 2017) ("[T]he government must prove, by direct or circumstantial evidence, that the defendant knew that he was not legally entitled to the property that he [either] received or attempted to receive." (citation omitted)); Dkt. 107 (government's proposed instruction that, "[t]o prove extortion under color of official right, the government must show that the defendant obtained property to which he was not entitled and knew at the time that he was obtaining it in return for official acts").

Here, the evidence was entirely consistent with Mr. Tompkins's belief that he was legally entitled to receive an interest in Cananovus for his payment of $50,000, which the evidence showed represented fair market value. Additionally, at the time Mr. Tompkins first requested a refund of his investment, the value of the shares he purportedly owned an interest in was greater than the $50,000 he requested. Accordingly, no reasonable juror could find beyond a reasonable doubt that Mr. Tompkins knew at the time that he was not entitled to the equity interest or the subsequent refund. This fundamental defect, in itself, is fatal to the prosecution's case under either theory of extortion.

The government contends that Mr. Tompkins was not entitled to receive an equity interest in Ascend prior to the company's IPO. But it has offered no evidence of any prohibition on Mr. Tompkins receiving an interest ***in Cananovus*** for a fair-market-value payment. At the

very least, Mr. Tompkins could have reasonably believed that he was entitled to such an ownership interest after paying fair market value and with Mr. Perullo's consent.

## V. Conclusion

For the foregoing reasons, Mr. Tompkins respectfully requests that this Honorable Court enter a judgment of acquittal on both counts pending against him.

Respectfully Submitted,
STEVEN TOMPKINS
By His Attorney,

**/s/ Martin G. Weinberg**
Martin G. Weinberg, Esq.
Mass. Bar No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

**/s/ Maksim Nemtsev**
Maksim Nemtsev, Esq.
Mass. Bar No. 690826
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
max@mnpc.law

Dated: September 1, 2026

## CERTIFICATE OF SERVICE

I, Martin G. Weinberg, hereby certify that on this date, September 1, 2026, a copy of the foregoing document has been served via Electronic Court Filing system on all registered participants.

**/s/ Martin G. Weinberg**
Martin G. Weinberg, Esq.